Daniel M. Hattis (SBN 232141)
Paul Karl Lukacs (SBN 197007)
HATTIS & LUKACS
400 108th Ave NE, Ste 500
Bellevue, WA 98004
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS MALONE, CHRIS AYERS, JAMES BACKUS, DAVID EATON, STEVEN GRAVEL, and TOD WEITZEL, for Themselves, as Private Attorneys General, and/or On Behalf Of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WESTERN DIGITAL CORPORATION,<br><br>Defendant. | Case No. 5:20-cv-03584-NC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**(1) VIOLATION OF CAL. CIVIL CODE § 1750**<br><br>**(2) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17500**<br><br>**(3) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17200**<br><br>**(4) IN THE ALTERNATIVE, STATE CONSUMER PROTECTION LAW SUBCLASSES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Nicholas Malone, Chris Ayers, James Backus, David Eaton, Steven Gravel, and Tod Weitzel, individually, as private attorneys general, and/or on behalf of all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendant Western Digital Corporation ("WDC," "Western Digital" or "Defendant"):

FIRST AMENDED
CLASS ACTION COMPLAINT                - 1 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

**INTRODUCTION AND SUMMARY**

1.      This case is brought against Western Digital Corporation on behalf of all United States residents who purchased certain hard drives which were branded "WD Red NAS" and were explicitly advertised and represented to be designed for and suitable for use in NAS (Network Attached Storage) devices, but which in fact are not suitable for that intended use and which put customer data at greater risk of data loss or destruction. The hard drives contain inappropriate recording technology called "SMR" (Shingled Magnetic Recording), which by its very nature is detrimental to and incompatible with usage in NAS devices and RAID storage systems. WDC surreptitiously snuck—without any disclosure whatsoever—this cheaper SMR technology into its WD Red NAS hard drives in 2018 in an effort to shave costs while keeping the selling price the same.

2.      This inappropriate SMR technology replaced the more-expensive-to-produce but industry-standard "CMR" (Conventional Magnetic Recording) technology which WDC had previously utilized—for nearly a decade—in these very same "WD Red NAS" branded hard drives. Notably, WDC is the <u>only</u> hard drive manufacturer in the world who has <u>ever</u> used SMR technology in NAS-labeled hard drives; all other manufacturers have solely used CMR technology. In fact, WDC's largest competitor, Seagate Technology, has publicly stated that SMR is <u>incompatible</u> with NAS and RAID.

3.      WDC has been sneaking SMR technology into its NAS hard drives since 2018. WDC even designed these SMR drives in a way to hide the existence of the SMR technology, through drive-managed tricks which cause the drives to be recognized by NAS and RAID systems as if they are traditional (but unusually poor-performing) CMR drives.

4.      Meanwhile, customers who purchased and utilized these hard drives for their advertised and intended purpose—in NAS devices and in RAID arrays—experienced, at best, terrible performance of between 70% to 1,000% slower write speed and read/write latency compared to CMR drives, and also increased risk of data loss during RAID rebuilds due to greatly increased rebuild times. At worst, customers experienced hard drives that froze up and performed so badly that they were detected by the NAS or RAID array as failed hardware and

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 2 -                    HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

dropped from the disk array, causing catastrophic data loss. Even adding just one of these inferior SMR hard drives to an existing storage array (which otherwise contains traditional, good-performing CMR hard drives) will poison the entire drive array, causing the entire array to suffer this poor performance and greater risk of data loss.

5.      WDC was able to get away with this fraud until April 2020 because it intentionally hid, and even outright lied about, its use of the SMR technology until it was forced to admit its scheme in response to an exhaustive investigation by a leading storage technology online publication on April 14, 2020. Until then, WDC did not disclose its use of the SMR technology anywhere—including on its product datasheets. Based on information and belief, WDC did not even disclose its use of the SMR technology to its vendor-partners who manufactured the NAS devices for which the hard drives were purportedly designed. Based on information and belief, WDC customer support staff were instructed to refuse to acknowledge to customers that the WD Red NAS drives utilized SMR technology—even when asked—and would blame "user error" for bad performance and problems. In fact, a senior WDC executive as recently as March 30, 2020 outright denied that any WD Red NAS hard drives used SMR technology—before WDC was forced to publicly reverse itself two weeks later.

6.      Since WDC's scheme was brought to light two months ago, two of the leading NAS device manufacturers (specifically, Synology, Inc. and iXsystems) have blacklisted all WD Red drives with SMR technology[1], removing them from their hardware compatibility lists. Those NAS manufacturers now urge their customers not to use the hard drives in their NAS devices because the drives are in fact not appropriate for the hard drives' advertised and intended purpose.

7.      Remarkably, WDC's response, even after getting caught red-handed, has been to claim that using SMR in NAS drives is a good idea and that it has done nothing wrong. In a blog post WDC put out on April 20, 2020 in response to the snowballing fiasco, WDC even attempted to blame its own customers for the problems they were experiencing. WDC accused

---

[1] Specifically, WD Red NAS hard drives with the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX and WD60EFAX.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

its customers of overusing the drives "in system workloads far exceeding their intended uses," suggesting that affected customers somehow should have known to purchase different NAS hard drives (i.e., NAS drives with CMR technology) instead, even though WDC had not previously disclosed what recording technology any of its NAS hard drives had used.

8.      Meanwhile, to this day, WDC continues to falsely advertise that these SMR-technology WD Red NAS hard drives are "**Built for NAS compatibility**," are "**specifically designed for use in NAS systems with up to 8 bays**," are "**purpose-built for NAS**," "**Helps ensure your data is protected … in a NAS or RAID environment**," and are appropriate for "**Small and home office NAS systems in a 24x7 environment**."

9.      WDC knows these representations and advertisements are false or deceptive. WDC knows with certainty that these hard drives should never have been labeled and advertised as "NAS" hard drives. WDC has been told by its own vendor-partners (who have blacklisted these supposedly "Built for NAS compatibility" hard drives) that these hard drives are not compatible with their NAS devices and are not fit for the drives' advertised and intended purpose. WDC knows that thousands of customers have suffered poor performance and/or data loss, and that thousands of customers are now—justifiably—worried that the hard drives are essentially ticking time bombs that risk the destruction of customer data and files at any moment due to increased likelihood of failure, especially during the RAID rebuilding process.

10.     But WDC refuses to make things right. WDC would rather continue defrauding its customers and continue leveraging—and ultimately squandering—its past best-in-class reputation to increase its short-term profits.

11.     As a result of WDC's fraud and deception, thousands of customers nationwide, including the 6 Plaintiffs, who purchased these WD Red NAS hard drives for their advertised and intended use, have been duped and have suffered harm and damages. Ultimately, the hard drives are completely worthless for their intended purpose—and are in fact dangerous to customer data.

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

12.     Plaintiffs Nicholas Malone, Chris Ayers, James Backus, David Eaton, Steven Gravel and Tod Weitzel bring this action individually as deceived Western Digital customers and as private attorneys general seeking an order for public injunctive relief to protect the general public, directing that WDC stop advertising, and to instruct its resellers to stop advertising, any hard drives with SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names).

13.     Plaintiffs also bring this action as representative plaintiffs on behalf of a nationwide class (or in the alternative, on behalf of 6 state subclasses), who purchased WD Red NAS hard drives utilizing SMR technology, seeking, among other things, that Defendant be ordered to disgorge all revenues Defendant has unjustly received from the members of the class. Plaintiffs also seek an order requiring Defendant to: (1) provide notice to every class member that the WD Red NAS hard drive they purchased is not suited for its intended purpose; and (2) either provide a full refund to Plaintiffs and class members for their WD Red NAS hard drives, or provide Plaintiffs and class members with replacement CMR-technology hard drives that are truly suited for use with NAS devices and RAID, at no additional cost.

14.     To be clear: Plaintiffs are herein alleging <u>false advertising</u> claims against WDC. Plaintiffs are not currently alleging design defect or product defect claims (although the facts could certainly support such claims). Plaintiffs, representing a national class, or in the alternative, 6 state subclasses, are confining this First Amended Complaint to WDC's false statements and material omissions made in WDC's advertising and promotion of the WDC Red NAS hard drives containing SMR technology. In sum, WDC advertised these hard drives as being appropriate for NAS or RAID environments when in fact, due to WDC's secret switch from CMR to SMR technology, these drives are not fit for the purpose advertised.

## THE PARTIES

15.     Plaintiff Nicholas Malone is a citizen and resident of Madison, Wisconsin.

16.     Plaintiff Chris Ayers is a citizen and resident of Temple Terrace, Florida.

17.     Plaintiff James Backus is a citizen and resident of Suffolk, Virginia.

18.     Plaintiff David Eaton is a citizen and resident of Kirkwood, Missouri.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

19.     Plaintiff Steven Gravel is a citizen and resident of Delmar, New York.

20.     Plaintiff Tod Weitzel is a citizen and resident of Sunnyvale, California.

21.     Defendant Western Digital Corporation is a Delaware corporation with its principal place of business and/or nerve center located at 5601 Great Oaks Parkway, San Jose, California 95119.

## JURISDICTION AND VENUE

22.     **Subject Matter Jurisdiction**. The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—*i.e.*, Class Action Fairness Act jurisdiction —because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

23.     **Personal Jurisdiction**. This Court has personal jurisdiction over Defendant because: (1) Defendant WDC is headquartered in San Jose, California (which is within the Northern District of California) and is authorized to do business and regularly conducts business in the State of California such that the maintenance of this lawsuit does not offend traditional notions of fair play and substantial justice; and/or (2) Defendant has committed tortious acts within the State of California (as alleged, without limitation, throughout this Complaint).

24.     **Venue**. Venue is proper in the Northern District of California because, pursuant to 28 U.S.C. § 1391(b)(1), this judicial district is a judicial district in which Defendant WDC resides, and pursuant to 28 U.S.C. § 1391(c)(2), for venue purposes WDC shall be deemed to reside in this judicial district because WDC is subject to the court's personal jurisdiction with respect to this civil action.

## COMMON FACTUAL ALLEGATIONS

25.     Western Digital ("WDC") is one of the largest manufacturers of hard drives in the world. Western Digital manufactures two different types of hard drives: traditional large-capacity spinning disk mechanical hard drives, and more modern but smaller-capacity solid-state flash storage drives (often also called hard drives) which have no moving parts. This

FIRST AMENDED
CLASS ACTION COMPLAINT          - 6 -          **HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

lawsuit concerns the traditional large capacity spinning disk mechanical hard drives, and any reference to "hard drives" herein means traditional spinning disk mechanical hard drives.

26.     Hard drives are utilized to store digital data and files for a home or business computer system. Several hundred million hard drives (spinning disk mechanical hard drives) are sold each year to consumers and businesses worldwide. Hard drives utilize spinning magnetic disk technology to hold information inscribed in very tiny tracks, somewhat similar to how a vinyl record holds information read by record players. These hard drives have moving parts, including a mechanical head which reads and writes data to one or more disk platters, which are contained inside a single sealed unit.

27.     In 2012, WDC released its WD Red series NAS hard drives, which were specifically designed for NAS (Network-Attached Storage) systems and for RAID (Redundant Array of Independent Disks) environments. A NAS device is a stand-alone computing device which typically contains multiple individual hard drives that are grouped together to form one large datastore, which is used to store files and share them with other computers or laptops over a network. RAID is a technology, typically utilized in NAS devices, of combining multiple hard drives into a single logical datastore or virtual drive for data redundancy, data security, and performance purposes. NAS devices which contain two or more hard disks typically (and often automatically) format the drives in a RAID format via software or hardware, which builds in redundancy such that one or multiple drives can fail and data will not be lost. NAS devices and storage servers most commonly utilize either a Linux-based ext4 or btrfs storage file system with hardware- or software-based RAID, or a ZFS file system with software-based RAID.[2] NAS devices have become increasingly popular for both home and small business use, as the use of digital data has exploded over the years including digital files, photographs, videos, and databases which have required ever-increasing storage capacity which NAS devices

---

[2] ZFS is a proprietary file system and logical disk volume manager owned by Oracle with robust redundancy and error-correction features. The term "ZFS" is also often used to mean OpenZFS, which is a popular open-source version of ZFS. ZFS is most commonly used in FreeNAS-based NAS devices and storage servers. FreeNAS is an open-source NAS operating system based on Linux and the OpenZFS file system.

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 7 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

(with their grouping of large hard drives) are able to provide along with data redundancy.

28.     Hard drives which are designed and built for NAS and RAID must have certain characteristics. In particular, such hard drives must be able to handle continuous and sustained writes and heavy random writes, which occur often during the RAID rebuilding process (also called "resilvering") when a failed hard drive in a RAID array is replaced with a new drive and the data is redistributed across the replacement drive and the other drives. Continuous and heavy writes also occur when the storage capacity of a RAID array is expanded by adding hard drives, which requires a similar resilvering process where the data is redistributed and spread across all the drives.

29.     Continuous and sustained writes and heavy random writes also occur during RAID "scrubbing," which is a standard and recommended periodic data integrity check where all the data on the hard drive is checked for errors and consistency and automatically corrected. NAS manufacturers generally recommend (and often set their devices to automatically perform) RAID scrubbing at least once a month to maintain system health and to prevent data loss.

30.     Hard drives designed and built for NAS and RAID also are expected to have reliable and fast random-write performance in general, and to be able to handle continuous random writes. NAS units and RAID arrays are often utilized to house databases and database files, iSCSI datastores, software-based virtual machines, large numbers of small files written and read from multiple computers on a network, and backup files, all of which often require heavy random writes to the hard drives.

31.     For nearly a decade, WD Red NAS hard drives have enjoyed a strong reputation as best-in-class for use in NAS devices and RAID storage arrays.

32.     WDC today continues to advertise its WD Red NAS hard drives as "**Built for NAS compatibility**" and "**Designed for RAID environments**."  WDC advertises WD Red NAS hard drives as "**specifically designed for use in NAS systems with up to 8 bays**" and appropriate for "**small and home office NAS systems in a 24x7 environment**."

33.     And until 2018, WDC's advertising rang true, and all of its WD Red NAS hard

drives, which all utilized industry-standard CMR (Conventional Magnetic Recording) technology, did indeed rightfully earn a reputation for reliability and being "purpose-built" and well-suited for NAS and RAID environments.

34.     However, in 2018, WDC secretly swapped out the industry-standard CMR technology in its 2TB, 3TB, 4TB and 6TB capacity WD Red NAS hard drives, and replaced it with inappropriate—and cheaper—hard drive technology called SMR (Shingled Magnetic Recording).

35.     WDC switched the recording technology in these drives to SMR for one reason: to reduce its costs and increase its profits. SMR technology enables WDC to fit 25% more data onto the same-size disk platters, thus significantly reducing its costs to produce the drives. Meanwhile, WDC kept the switch to this inappropriate SMR technology a secret so that it could continue to charge the same price WDC previously charged for its previous generation CMR drives, thereby increasing its profits. WDC intentionally did not disclose its use of SMR technology in the new drives anywhere whatsoever. WDC did not mention the SMR technology in its advertising, in its hard drive documentation, in the hard drive product datasheets, or in the labeling on the hard drive itself.

36.     Unfortunately, this SMR technology is wholly inappropriate for use in NAS and RAID systems—which is the very use that WDC advertises and promotes these WD Red NAS hard drives for. Notably, WDC is the only hard drive manufacturer in the world who has ever used SMR technology in NAS-labeled hard drives; all other manufacturers have solely used CMR technology. In fact, WDC's largest competitor, Seagate Technology, has publicly stated that SMR is incompatible with NAS and RAID.

37.     SMR technology was created, and had previously been utilized, for the limited purpose of creating maximum-capacity archival hard drives. Historically, SMR hard drives had been explicitly promoted for, and utilized as, a cost-effective archiving solution and for cold storage. (Cold storage means long-term storage, where after the drive is filled it is unplugged and stored for safekeeping.) SMR drives had been limited to archival purposes, where the very poor write performance of Shingled Magnetic Recording technology would not be a significant

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 9 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

limitation because archive drives do not require fast or reliable continuous writes.

38.     SMR technology provides for the tracks on a hard disk platter to be layered on top of each other, like roof shingles on a house, to increase platter and storage density. Hard drives that use SMR technology are significantly slower in writing data than CMR hard drives because when an SMR drive writes to an area, the underline region (i.e., below and above the shingle) will need to be read, copied, and re-written, in contrast to a standard CMR drive where the data can be written quickly and discretely anywhere on the drive.

39.     WDC designed these small-capacity SMR drives in a way to <u>hide</u> the existence of the SMR technology, through drive-managed tricks which cause the drives to be recognized by NAS and RAID systems as if they are traditional—but unusually poor performing—CMR drives. WDC utilized the trick of a small CMR disk cache zone to function as a temporary storage space. Data writes are first <u>temporarily stored</u> on this staging disk area (the small CMR cache zone). Then, when the disk is idle (i.e., when there is no writing being made to it), the hard drive rearranges the data in the background, moving the data that was temporarily saved in the CMR cache over to the main SMR part of the drive. This data rearranging and clean-up process is often referred to as the "garbage collection" process.

40.     However, after continuous heavy writes, the CMR cache layer becomes full, and the drive slows down dramatically—it essentially "chokes" and stops the flow of data while it flushes out the CMR cache and tries to catch up writing to the much slower main SMR hard disk. This is especially problematic and dangerous when the hard drive has been set up in a NAS as part of a RAID array. In that case, the choking hard drive can report "timeouts" or loss of connectivity to the NAS, which logically assumes the hard disk has failed and then kicks the drive out of the RAID array, which can cause catastrophic data loss.

41.     According to recent testing by technology websites *Serve The Home* and *Ars Technica*, WD Red NAS SMR-technology drives at <u>best</u> offer lousy performance compared to CMR-technology drives, and at <u>worst</u> the drives fall flat on their face so badly that data loss

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

may result.[3] The SMR versions of the WD Red NAS drives offer between 70% to 1,000% slower write speed and read/write latency compared to CMR drives (including the prior CMR versions of the same capacity WD Red NAS drives).

42.     Using an SMR WD Red NAS drive also results in increased risk of data loss during RAID rebuilds due to greatly increased rebuild times. For example, *Serve The Home* found RAID resilvering times with an SMR WD Red NAS drive could take nearly <u>16 times longer</u> than with a CMR drive. In Will Taillac's testing for *Serve The Home*, all three of the tested traditional 4TB CMR drives took less than 17 hours to complete the resilvering process (in fact, the prior generation CMR version of the 4TB WD Red NAS was the quickest of the CMR drives at 14.6 hours), versus the "new" SMR version of the 4TB WD Red NAS which took 229.7 hours (over 9 days) to complete the resilvering process—i.e., nearly 16x longer! This massively increased resilvering time is particularly dangerous and unacceptable in a RAID array because a resilvering process is typically performed to replace a failed hard drive; and often if just one more hard drive fails, catastrophic data loss can result. The resilvering process is extremely stressful on hard drives because all the data is being redistributed among the drives in the array. Because SMR drives can increase the required resilvering time by an order of magnitude (from hours to days) as compared to CMR drives, the likelihood of another drive failing during that extended resilvering process—and thus the likelihood of catastrophic data loss—likewise increases substantially.

43.     Even the <u>read</u> performance of SMR WD Red NAS drives can be poor and unacceptable, where the increased latency due to the SMR technology causes freezes and stops and starts in opening and viewing files and data. As Jim Salter explained based on his testing of the drive for *Ars Technica*, "for a desktop user, someone who wants things to *happen* when they click buttons and drag things around, the Red can occasionally provide a truly frustrating

---

[3] *See Serve The Home* article by Will Taillac, dated May 28, 2020, at https://www.servethehome.com/wd-red-smr-vs-cmr-tested-avoid-red-smr/; see *Ars Technica* article by Jim Salter, dated June 5, 2020, at https://arstechnica.com/gadgets/2020/06/western-digitals-smr-disks-arent-great-but-theyre-not-garbage/.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1 | experience during what should be a very, very easy workload, even for a conventional drive."

2 | (Emphasis in original.)[4]

3 |   44.   Remarkably, and unfortunately, even adding just one of these inferior SMR WD

4 | Red NAS hard drives to an existing storage array (which otherwise contains traditional, good-

5 | performing CMR hard drives) can poison the entire drive array, causing the entire array to

6 | suffer this poor performance and greater risk of data loss. RAID arrays are often only as good

7 | as their weakest link.

8 |   45.   When WDC downgraded the technology in its WD Red NAS hard drives to

9 | SMR technology, it did so secretly, without telling a soul. Based on information and belief,

10 | WDC did not inform the NAS manufacturers, who had tested and certified the previous

11 | generation CMR versions of the hard drives, that WDC had replaced the guts of these

12 | identically-labeled drives with cheaper and poor-performing SMR technology. Based on

13 | information and belief, WDC likewise did not inform its resellers, such as Amazon.com and

14 | Newegg.com, that it had replaced the guts of many of its WD Red NAS hard drive models with

15 | inferior and cheaper SMR technology.

16 |   46.   Critically, when WDC downgraded its hard drives to SMR technology, WDC

17 | did not change any of its advertising or representations regarding the hard drives being

18 | "purpose-built" and suitable for NAS and RAID. WDC did not make any disclosure

19 | whatsoever of its use of SMR technology in the hard drives. WDC advertising and

20 | specifications, which were also utilized by WDC's resellers in their ads and product web pages

21 | for the hard drives, continued to make the exact same representations and statements that the

22 | WD Red NAS hard drives were specifically intended and appropriate for NAS and RAID.

23 |   47.   Starting around March 2019, various purchasers of WD Red NAS hard drives

24 | began reporting on online message boards that they were experiencing poor write performance

25 | and consistent failures during RAID resilvering.

26 |

27 | _____

28 | [4] *See* responsive comments by author to *Ars Technica* article by Jim Salter, dated June 5, 2020, at https://arstechnica.com/gadgets/2020/06/western-digitals-smr-disks-arent-great-but-theyre-not-garbage/.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

48.     For example, one user stated: "[W]hen I was moving data from one drive to another, several terabytes worth, it literally took most of a week. The drive would fill 30GB, then stop and basically lock up the OS."[5]

49.     Another user stated: "[T]he latest iteration of WD REDS [are] unable to be used for rebuilding RAID[56] or RAIDZ sets: They rebuild for a while (1-2 hours), then throw errors and get kicked out of the set."[6]

50.     Another user posted on a Synology (a leading NAS manufacturer) user forum that he was unable to add a new WD Red NAS 6TB drive to a RAID setup containing three older WD Red NAS 6TB drives. When the user added the new WD Red NAS drive, the resilvering process took over three days and then failed.[7]

51.     Many purchasers reported being unable to use the hard drives in their NAS systems, and that the hard drives kept getting kicked out of their RAID arrays. One user stated: "Attempting to replace drives in my existing array resulted in new WD-RED WD40EFAX drives (multiple units) throwing HARD errors (IDNF - Sector ID not found) and being kicked out of the array. That's apart from them pausing for 30-180 seconds at a time occasionally whilst they rebuild their internals, or the painfully slow random-write speeds when you throw more than about 2GB at a time at them."[8]

52.     Another user posted: "I got recently bit by WD40EFAX … When I tried to replace one of the failed WD Red disk in my vdev I started getting bunch of errors… I replaced that with WD purple and haven't had any problems so far."[9]

53.     Some hard drive technology enthusiasts noticed that the reported problems appeared to affect WD Red NAS drives 6TB or below in size, with a SKU containing the letters

---

[5] *See* https://arstechnica.com/gadgets/2020/04/caveat-emptor-smr-disks-are-being-submarined-into-unexpected-channels/.

[6] *See* https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.

[7] *See* https://community.synology.com/enu/forum/1/post/127228.

[8] *See* https://np.reddit.com/r/DataHoarder/comments/fyhzl9/disguised_smr_drives_the_official_western_digital/.

[9] *Ibid.*

- 13 -

"EFAX."

54.     Several of these technology enthusiasts noted that, remarkably, the official WDC spec sheet for these *EFAX hard drives indicated the EFAX drives should have *better* performance than the prior version of the drives (which contained the letters "EFRX"). The EFAX drives were listed with a faster "interface transfer rate" (180 MB/s versus as low as 150 MB/s), and with four times as much DRAM cache (256MB versus 64MB). The WDC product data sheet gave zero indication whatsoever that the EFAX drives contained SMR technology (as compared to the prior EFRX versions of the "same" drives which contained the standard CMR technology).

55.     Nonetheless, some of the technology enthusiasts who were experiencing these problems surmised that the drives may in fact be SMR drives under the covers, because the drives' poor write performance, RAID and NAS incompatibility, and their data-choking behavior were consistent with the known limitations of SMR technology.

56.     WDC's response to these allegations was to lie and deny that the hard drives contained SMR technology. For example, on March 30, 2020, Yemi Elegunde, an enterprise and channel senior sales manager for Western Digital's UK operations, denied that the WD Red NAS drives used SMR technology, stating: "The only SMR drive that Western Digital will have in production is our 20TB hard enterprise hard drives and even these will not be rolled out into the channel. All of our current range of hard drives are based on CMR Conventional Magnetic Recording."[10]

57.     Based on information and belief, WDC customer support staff were instructed to refuse to acknowledge that the new WD Red NAS hard drives now utilized SMR technology. One purchaser reported WDC's response when he contacted WDC customer support to ask if the drive utilized SMR versus CMR technology: "Western Digital support has gotten back to me. They have advised me that they are not providing that information so they are unable to tell me if the drive is SMR or PMR [PMR is another term used for CMR]. LOL. He said that my

---

[10] *See* https://zfsonlinux.topicbox.com/groups/zfs-discuss/T4b48af94f1bc50a7.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

question would have to be escalated to a higher team to see if they can obtain that info for me." Then, "the higher team contacted me back and informed me that <u>the information I requested about whether or not the WD60EFAX was a SMR or PMR would not be provided to me. They said that information is not disclosed to consumers.</u> LOL. WOW."[11] (Emphasis added.)

58.     Based on information and belief, when consumers contacted WDC to complain about the poor performance of its (SMR-technology) WD Red NAS hard drives in NAS and RAID environments, WDC <u>as a matter of policy</u> continued to insist that the hard drives were suitable for those environments, failed to disclose that the drives utilized (inappropriate) SMR technology, and <u>blamed "user error"</u> or the user's other equipment for the poor performance.

59.     In April 2020, Chris Mellor, a journalist at a leading storage technology website, *Blocks & Files*, began investigating this possible undisclosed use of SMR technology in WD Red NAS hard drives after an information technology expert brought his suspicions to Mellor's attention. As stated in the *Blocks & Files* article published April 14, 2020: "Alan Brown, a network manager at UCL Mullard Space Science laboratory, the UK's largest university-based space research group, told us about his problems adding a new WD Red NAS drive to a RAID array at his home. Although it was sold as a RAID drive, the device 'keep[s] getting kicked out of RAID arrays due to errors during resilvering,' he said."[12] Mr. Brown suspected the drive was an SMR drive under the covers, and his testing seemed to confirm his hypothesis. Mr. Brown told the website that the WD Red NAS drive's poor performance had "been a hot-button issue in the datahoarder Reddit for over a year. People are getting pretty peeved by it because SMR drives have ROTTEN performance for random write usage." *Ibid.*

60.     Until then, WDC had never publicly admitted that any WD Red NAS drives utilized SMR technology. But, when *Blocks & Files* contacted WDC and asked WDC point-blank whether WD Red NAS drives used SMR technology, WDC realized the jig was up. WDC had been caught. WDC was finally forced to acknowledge the truth.

61.     WDC stated on the record to *Blocks & Files* (in the article published April 14,

---

[11] *See* https://community.synology.com/enu/forum/1/post/127228.

[12] *See* https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

2020):

> Currently, Western Digital's WD Red 2TB-6TB drives are device-managed SMR (DMSMR)… You are correct that we do not specify recording technology in our WD Red HDD documentation.  We strive to make the experience for our NAS customers seamless, and recording technology typically does not impact small business/home NAS-based use cases. In device-managed SMR HDDs, the drive does its internal data management during idle times. In a typical small business/home NAS environment, workloads tend to be bursty in nature, leaving sufficient idle time for garbage collection and other maintenance operations.[13]

62.    Once WDC finally admitted what it had done, WDC was universally condemned by the technology press. Storage experts were in utter disbelief that WDC would do something so utterly reckless and inappropriate as sneak SMR technology into hard drives that WDC advertised and represented to be designed for NAS and RAID.[14] As Alan Brown stated in a separate interview article with *Block & Files*, these SMR-technology WD Red NAS hard drives were "unfit for the purpose for which they are marketed."[15]

63.    As the scandal unfolded, Seagate Technology (WDC's largest competitor) publicly stated that SMR is incompatible with NAS and RAID, and that its NAS-specific hard drives did not use SMR: "Seagate only produces NAS drives that are CMR. We do not have any SMR drives in our IronWolf and IronWolf Pro drives, which are NAS solutions**…[W]e don't recommend SMR for NAS**… Seagate will always recommend the correct drive technology for the right application." [16] (Emphasis added.)

64.    On April 20, 2020, six days after the *Blocks & Files* article was published, as the fiasco and condemnation continued to snowball, WDC posted a public statement about the

---

[13] *Ibid.*

[14] *E.g., see Extreme Tech* article dated April 24, 2020, at https://www.extremetech.com/computing/309730-western-digital-comes-clean-shares-which-hard-drives-use-smr; *Ars Technica* article dated April 17, 2020, at https://arstechnica.com/gadgets/2020/04/caveat-emptor-smr-disks-are-being-submarined-into-unexpected-channels/; *Serve The Home* article dated May 28, 2020, at https://www.servethehome.com/wd-red-smr-vs-cmr-tested-avoid-red-smr/.

[15] *See* https://blocksandfiles.com/2020/04/15/shingled-drives-have-non-shingled-zones-for-caching-writes/.

[16] *See* https://arstechnica.com/information-technology/2020/04/seagate-says-network-attached-storage-and-smr-dont-mix/.

FIRST AMENDED
CLASS ACTION COMPLAINT                     - 16 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

matter on a blog post on its website.[17] In the post, WDC acknowledged that "some" of its WD Red NAS hard drives utilized SMR technology—but WDC <u>still</u> did not identify <u>which</u> particular WD Red NAS hard drive SKUs used SMR. Meanwhile, as WDC previously admitted in its statement to *Blocks & Files*, WDC had never previously disclosed that it had sneaked SMR technology into its hard drives, or which particular drives had it: "You are correct that we do not specify recording technology in our WD Red HDD documentation."[18]

65.     Since WDC's scheme was brought to light, two of the leading NAS device manufacturers have blacklisted all WD Red NAS drives with SMR technology[19], removing them from their hardware compatibility lists, because they have deemed them unfit and inappropriate for use in their NAS devices. Notably, this blacklisting of WD Red NAS drives by major NAS manufacturers <u>directly contradicts</u> WDC's April 20, 2020 statement on its public blog that <u>all</u> of the WD Red NAS drives, including those with SMR technology, have been "rigorously tested" "and have been validated by the major NAS providers."[20]

66.     Synology, Inc. is one of the world's leading manufacturers of NAS devices and storage servers for consumers and businesses. Synology NAS units are consistently among the most popular consumer NAS devices offered on Amazon.com. Based on information and belief, which will be confirmed by third-party discovery of Synology, Inc., <u>WDC failed to notify Synology</u> that it had secretly swapped the guts of many of its WD Red NAS drives with SMR technology. Since the news broke publicly of WDC's swapping out CMR for the inferior SMR technology, Synology has removed those WD Red NAS drives from the hardware compatibility lists for its NAS units.[21] Based on the investigation of Plaintiffs' counsel, Synology customer support staff now tells Synology customers, when asked, that they should

---

[17] *See* https://blog.westerndigital.com/wd-red-nas-drives/.

[18] *See* https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.

[19] Specifically, WD Red NAS hard drives with the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX, and WD60EFAX.

[20] *See* https://blog.westerndigital.com/wd-red-nas-drives/.

[21] *See* https://www.synology.com/en-us/compatibility?search_by=category&category=hdds_no_ssd_trim&p=1.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1  not use these SMR-technology WD Red NAS drives (i.e., WDC's newest WD Red NAS drives

2  with 2TB-6TB capacities with SKUs WD20EFAX, WD30EFAX, WD40EFAX, and

3  WD60EFAX) in Synology products and that those drives are not supported.[22]

4      67.    Another leading manufacturer of NAS devices, iXsystems, now recommends

5  that its customers not use WD Red NAS drives with SMR technology. iXsystems stopped

6  offering its NAS and storage server solutions with WD Red NAS SMR-technology drives pre-

7  installed; previously, since 2019, iXsystems had shipped systems containing these SMR drives.

8  Based on the investigation of Plaintiff's counsel, iXsystems long had a policy of recommending

9  against the use of SMR drives. Based on information and belief, which will be confirmed by

10  third-party discovery of iXsystems, WDC failed to notify iXsystems that it had secretly

11  swapped the guts of many of its WD Red NAS drives with SMR technology. Based on

12  information and belief, iXsystems was caught flat-footed when the WDC SMR scandal broke,

13  not having previously realized it was selling hardware with SMR hard drives, and as a result

14  iXsystems has received complaints from many upset and damaged customers.

15      68.    iXsystems is also the creator of the open source FreeNAS storage software

16  which is utilized not only in its own NAS and storage systems, but also in NAS units and

17  servers designed by many other manufacturers. Additionally, thousands of individual users

18  install FreeNAS software in their own custom-built storage servers and NAS units.

19  Unfortunately, NAS and storage servers utilizing FreeNAS (which utilizes the ZFS file system)

20  have proven particularly incompatible with SMR-technology WD Red NAS hard drives. The

21  ZFS filesystem was designed to use small blocksize random writes in virtually all usage

22  scenarios, including disk array resilvering. As previously discussed, SMR technology is wholly

23  incompatible with these constant random writes because they cause the CMR cache area to

24  rapidly and constantly fill up. This causes the drive to choke and stop the flow of data while it

25

26  [22] Meanwhile, and likely confusing to consumers, Synology continues to recommend the older WD Red NAS drives with 2TB-6TB capacities (SKUs WD20EFRX, WD30EFRX, WD40EFRX, and WD60EFRX) because they utilize traditional CMR technology. Also likely

27  confusing to consumers, Synology continues to recommend other *new* WD Red NAS drives with 10TB-12TB capacities with SKUs of *EFAX because unlike the smaller capacity 2TB-

28  6TB *EFAX drives, these 10TB-12TB *EFAX drives continue to utilize CMR technology.

flushes out the CMR cache and tries to write the data to the much slower main SMR hard disk. In addition to this terrible performance and increased risk of data loss, iXsystems has also confirmed reports (and has notified WDC) of an additional problem that under heavy write loads and/or resilvering the WD Red NAS drives can return Sector ID Not Found (IDNF) errors, making the drives unusable and causing data to be destroyed.[23] Unsurprisingly, as a result, iXsystems recommends that FreeNAS and ZFS users not install SMR WD Red NAS drives in FreeNAS systems.

69.     Incredibly, WDC's response, even after having been caught red-handed, has been to double-down on its deception. In the blog post WDC put out on April 20, 2020 in response to the snowballing fiasco, WDC continued to claim that using SMR in NAS drives was appropriate because "The data intensity of typical small business/home NAS workloads is <u>intermittent</u>, leaving sufficient idle time for DMSMR drives to perform background data management tasks as needed and continue an optimal performance experience for users."[24] (Emphasis added.) This was similar to WDC's prior inaccurate statement to *Blocks & Files* that "recording technology typically does not impact small business/home NAS-based use cases. In device-managed SMR HDDs, the drive does its internal data management during idle times. In a typical small business/home NAS environment, workloads tend to be bursty in nature, leaving sufficient idle time for garbage collection and other maintenance operations."[25]

70.     In the same April 20, 2020 blog post, WDC attempted to <u>blame its own customers</u> for the problems they were experiencing. WDC accused its customers of overusing the drives "in system workloads far exceeding their intended uses." WDC suggested that affected customers somehow should have known to purchase different NAS hard drives (i.e., NAS drives with CMR technology) to perform *what were in fact <u>typical</u> NAS workloads*, even though WDC had not previously disclosed what recording technology any of its NAS hard drives had used. In truth, the earlier CMR versions of the same-capacity "WD Red NAS"

---

[23] *See* https://www.ixsystems.com/blog/library/wd-red-smr-drive-compatibility-with-zfs/.

[24] *See* https://blog.westerndigital.com/wd-red-nas-drives/.

[25] *See* https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

drives (i.e., the prior *EFRX CMR versions of the drives, as opposed to the newer *EFAX SMR versions of the drives) could <u>easily</u> perform such "workloads," as could <u>all</u> competing NAS drives from other manufacturers (all of which utilized CMR technology).

71.     These statements are an attempt by WDC to create a false narrative to save face and redirect blame. WDC in fact knows full well that these SMR WD Red NAS hard drives should <u>never</u> have been labeled and advertised as "NAS" hard drives. WDC has been told by its own vendor-partners that these hard drives are <u>not compatible</u> with their NAS devices and that the hard drives <u>are not fit for the drives' advertised and intended purpose</u>. WDC knows that thousands of customers have suffered poor performance and data loss and/or are now— justifiably—worried that the hard drives are essentially ticking time bombs that risk the destruction of customer data and files at any moment due to increased likelihood of failure during the RAID rebuilding process.

72.     In fact, WDC's acknowledgment on its public blog and to *Blocks & Files* that SMR-technology WD Red NAS hard drives are appropriate only for "intermittent" occasional "bursty" writes, is essentially an <u>admission</u> that these hard drives are <u>not suitable</u> for their advertised and intended use in NAS and RAID systems. WDC <u>admitted</u> that the drives require "sufficient idle time for garbage collection and other maintenance operations" (unlike CMR drives)—which is incompatible with usage in NAS and RAID systems.[26] WDC had even previously released a YouTube video explaining and <u>admitting</u> that SMR-technology hard drives are not appropriate for random-write workloads—which is a typical and common use of NAS systems.[27]

73.     Meanwhile, WDC continues to falsely advertise and promise that these WD Red NAS drives are designed and appropriate for RAID and NAS. WDC <u>continues</u> to keep "NAS" in the name of these SMR drives, and <u>continues</u> to promise and advertise (and to provide marketing materials to its resellers that promise and advertise) that the SMR drives are:

"**purpose-built for NAS**," "**Built for NAS compatibility**," "**Designed for RAID**

---

[26] *See* https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.
[27] *See* https://www.youtube.com/watch?v=_VzM3T9J1x4&feature=youtu.be.

environments," "**specifically designed for use in NAS systems with up to 8 bays**," and are appropriate for "**Small and home office NAS systems in a 24x7 environment**." WDC continues to state: "**Desktop drives aren't purpose-built for NAS. But WD Red drives with NASware technology are. Our exclusive technology takes the guesswork out of selecting a drive… In a Network Attached Storage device, a desktop hard drive is not typically designed for NAS environments. Do right by your NAS and choose the drive designed for NAS with an array of features to help preserve your data …**"

74.     These representations are false or misleading. These SMR-technology hard drives are not only inappropriate and perform poorly for their advertised and intended use in NAS and RAID applications—these hard drives are actually outright <u>dangerous</u> when used in those applications, putting customer data at increased risk.

75.     Any and all recent purported disclosures which WDC has made regarding the WD Red NAS hard drives since WDC first publicly admitted on April 14, 2020 that it had sneaked SMR technology into the drives, have been insufficient and inadequate. Based on the investigation of Plaintiffs' counsel, the only additional disclosures or changes in its marketing that WDC has made since April 14, 2020 are to update its technical product datasheet for the hard drives to add a single line specifying either "CMR" or "SMR" recording technology for each listed hard drive SKU, without explaining or disclosing what that means or its significance. (Product datasheets are a form of advertising, as are all of the statements by Defendant quoted in this First Amended Complaint.)

76.     The disclosure of the utilization of SMR versus CMR technology continues to not appear anywhere in the advertising, online brochures and specifications which customers actually see on the product webpages of WDC resellers such as Amazon.com and Newegg.com. But even if prospective customers somehow did come across the words "SMR" or "CMR," they would have no idea of their significance or what those letters meant. A reasonable consumer (the WD Red NAS drives are marketed to consumers and small businesses) would not see these strange abbreviations and understand that they completely <u>nullify</u> all the advertising and representations WDC is making about the drives being "purpose-

FIRST AMENDED
CLASS ACTION COMPLAINT                              - 21 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

built" for NAS and RAID.

77.     The bottom line is that in order to cut costs and increase its profits, WDC made the decision to sneak inferior and inappropriate SMR technology into its previously best-in-class drives, putting customer data at risk. WDC was finally caught and forced to admit the truth. But WDC has refused to rectify its wrongs or to change course. WDC has stubbornly and recklessly decided to continue defrauding its customers and to continue leveraging—and squandering—its past best-in-class reputation to increase its short-term profits.

78.     As a result of WDC's fraud and deception, thousands of customers nationwide, including the 6 Plaintiffs, who purchased these WD Red NAS hard drives for their advertised and intended use, have been duped and have suffered harm and damages. Ultimately, the hard drives are <u>completely worthless</u> for their intended purpose—and are in fact dangerous to customer data.

79.     The experiences of Plaintiffs Nicholas Malone, Chris Ayers, James Backus, David Eaton, Steven Gravel, and Tod Weitzel are typical of the thousands of other class members throughout the United States who have been similarly deceived by WDC. Each Plaintiff's experience is documented in the "Plaintiffs' Factual Allegations" section below.

80.     To be clear: Plaintiffs are herein alleging <u>false advertising</u> claims against WDC. Plaintiffs are not currently alleging design defect or product defect claims (although the facts could certainly support such claims). Plaintiffs, representing a national class, or in the alternative, 6 state subclasses, are confining this First Amended Complaint to WDC's false statements and material omissions made in WDC's advertising and promotion of the WD Red NAS hard drives containing SMR technology. In sum, WDC advertised these hard drives as being appropriate for NAS or RAID environments when in fact, due to WDC's secret switch from CMR to SMR technology, these drives are not fit for the purpose advertised.

81.     These misrepresentations and omissions by WDC are material, in that they are the type of representations on which an ordinary person would reasonably rely upon in conducting his or her affairs.

82.     The Defendant is primarily engaged in the business of selling or leasing goods

FIRST AMENDED
CLASS ACTION COMPLAINT                                     - 22 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

or services. Each cause of action brought by Plaintiffs and the Class against Defendant in this pleading arises from and is limited to statements or conduct by Defendant that consist of representations of fact about Defendant's business operations, goods or services that is or was made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in Defendant's goods or services or the statement is or was made in the course of delivering Defendant's goods or services. Each cause of action brought by Plaintiffs and the Class against Defendant in this pleading arises from and is limited to statements or conduct by Defendant for which the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statements to, or otherwise influence, an actual or potential buyer or customer.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### Plaintiff Nicholas Malone

83.     Plaintiff Nicholas Malone is, and at all relevant times has been, a Wisconsin resident.

84.     In March 2020, Malone desired to purchase a NAS device along with hard drives which were designed for use in that NAS device with a RAID setup. Malone wanted to store his important home personal data, media files, and computer backups in a centralized, large datastore with data redundancy and security features, and had determined that a NAS system utilizing RAID for redundancy and failure recovery was the best solution.

85.     On March 6, 2020, Malone went to Amazon.com to shop for a NAS device and NAS-appropriate hard drives. Malone decided to purchase a QNAP 4-bay NAS device.

86.     Malone then began researching the options available on Amazon for four 6TB NAS-appropriate hard drives to put into the QNAP NAS device. Malone previously had purchased and had been happy with many WDC hard drives over the years, and he understood them to have a good reputation for reliability and quality. Malone browsed the Amazon product webpage for the WD Red NAS 6TB hard drive, and viewed the advertising and product information (which was provided to Amazon by WDC). Besides seeing that the drive had "NAS" in the product name, Malone viewed the prominent bullet points on the product

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," and "**NASware firmware for compatibility**."

87.     Lower down on the product webpage for the WD Red NAS 6TB hard drive was a colorful product brochure labeled: "From the manufacturer." Malone viewed the representations there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**" and "**3D Active Balance Plus. Helps ensure your data is protected … in a NAS or RAID environment**."  Based on these representations, Malone reasonably believed and understood the WD Red NAS 6TB hard drive was specifically designed and built for NAS device RAID environments like the QNAP system he intended to purchase and set up (unlike cheaper consumer desktop hard drives which were not purpose-built for NAS and RAID).

88.     Malone had no idea the hard drives in fact utilized inferior and inappropriate SMR technology, which was not disclosed to him. Regardless, even if the letters "SMR" had appeared in the hard drive description, Malone would not have known what SMR was or what it stood for or what if any impact SMR had on hard drive performance.

89.     Malone also viewed the product webpage for a NAS hard drive from a competing manufacturer, the Seagate IronWolf 6TB NAS hard drive. The Seagate hard drive was likewise advertised as having been designed and built for NAS and RAID for devices with up to 8 drive bays.

90.     Relying on the representations regarding the WD Red NAS 6TB hard drive on the Amazon webpage, and also based on his prior good experience with WDC hard drives, Malone decided to purchase four of the WD Red NAS 6TB hard drives for $150.12 each, paying a total of $600.48 plus tax. The SKU for the hard drives was WD60EFAX. Malone also purchased the QNAP NAS device (the QNAP TS-453Be-4G-US) for $548.89 plus tax.

91.     After receiving the WD Red NAS hard drives and QNAP NAS device, Malone installed the hard drives into the QNAP and set up the device with RAID 5 redundancy.

FIRST AMENDED
CLASS ACTION COMPLAINT                           - 24 -                           **HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

92.     Over the next month and a half, Malone gradually moved and copied his personal data and media files over to the NAS, and also stored backups of his computer system, filing the NAS with almost 18TB of important and valuable data. Malone noticed that the write/copy speed when transferring these files seemed to be slower and worse than he had previously experienced with other hard drives and other NAS devices.

93.     In late April or early May 2020, Malone viewed a YouTube video about NAS setup and storage. During the video, the narrator began talking about the recent scandal about WDC having admitted that some of its WD Red NAS hard drives utilized SMR technology. The narrator explained that the SMR technology was inappropriate for NAS systems and should not have been advertised and sold for that purpose by WDC.

94.     After viewing this video, Malone became concerned that he had purchased these SMR-technology WD Red NAS hard drives. After researching the matter further, he learned that the four hard drives he had purchased (with SKU WD60EFAX) did indeed utilize SMR recording technology.

95.     Malone had been defrauded. Malone had bought the hard drives based on WDC's representations that the drives were purpose-built for NAS and RAID, and had specifically purchased and set up his system for the redundancy and failure recovery features that NAS with RAID provided. But the hard drives he purchased, contrary to WDC's express representations, were not appropriate for NAS or RAID.  In fact, by using the hard drives for their intended and advertised purpose, in a NAS device with RAID, his data was now at increased risk.

96.     Malone was now, and continues to be, extremely upset and worried about losing his data. The failure of a single drive could result in the loss of data due to the much longer RAID rebuild times (i.e., resilvering) as compared to CMR drives, which would put his data at increased risk. Malone is also unable to perform recommended and standard RAID "scrubbing" to ensure the integrity of his data and to automatically correct any disk errors, because the process could cause one or more hard drives to be kicked out of the RAID array, potentially causing data loss. In order to secure and protect his data, Malone now must now expend

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

hundreds more dollars and many hours of his time to purchase several external hard drives and/or a second NAS, and then copy his data over to the new storage.

97.     Malone reasonably relied on WDC's misrepresentations and omissions of material facts. If Malone had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for their intended and advertised use, Malone would not have purchased the hard drives. Malone would have purchased different hard drives that were truly appropriate for NAS and RAID use, such as the Seagate IronWolf 6TB NAS hard drive that he had also considered while shopping on Amazon.com. In fact, <u>no other leading hard drive manufacturer</u> uses this inferior SMR technology in its hard drives that are labeled for NAS or RAID use.

98.     As a direct and proximate result of WDC's acts and omissions, Malone was harmed, suffered an injury-in-fact, and lost money or property.

99.     Malone has a legal right to rely now, and in the future, on the truthfulness and accuracy of WDC's representations.

100.    Malone would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding their appropriateness and fitness for NAS systems and RAID.

101.    Malone will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

102.    If Malone were to purchase a WD NAS hard drive again without WDC having changed its unlawful and deceptive conduct alleged herein, Malone would be harmed on an ongoing basis and/or would be harmed once or more in the future.

### Plaintiff Chris Ayers

103.    Plaintiff Chris Ayers is, and at all relevant times has been, a Florida resident.

104.    In May 2020, one of the hard drives in Ayers' four-bay Netgear ReadyNAS network-attached storage unit failed. At that time, the NAS unit, which Ayers utilized at his home to store personal files, contained four 3TB Western Digital Caviar Green hard drives in

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 26 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

RAID 5. Ayers had first installed the four 3TB Caviar Green drives approximately 8 years earlier. Three years after he had installed the Caviar Green hard drives, one of the drives had failed, and Ayers replaced it with an identical Caviar Green drive. Over the next five years Ayers did not have any other drive failures, until May 2020 when a second 3TB Caviar hard drive failed.

105.    The ReadyNAS unit utilized a Linux software RAID technology which Netgear called X-RAID, which allowed mixing of different size drives to expand storage while maintaining redundancy such that one hard drive could fail without suffering data loss. When this 3TB Caviar Green drive failed in May 2020, Ayers replaced it with a Seagate 6TB drive. After he installed the replacement Seagate 6TB drive, the ReadyNAS took approximately 8 hours to rebuild the RAID array and redistribute the data among the hard drives (i.e., to perform the RAID rebuilding, or "resilvering" process).

106.    Ayers then decided to further expand the storage capacity of his ReadyNAS by replacing the remaining three 3TB hard drives with three larger 6TB hard drives. To do so, Ayers would need to purchase the three 6TB hard drives, and then replace the drives sequentially, waiting for the RAID volume to rebuild each time (and thus performing three separate rebuilds, one for each new drive).

107.    On May 17, 2020, Ayers went to Amazon.com to shop for a new 6TB hard drive that was purpose-built for NAS devices like his. For over a decade, Ayers had purchased and had been happy with WDC hard drives, and he understood them to have a good reputation for reliability and quality. Ayers browsed the Amazon product webpage for the WD Red NAS 6TB hard drive, and viewed the advertising and product information (which was provided to Amazon by WDC). Besides seeing that the drive had "NAS" in the product name, Ayers viewed the prominent bullet points on the product webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," and "**NASware firmware for compatibility**."

108.    Lower down on the product webpage for the WD Red NAS 6TB hard drive was a colorful product brochure labeled: "From the manufacturer." Ayers viewed the

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

representations there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**" and "**3D Active Balance Plus. Helps ensure your data is protected … in a NAS or RAID environment**."  Based on these representations, Ayers reasonably believed and understood the WD Red NAS 6TB hard drive was specifically designed and built for NAS device RAID environments like his ReadyNAS system.

109.    Ayers had no idea the WD Red NAS 6TB hard drive in fact utilized inferior and inappropriate SMR technology, which was not disclosed to him. Regardless, even if the letters "SMR" had appeared in the hard drive description, Ayers would not have known what SMR was or what it stood for or what if any impact SMR had on hard drive performance.

110.    Relying on the representations regarding the WD Red NAS 6TB hard drive on the Amazon product webpage, and also based on his prior good experience with WDC hard drives, Ayers decided to purchase one WD Red NAS 6TB hard drive for $156.83 plus tax. The SKU for the hard drive was WD60EFAX.

111.    A few days later, on May 23, 2020, Ayers went to the same Amazon product webpage for the WD Red NAS 6TB hard drive, viewed the same advertising and representations on the webpage, and purchased two more of the drives for a total of $303.98 plus tax. The SKU for the hard drives was WD60EFAX.

112.    After receiving the hard drives, Ayers replaced the first of his three remaining 3TB drives with one of the WD Red NAS 6TB hard drives. This time, the resilvering process took much longer, approximately 14 hours.

113.    After the resilvering process completed, Ayers replaced another of the 3TB drives with another of the new WD Red NAS 6TB hard drives. This time, the resilvering process took more than 24 hours.

114.    After the resilvering process completed, Ayers replaced the third (and last remaining) 3TB drive with the third WD Red NAS 6TB hard drive. This time, the resilvering process went on for more than 24 hours, and then failed altogether. The ReadyNAS unit

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 28 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

became unresponsive. Ayers nervously rebooted the ReadyNAS unit. After rebooting, the resilvering process continued, and then finally completed after a few more hours.

115.    Ayers was very concerned about the problems he had experienced in the resilvering process. Ayers was worried about potential data loss. Ayers also noticed that the performance of the ReadyNAS was now noticeably worse than before he had added the WD Red NAS 6TB drives. Ayers would occasionally experience strange delays, disconnects, and temporary "hangs" when accessing or writing data and when opening files, which he had not previously experienced prior to adding the WD Red NAS 6TB drives.

116.    Ayers did an online search to try to learn why he was experiencing such poor performance. Ayers found and read an article on *Ars Technica* which discussed how WDC had snuck inferior SMR technology into its WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss. After some further research, Ayers learned that WDC had recently admitted to the technology press that the WD Red NAS 6TB drives he purchased, with SKU WD60EFAX, were among these inferior and inappropriate SMR-technology drives.

117.    Ayers had been defrauded. Ayers had bought the hard drives based on WDC's representations that the drives were purpose-built for NAS and RAID. But the hard drives he purchased, contrary to WDC's express representations, were not appropriate for NAS or RAID. Ayers' data was now at risk, and he also was experiencing worse performance in his NAS than he had prior to installing the WD Red NAS hard drives.

118.    Ayers was, and continues to be, extremely upset and worried about losing his data. The failure of a single drive could result in the loss of data due to the much longer RAID rebuild times (i.e., resilvering) of these SMR drive as compared to CMR drives. Ayers has already witnessed this much longer and riskier resilvering process first-hand. Meanwhile, Ayers is also unhappy with the slower performance he continues to experience in reading and writing files.

119.    Ayers reasonably relied on WDC's misrepresentations and omissions of material facts. If Ayers had known that the WD Red NAS hard drives he purchased utilized recording

FIRST AMENDED
CLASS ACTION COMPLAINT

- 29 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

technology which was inappropriate for their intended and advertised purpose, Ayers would not have purchased the hard drives. Ayers would have purchased different CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

120.    As a direct and proximate result of WDC's acts and omissions, Ayers was harmed, suffered an injury-in-fact, and lost money or property.

121.    Ayers would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems and RAID.

122.    Ayers will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

**Plaintiff James Backus**

123.    Plaintiff James Backus is, and at all relevant times has been, a Virginia resident.

124.    In April 2020, Backus purchased a 5-bay Synology DS1019+ network attached storage device from Newegg.com for use in his home. Backus also planned to purchase two 4TB NAS drives and two 6TB NAS hard drives which were purpose-built for use in a NAS RAID device like the Synology unit.

125.    Over the past decade, Backus had been loyal to the Western Digital brand and its WD Red NAS hard drives based on their reputation for being best-in-class for NAS and RAID, and based on his excellent experience with their performance. Backus had previously purchased at least eight WD Red NAS drives, many of which he was still using in another Synology DS410j NAS unit and in a PC server with a RAID array.

126.    On April 11, 2020, Backus visited Amazon.com and browsed the product webpage for the WD Red NAS 4TB hard drive. Backus viewed the advertising and product information (which was provided to Amazon by WDC) on the product webpage. Backus viewed the prominent bullet points on the product webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," "**NASware firmware for compatibility**," and "**Supports up to**

FIRST AMENDED
CLASS ACTION COMPLAINT                          - 30 -                          **HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

**180TB/yr workload rate**.”

127.    Lower down on the product webpage for the WD Red NAS 4TB hard drive was a colorful product brochure labeled: “From the manufacturer.” Backus viewed the representations there, including: “**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**” and “**3D Active Balance Plus. Helps ensure your data is protected … in a NAS or RAID environment**.”  Based on these representations, and based on his own past excellent experience with WD Red NAS hard drives in his NAS devices and PC RAID storage arrays which was consistent with these representations, Backus reasonably believed and understood the WD Red NAS 4TB hard drive was specifically designed, built, and optimized for NAS device RAID environments like the Synology DS1019+ unit.

128.    Backus had no idea the WD Red NAS 4TB hard drive in fact utilized inferior and inappropriate SMR technology (unlike all of the WD Red NAS drives he had previously purchased and used), which was not disclosed to him.

129.     Relying on the representations regarding the WD Red NAS 4TB hard drive on the Amazon product webpage, and also based on his prior good experience with WDC hard drives, Backus decided to purchase two WD Red NAS 4TB hard drives for $203.98 plus tax. The SKU for the hard drives was WD40EFAX.

130.    That same day on April 11, 2020, Backus visited Newegg.com and browsed the product webpage for the WD Red NAS 6TB hard drive. Backus viewed the advertising and product information on the product webpage (which was provided to Newegg by WDC). Backus viewed the prominent bullet points on the product webpage which stated: “**Specifically designed for use in NAS systems with up to 8 bays**,” “**Small and home office NAS systems in a 24/7 environment**,” “**NASware firmware for compatibility,**” and “**Supports up to 180TB/yr workload rate**.”

131.    Lower down on the product webpage for the WD Red NAS 4TB hard drive was a colorful product brochure provided and created by WDC. Backus viewed the representations

FIRST AMENDED
CLASS ACTION COMPLAINT                          - 31 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**"; "**The drive for NAS. Desktop drives aren't typically tested or designed for the rigors of a NAS system. Do right by your NAS and choose the drive with an array of features to help preserve your data and maintain optimum performance**"; and "**Built for NAS Compatibility. WD Red drives with NASware 3.0 technology are purpose-built to balance performance and reliability in NAS and RAID environments**."

132.     Backus had no idea that the WD Red NAS 6TB hard drive in fact utilized inferior and inappropriate SMR technology, which was not disclosed to him.

133.     Relying on the representations regarding the WD Red NAS 6TB hard drive on the Newegg.com product webpage, and also based on his prior good experience with WDC hard drives, Backus decided to purchase two WD Red NAS 6TB hard drives for $317.98 plus tax. The SKU for the hard drives was WD60EFAX.

134.     When Backus received the four hard drives, he installed them into the Synology DS1019+ NAS unit. He configured the Synology to set the four drives up in a RAID 10 array, where they would be split into two groups of 8TB arrays, each having one 4TB drive, and one 6TB drive that was formatted as a 4TB drive. The two 8TB arrays would be clones of each other for redundancy and reliability. Backus then started the build process for the RAID 10 array, which took longer than he expected to complete as compared to his past experience of resilvering with his other WD Red NAS drives.

135.     A key reason Backus set up the drive array with RAID 10 in this way was to enable and facilitate ready expansion when needed. When he needed more capacity later, his plan was to first replace one of the 4TB drives with another 6TB Red NAS drive (but to format it as a 4TB drive), and then rebuild the array with the new drive. Then he would replace the other 4TB drive with another 6TB Red NAS drive in the same way. Finally, once all the drives were WD 6TB Red NAS drives, he would expand the volume size on the drives from 4TB to 6TB. This process necessarily would require two full RAID rebuilds (i.e., two resilvering

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 32 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

processes) to expand his data capacity.

136.     Backus populated the fifth bay of the Synology DS1019+ with a stand-alone older hard drive containing many small files and family photos which he wanted to copy onto the new storage array. After the resilvering process had completed on the storage array, Backus began copying several terabytes of data from this older hard drive over to the new RAID array. Backus noticed that the copy performance was poor and slow, with stops and starts. After a period of time, the copying process would slow dramatically, freeze up, and then after a while speed up again, only to repeat the process ad nauseam.

137.     After the copying finally completed, Backus noticed that the storage array on the Synology DS1019+ continued to perform more poorly than he expected based on his past experience. Backus would occasionally experience strange delays, disconnects, and temporary "hangs" when accessing or writing data and on opening files, which he had not previously experienced with his other NAS units and RAID arrays. Backus also noticed delays and stops and starts when playing videos stored on the storage array, which he had never previously experienced with his other hard drives.

138.     In late April, Backus read an article on *Ars Technica* about how WDC had snuck inferior and inappropriate SMR technology into its WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss. After some further research, Backus learned that WDC had recently admitted to the technology press that the WD Red NAS 4TB and 6TB drives he purchased, with SKUs WD40EFAX and WD60EFAX, were among these inferior SMR-technology drives.

139.     Notably, <u>after</u> WDC publicly admitted in late April 2020 that certain SKUs of its WD Red NAS hard drives now contained SMR technology[28], Synology (the manufacturer of Backus' NAS device) removed those SMR hard drives from Synology's compatibility list— including the hard drives with SKUs WD40EFAX and WD60EFAX which Backus had purchased. Based on the investigation of Plaintiffs' counsel, Synology customer support staff

---

[28] Specifically, the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX, and WD60EFAX.

1  now tell Synology customers, when asked, that they should not use these SMR-technology WD

2  Red NAS drives in Synology products and that the drives are not supported.

3      140.   Backus had been defrauded. Backus felt betrayed and taken advantage of by

4  WDC. WDC had tricked Backus into relying on the past reputation and performance of WD

5  Red NAS drives. WDC had secretly snuck the inferior SMR-technology into the drives to

6  increase its short-term profits while exploiting customers like Backus whom WDC kept in the

7  dark. WDC had continued to promise and advertise that the WD Red NAS hard drives he

8  purchased were "purpose-built" for NAS devices and RAID and that the drives were

9  compatible with his Synology unit. But the hard drives he purchased, contrary to WDC's

10  express representations, were <u>not</u> appropriate for NAS or RAID, and Synology now states that

11  the drives are inappropriate for and are not supported in its NAS units.

12      141.   Backus' data was now at risk, and he also was experiencing worse performance

13  in his NAS than he had ever experienced before with other drives that (in contrast) had truly

14  been appropriate for NAS and RAID.

15      142.   Backus was, and continues to be, extremely upset and worried about losing his

16  data, especially in the event he needs to perform a RAID rebuild. The failure of a single drive

17  could result in the loss of data due to the inferior technology and much longer RAID rebuild

18  times (i.e., resilvering) of these SMR drives as compared to CMR drives. Backus had

19  specifically purchased these drives for their appropriateness and reliability in RAID and

20  resilvering, because his entire expansion plan was contingent on performing multiple RAID

21  rebuilds in sequence. Yet now he could no longer do so, because he would be putting his data at

22  increased risk due to the inappropriate SMR technology utilized by these hard drives. In order

23  to secure and protect his data, Backus must now expend hundreds more dollars and many hours

24  of his time to purchase several external hard drives and/or another NAS device, and then copy

25  his data over to the new storage, which he cannot now afford to do.

26      143.   Backus reasonably relied on WDC's misrepresentations and omissions of

27  material facts. If Backus had known that the WD Red NAS hard drives he purchased utilized

28  recording technology which was inappropriate for the drives' intended and advertised use,

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 34 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1   Backus would not have purchased the hard drives. Backus would have purchased different

2   CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

3        144.   As a direct and proximate result of WDC's acts and omissions, Backus was

4   harmed, suffered an injury-in-fact, and lost money or property.

5        145.   Backus would purchase WD NAS hard drives again if he could have confidence

6   regarding the truth of WDC's representations regarding the drives' appropriateness and fitness

7   for NAS systems and RAID.

8        146.   Backus will be harmed if, in the future, he is left to guess as to whether WDC's

9   representations are accurate and whether there are omissions of material facts regarding the

10  features or specifications of WDC's NAS hard drives.

11       **Plaintiff David Eaton**

12       147.   Plaintiff David Eaton is, and at all relevant times has been, a Missouri resident.

13       148.   In September 2017, Eaton purchased a 4-bay Synology DS416play NAS unit

14  along with two WD Red NAS 4TB drives. The hard drives utilized traditional CMR

15  technology. The Synology NAS unit utilized a Linux software RAID technology which

16  Synology called Synology Hybrid RAID (or "SHR"), which allowed mixing of different size

17  drives to expand storage while maintaining redundancy such that one hard drive could fail

18  without suffering data loss.

19       149.   Eaton installed the two WD Red NAS 4TB drives in the NAS, along with a 1TB

20  drive and a 2TB drive that he already had, creating a SHR storage pool. Later, he swapped out

21  the 1TB drive for a 2TB drive which he purchased. The resilvering process to rebuild the RAID

22  array and redistribute the data among the hard drives including the new 2TB drive took

23  approximately 8 hours.

24       150.   On April 6, 2020, Eaton was shopping at his local Micro Center computer store

25  in Brentwood, Missouri, when he saw WD Red NAS 6TB hard drives on display and for sale.

26  For many years, Eaton had purchased and had been happy with WDC hard drives, and he

27  understood them to have a good reputation for reliability and quality. Eaton understood that

28  WD Red NAS drives were purpose-built for NAS devices with RAID setups like his Synology

FIRST AMENDED
CLASS ACTION COMPLAINT                        - 35 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1    NAS. Eaton had been happy with his existing WD Red NAS 4TB hard drives and their

2    performance.

3        151.    Eaton saw that the outside box for the WD Red NAS 6TB drives stated "WD

4    RED 3.5" NAS HARD DRIVE" and "RAID OPTIMIZED."  Eaton understood that the WD

5    Red NAS hard drives were premium hard drives that were purpose-built for NAS and RAID,

6    unlike cheaper desktop drives. The advertising and statements on the box of the WD Red NAS

7    drives confirmed his understanding.

8        152.    Eaton had no idea the WD Red NAS 6TB hard drive in fact utilized inferior and

9    inappropriate SMR technology, which was not disclosed to him. Regardless, even if Eaton had

10   seen the letters "SMR" in the hard drive description, he would not have known what SMR was

11   or what it stood for or what if any impact SMR had on hard drive performance.

12       153.    Relying on the representations on the box of the WD Red NAS 6TB hard drive,

13   including the "NAS" in the name of the drive, the drive being advertised as "Raid Optimized,"

14   and also based on Eaton's prior good experience with the two WD Red NAS 4TB drives which

15   were currently in his Synology NAS, Eaton decided to buy one WD Red NAS 6TB hard drive.

16   Eaton purchased the WD Red NAS 6TB drive for $149.99 plus tax.

17       154.    Eaton replaced one of his existing 2TB drives with the WD Red NAS 6TB hard

18   drive, and the Synology NAS began the resilvering process.

19       155.    Eaton decided that he wanted to increase the storage capacity of his storage

20   array even further, by also replacing the last 2TB drive in the Synology with another WD Red

21   NAS 6TB drive.

22       156.    The next day, on April 7, 2020, Eaton visited the Micro Center computer store

23   again to purchase a second WD Red NAS 6TB hard drive.

24       157.    After Eaton returned home with the second hard drive from the Micro Center

25   computer store, he was surprised to see that the resilvering process with the first WD Red NAS

26   6TB drive had not completed. Previously, with the 2TB hard drive, it had taken less than 10

27   hours to complete the resilvering process.

28       158.    In fact, this time with the WD Red NAS 6TB drive, the resilvering process

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 36 -                    HATTIS & LUKACS
                                                                    400 108th Ave. NE, Ste 500
                                                                    Bellevue, WA 98004
                                                                    T: 425.233.8650 | F: 425.412.7171
                                                                    www.hattislaw.com

1  ultimately took <u>seven days</u> – almost 17 times as long as the prior drive had taken.

2  159.    After the resilvering process had completed, Eaton replaced the last 2TB drive

3  with the second WD Red NAS 6TB drive he had purchased. The resilvering process again took

4  approximately seven days.

5  160.    Eaton uses the Synology NAS to store personal documents, family photos, and

6  to store and serve videos and movies.

7  161.    Eaton noticed that after the WD Red NAS 6TB hard drives were incorporated

8  into his storage pool, playback of videos was often choppy with stops and starts—which he had

9  not previously experienced prior to adding the WD Red NAS 6TB drives.

10  162.    After experiencing this worse video playback performance and the extremely

11  long resilvering process of seven days per drive, Eaton became concerned about the reliability

12  of the hard drives in his storage array and the possibility of data loss.

13  163.    In late April, Eaton read an article on *Ars Technica* about how WDC had snuck

14  inferior and inappropriate SMR technology into its WD Red NAS hard drives, causing poor

15  performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss.

16  Eaton learned that WDC had admitted that it had switched WD Red NAS 6TB hard drives with

17  the SKU WD60EFAX to the SMR technology. Eaton checked the web interface of his

18  Synology NAS and saw that the two WD Red NAS 6TB hard drives were in fact the

19  WD60EFAX drives with the inferior SMR technology.

20  164.    Notably, <u>after</u> WDC publicly admitted in late April 2020 that certain SKUs of its

21  WD Red NAS hard drives now contained SMR technology[29], Synology (the manufacturer of

22  Eaton's NAS device) removed those SMR hard drives from its compatibility list—including the

23  hard drive with SKU WD60EFAX which Eaton had purchased. Based on the investigation of

24  Plaintiffs' counsel, Synology customer support staff now tell Synology customers, when asked,

25  that they should not use these SMR-technology WD Red NAS drives in their Synology

26  products and that the drives are not supported.

27  ―――――――――――――

28  [29] Specifically, the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX, and
WD60EFAX.

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

165.    Eaton had been defrauded. Eaton felt betrayed and taken advantage of by WDC. WDC had tricked Eaton into relying on the past reputation and performance of WD Red NAS drives. WDC had secretly snuck the inferior SMR-technology into the drives to increase its short-term profits while exploiting customers like Eaton whom WDC kept in the dark. WDC had continued to promise and advertise that the WD Red NAS hard drives he purchased were designed for NAS devices like his Synology unit. But the hard drives he purchased were not appropriate for NAS or RAID, and Synology now states that the drives are inappropriate for and are not supported in its NAS units.

166.    Eaton was, and continues to be, extremely upset and worried about losing his data. The failure of a single drive could result in the loss of data due to the much longer RAID rebuild times—e.g., resilvering now takes seven days, as Eaton experienced when he installed the SMR drives, compared to the less than one day resilvering process which would be typical with a CMR drive. Eaton felt lucky he had not lost data the last time he resilvered with the SMR drives, and he does not want to push his luck further. Meanwhile, Eaton is also unhappy with the slower performance he continues to experience including choppy video playback.

167.    Eaton reasonably relied on WDC's misrepresentations and omissions of material facts. If Eaton had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for the drives' intended and advertised use, Eaton would not have purchased the hard drives. Eaton would have purchased different CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

168.    As a direct and proximate result of WDC's acts and omissions, Eaton was harmed, suffered an injury-in-fact, and lost money or property.

169.    Eaton would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems and RAID.

170.    Eaton will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 38 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

**Plaintiff Steve Gravel**

171.   Plaintiff Steve Gravel is, and at all relevant times has been, a New York resident.

172.   In August 2019, Gravel purchased four WD Red NAS 4TB drives from Amazon.com for his 4-bay QNAP TS-453Be network attached storage device which he used in his home for personal use. Gravel purchased the 4TB WD Red NAS hard drives because they were advertised as being "purpose-built" for NAS and RAID, and he understood WD Red NAS hard drives to have a good reputation for such usage. The hard drives utilized traditional CMR technology. The SKU for the hard drives was WD40EFRX. Gravel installed the hard drives in the QNAP and set up the storage array with RAID 5 redundancy.

173.   Gravel utilized the QNAP NAS for random-write intensive workloads including iSCSI volumes and mixed content file shares. He also used the QNAP as a media server to store and play movies which he owned. Gravel was happy with the performance of the hard drives in his QNAP. Gravel's only regret was that he had not purchased larger capacity hard drives, because he soon began running out of storage capacity.

174.   A few months later, in December 2019, Gravel decided to expand his storage capacity. Gravel purchased an external 4-bay QNAP expansion unit (the QNAP TR-004) that externally connected directly to the QNAP TS-452Be NAS device via a USB-C cable, so he could move his existing WD40EFRX drives to the expansion unit as a second storage array. He planned to rebuild the first storage array in the main QNAP TS-452Be unit with four new larger capacity NAS hard drives. Both of the arrays would be independently set up with RAID 5, and both would be managed by the computing processor and software interface of the main QNAP TS-452Be NAS device.

175.   On December 14, 2019, Gravel went to Newegg.com to shop for four larger hard drives that were purpose-built for NAS devices like his. Gravel was considering purchasing either Seagate IronWolf NAS hard drives or more WD Red NAS hard drives. Both the Seagate and Western Digital hard drives were advertised as having been designed and built for NAS and RAID for devices with up to 8 drive bays.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

176.     Given Gravel's good experience with his current WD Red NAS drives, he gravitated towards purchasing more WD Red NAS drives.

177.     Gravel browsed the Newegg.com product webpage for the WD Red NAS 6TB hard drive. Based on the advertising and representations on the product webpage, Gravel reasonably assumed and understood that the WD Red NAS 6TB drive advertised there was virtually identical in performance to his existing, and excellent performing, WD Red NAS 4TB drives, but with 2TB greater capacity.

178.     Gravel viewed the advertising and product information on the product webpage (which was provided to Newegg by WDC). Gravel viewed the prominent bullet points on the product webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," "**NASware firmware for compatibility,**" and "**Supports up to 180TB/yr workload rate**."

179.     Lower down on the product webpage for the WD Red NAS 6TB hard drive was a colorful product brochure provided and created by WDC. Gravel viewed the representations there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**"; "**The drive for NAS. Desktop drives aren't typically tested or designed for the rigors of a NAS system. Do right by your NAS and choose the drive with an array of features to help preserve your data and maintain optimum performance**"; and "**Built for NAS Compatibility. WD Red drives with NASware 3.0 technology are purpose-built to balance performance and reliability in NAS and RAID environments**."

180.     Based on these representations, Gravel reasonably believed and understood the WD Red NAS 6TB hard drive was specifically designed and built for NAS device RAID environments like his QNAP system, and that the drive would perform just as well in that environment as the WD Red NAS 4TB drives he had previously purchased only a couple of months earlier and which he was currently using.

181.     Gravel had no idea that the WD Red NAS 6TB hard drive now being offered by

FIRST AMENDED
CLASS ACTION COMPLAINT

- 40 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Newegg in fact utilized inferior and inappropriate SMR technology, which WDC had snuck into the drives and which was not disclosed to him. Regardless, even if the letters "SMR" had appeared in the hard drive description, Gravel would not have known what SMR was or what it stood for or what if any impact SMR had on hard drive performance.

182.    Relying on the representations regarding the WD Red NAS 6TB hard drive on the Newegg product webpage, and also based on his prior good experience with WD Red NAS hard drives, Gravel decided to purchase four WD Red NAS 6TB hard drives for $539.96 plus tax. The SKU for the hard drives was WD60EFAX.

183.    Gravel installed the hard drives into the QNAP main unit, replacing and removing the older 4TB WD40EFRX drives that had previously been installed there. Gravel continued to store the iSCSI volumes and mixed content file shares in the main unit on this RAID 5 storage array with the new 6TB WD60EFAX drives. Like before, this meant that he regularly and necessarily performed intensive random writes and reads on the drives.

184.    Gravel noticed that the write and read performance on this new storage array was sluggish and very poor, in particular when being utilized for iSCSI and mixed content file shares. Workloads in general would perform more slowly than with the prior WD40EFRX storage array, and he also noticed that large file transfers would start fast but then after a few minutes would bog down with poor and slow write performance. In short, Gravel found that the new WD Red NAS 6TB hard drive array (SKU WD60EFAX) was unable to adequately perform the same tasks and jobs that his older WD Red NAS 4TB hard drive array (SKU WD40EFRX) had readily and easily performed.

185.    Gravel was puzzled and disappointed by this very poor performance. Gravel was unable to use the new hard drives for their intended and advertised purpose.

186.    After Gravel had installed these poor-performing WD Red NAS 6TB hard drives in the QNAP, Gravel had moved his four older WD Red NAS 4TB drives (SKU WD40EFRX) to the QNAP TR-004 external 4-bay expansion unit. The expansion unit was connected externally to the main QNAP TS-452Be unit via a USB-C cable. Gravel set up a second RAID 5 array on these old WD Red NAS 4TB drives in the expansion unit.

FIRST AMENDED
CLASS ACTION COMPLAINT                              - 41 -                              HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

187.     Given the consistently poor, and puzzling, performance of the first RAID 5 array in the main QNAP unit with the new WD Red NAS 6TB hard drives, Gravel decided to move his iSCSI data and mixed content file share onto the second datastore on the external expansion unit containing his older WD40EFRX drives, given those older drives previously performed well with that workload.

188.     Sure enough, once Gravel moved the iSCSI data and mixed content file share over to the expansion unit datastore with the older WD Red NAS 4TB drives, the performance improved dramatically to the same excellent level it had been before on those same WD40EFRX hard drives back when they had been installed in the main QNAP TS-452Be unit. Writes and reads and file transfers were no longer sluggish or choppy, and the performance was now consistent and excellent.

189.     Gravel decided to repurpose the newer (and poor performing) WD Red NAS 6TB datastore in the main QNAP unit for the lightweight and undemanding job of being a media server for playing movies that he owned. The drives were simply too poor performing for anything else.

190.     In late April 2020, Gravel read an article on *Ars Technica* which discussed how WDC had snuck inferior and inappropriate SMR technology into its new WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss. After some further research, Gravel learned that WDC had recently admitted to the technology press that the WD Red NAS 6TB drives he purchased, with SKU WD60EFAX, were among these inferior SMR-technology drives. When Gravel read this, he thought to himself that this suddenly made a whole lot of sense. Now there was an explanation for the strangely terrible performance he had experienced with the WD60EFAX drives he purchased. The problems and poor performance he had observed were consistent with the problems and complaints about these SMR drives now being reported by the online press and by consumers in online comments.

191.     Gravel had been defrauded. Gravel had bought the hard drives based on WDC's representations that the drives were purpose-built for NAS and RAID. But the hard drives he

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 42 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

purchased, contrary to WDC's express representations, were <u>not</u> appropriate for NAS or RAID, and were not appropriate for sustained random writes or usage in iSCSI datastores. Gravel was unable to use the new hard drives for their intended and advertised purpose.

192.    Gravel was also upset about the increased risk of losing his video and movie files stored on the SMR WD Red NAS 6TB drives. The failure of a single drive could result in the loss of data due to poorer performance in RAID rebuilds, where a second drive could fail or drop out of the array like other purchasers had reported happened to them.

193.    Gravel reasonably relied on WDC's misrepresentations and omissions of material facts. If Gravel had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for their intended and advertised use, Gravel would not have purchased the hard drives. Gravel would have purchased different CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

194.    As a direct and proximate result of WDC's acts and omissions, Gravel was harmed, suffered an injury-in-fact, and lost money or property.

195.    Gravel would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems and RAID.

196.    Gravel will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

**Plaintiff Tod Weitzel**

197.    Plaintiff Tod Weitzel is, and at all relevant times has been, a California resident.

198.    In June 2018, Weitzel purchased a Dell PC with a hardware RAID card. Weitzel set up the PC as a FreeNAS network attached storage server for his home use, with six hard drives set up in a ZFS storage pool.

199.    Weitzel used the FreeNAS server to store and access personal files and media, and also to run virtual machines (software emulations of physical computers).

200.    By April 2020, Weitzel had populated the FreeNAS server ZFS storage pool

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 43 -                    **HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

with five WD Red NAS 4TB hard drives (SKU WD40EFRX), and one WD Red NAS 3TB hard drive (SKU WD30EFRX). All of these WD Red NAS hard drives utilized traditional CMR technology.

201.    However, the storage pool of the FreeNAS server was almost full, and Weitzel decided to replace the sole 3TB hard drive with another WD Red NAS 4TB hard drive to add more capacity.

202.    Weitzel had previously purchased WD Red NAS hard drives because they were advertised as being "purpose-built" for NAS devices and FreeNAS ZFS pools, and he understood WD Red NAS hard drives to have a good reputation for such usage. Weitzel also knew and relied on the fact that the creator of the FreeNAS storage software, iXsystems, was a vendor partner of WDC and that iXsystems explicitly recommended WD Red NAS hard drives for use in FreeNAS systems. In fact, many of the FreeNAS hardware systems which iXsystems itself manufactured and offered for sale on its website came pre-populated with WD Red NAS hard drives. Meanwhile, Weitzel had been happy with his WD Red NAS hard drives and their performance in his existing FreeNAS ZFS storage pool.

203.    Based on his prior good experience with WD Red NAS hard drives and WDC's promotion and advertising of the hard drives for NAS systems like his, Weitzel desired to purchase another WD Red NAS 4TB drive.

204.    On April 14, 2020, Weitzel visited eBay.com to purchase another WD Red NAS 4TB hard drive. Weitzel navigated to an eBay product webpage for the drive. The description contained a manufacturer-provided image of the hard drive titled "WD RED 3.5" NAS HARD DRIVE," and stated the hard drive was "new" and was a "Western Digital NAS WD40EFAX 4TB SATA 256M Cache 3.5" WD Red." Weitzel reasonably assumed and understood that this WD Red NAS 4TB drive was virtually identical in performance to his existing, and excellent performing, five other WD Red NAS 4TB drives, and that as WDC advertised for all its WD Red NAS hard drives, the hard drive was "purpose-built" for NAS and FreeNAS systems like his.

205.    Weitzel had no idea the WD Red NAS 4TB hard drive in fact utilized inferior

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1     and inappropriate SMR technology, which was not disclosed to him.

2          206.    Relying on the representations regarding the WD Red NAS 4TB hard drive, and

3     based on his prior good experience with WD Red NAS hard drives and WDC's promotion and

4     advertising of the hard drives for NAS systems like his, Weitzel purchased the hard drive for

5     $115.00 plus tax.

6          207.    Weitzel received the hard drive on April 16, 2020. He then replaced the WD

7     Red NAS 3TB drive in his storage pool with this new hard drive and began the resilvering

8     process. While the ZFS pool was still in the resilvering process, Weitzel saw and read the *Ars*

9     *Technica* article which discussed how WDC had recently snuck inferior and inappropriate SMR

10    technology into its WD Red NAS hard drives, causing poor performance, hard disks to get

11    knocked out of RAID arrays, and increased risk of data loss particularly during the resilvering

12    process. Weitzel then learned that the WD Red NAS 4TB drive he purchased (SKU

13    WD40EFAX), which was currently in the middle of the resilvering process, was among these

14    inferior SMR-technology drives.

15         208.    In addition to being upset after learning of the poor drive performance, Weitzel

16    became very concerned that the resilvering process may fail and that he could suffer data loss.

17         209.    Thankfully, the resilvering process finally completed.

18         210.    However, after the drive was integrated and the ZFS array resilvering process

19    had completed, Weitzel now experienced terrible read and write performance in his ZFS pool.

20         211.    For example, reading and opening files became much slower than it used to be

21    prior to adding the WD40EFAX drive, especially for folders with large amounts of files. A

22    shared folder that used to take about 12 seconds to display all the file contents, now took up to

23    45 seconds. Weitzel also operated a Nextcloud virtual machine instance (a local file sharing

24    software platform) on the FreeNAS system. The Nextcloud operations likewise were now

25    significantly slower and often sputtered. Weitzel also used a Plex media server stored on the

26    FreeNAS system for recording and playing back over-the-air TV. The performance became

27    abysmal, such that the data would stall when recording and then stop altogether such that

28    recording video became impossible. Video and media playback was also plagued with

FIRST AMENDED
CLASS ACTION COMPLAINT                          - 45 -                          **HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1    intermittent buffering and stops and starts.

2        212.    Over the next few weeks, Weitzel became increasing frustrated with the now-

3    terrible performance of the ZFS pool. Weitzel purchased a Seagate IronWolf NAS 4TB drive to

4    replace the poor-performing (and virtually unusable) WD Red NAS SMR-technology drive.

5    Weitzel knew that all Seagate NAS-labeled drives exclusively used CMR technology like his

6    older WD Red NAS drives had. Weitzel had read in another *Ars Technica* article that Seagate

7    had publicly affirmed that "Seagate only produces NAS drives that are CMR. We do not have

8    any SMR drives in our IronWolf and IronWolf Pro drives, which are NAS solutions…[W]e

9    don't recommend SMR for NAS."[30]

10       213.    On May 31, 2020, Weitzel replaced the SMR-technology WD Red NAS 4TB

11   (SKU WD40EFAX) drive with the IronWolf NAS 4TB drive. With the WD40EFAX removed,

12   the resilvering process completed within a few hours without issue.

13       214.    After the resilvering process for the FreeNAS ZFS disk array had completed,

14   Weitzel immediately noticed that the disk performance had dramatically improved. The

15   performance had returned back to the excellent level it had been prior to having added the (now

16   removed) SMR-technology WD40EFAX hard drive.

17       215.    Notably, since WDC publicly admitted in late April 2020 that certain SKUs of

18   its WD Red NAS hard drives now contained SMR technology[31], iXsystems (the developer of

19   the FreeNAS software that Weitzel utilizes on his server) now states that SMR WD Red NAS

20   drives are not compatible with FreeNAS and ZFS, and iXsystems recommends that FreeNAS

21   users not install SMR WD Red NAS drives in their FreeNAS systems.

22       216.    Weitzel had been defrauded. Weitzel felt betrayed and taken advantage of by

23   WDC. WDC had tricked Weitzel into relying on the past reputation and performance of WD

24   Red NAS drives. WDC had secretly snuck the inferior SMR-technology into the drives to

25   increase its short-term profits while exploiting customers like Weitzel whom WDC kept in the

---

[30] *See* https://arstechnica.com/information-technology/2020/04/seagate-says-network-attached-storage-and-smr-dont-mix/.

[31] Specifically, the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX and WD60EFAX.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

dark. WDC had continued to promise and advertise that the WD Red NAS hard drives he purchased were designed for NAS and storage devices like his FreeNAS server. But the SMR hard drives he purchased were <u>not</u> appropriate for NAS devices or storage servers, and in fact WDC's vendor-partner iXsystems now states that the SMR drives are inappropriate for use in FreeNAS systems like Weitzel's.

217.    In fact, the SMR-technology WD Red NAS 4TB hard drive that Weitzel purchased was useless and completely worthless for its intended purpose. This drive now sits in a box on the floor next to Weitzel's FreeNAS server.

218.    Weitzel reasonably relied on WDC's misrepresentations and omissions of material facts. If Weitzel had known that the WD Red NAS hard drive he purchased utilized recording technology which was inappropriate for its intended and advertised use, Weitzel would not have purchased the hard drive. Weitzel would have purchased a different CMR-technology hard drive (such as the IronWolf NAS 4TB drive he later purchased to replace it), which was truly appropriate for use in a FreeNAS server.

219.    As a direct and proximate result of WDC's acts and omissions, Weitzel was harmed, suffered an injury-in-fact, and lost money or property.

220.    Weitzel would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems, RAID, and FreeNAS drive arrays.

221.    Weitzel will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

## CLASS ACTION ALLEGATIONS

222.    Plaintiffs Nicholas Malone, Chris Ayers, James Backus, David Eaton, Steven Gravel and Tod Weitzel (collectively, "Plaintiffs") hereby each brings this lawsuit on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

223.    **The Class.** All Plaintiffs and/or Plaintiff Tod Weitzel seek to represent the

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 47 -                    HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

following nationwide Class under California law:

> **All United States residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

224. Plaintiffs' and Mr. Weitzel's nationwide class presumes that California law can and will be applied to all of Defendant's acts and omissions alleged herein. Defendant is headquartered in California and is regulated by the UCL, FAL and CLRA. The acts and omissions of Defendant alleged herein were conceived in California, were approved in California, were executed in whole or in substantial part in California, and/or were, in the case of false or misleading communications or advertisements, communicated from California. The nationwide Class was harmed from California.

225. That being said, Plaintiffs acknowledge that a Court may disagree as to the application of California law to the entire nationwide Class and may limit each Plaintiff to representing a subclass of persons within his home state bringing claims under that state's consumer protection statute. While Plaintiffs intend to argue at all court levels that California law applies to the nationwide Class, Plaintiffs herein allege alternative state subclasses as per Plaintiffs' fiduciary duty to allege, protect and preserve as many viable claims as possible.

226. **California Subclass.** In the alternative, Plaintiff Tod Weitzel seeks to represent the following California subclass under California law:

> **All California residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

227. **Florida Subclass.** In the alternative, Plaintiff Chris Ayers seeks to represent the following Florida subclass under Florida law:

> **All Florida residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

228. **Missouri Subclass.** In the alternative, Plaintiff David Eaton seeks to represent the following Missouri subclass under Missouri law:

> **All Missouri residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

229.    **New York State Subclass.** In the alternative, Plaintiff Steven Gravel seeks to represent the following New York State subclass under New York State law:

> **All New York State residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

230.    **Virginia Subclass.** In the alternative, Plaintiff James Backus seeks to represent the following Virginia subclass under Virginia law:

> **All Virginia residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

231.    **Wisconsin Subclass.** In the alternative, Plaintiff Nicholas Malone seeks to represent the following Wisconsin subclass under Wisconsin law:

> **All Wisconsin residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

232.    Specifically excluded from the Class and each and every subclass are Defendant, any entity in which a Defendant has a controlling interest or which has a controlling interest in Defendant, Defendant's agents and employees and attorneys, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

233.    ***Numerosity.*** The Plaintiffs do not know the exact number of members of the Class and each subclass. That being said, Plaintiffs are informed and believe that the Class easily comprises tens of thousands of persons, while each subclass comprises one thousand or more individuals. In any event, the members of the Class and each subclass are so numerous that joinder of all members is impracticable.

234.    ***Commonality and Predominance.*** Well-defined, identical legal or factual questions affect the members of the Class and each subclass. All claims in this matter arise from the identical written advertising and omissions of material facts regarding the WD Red NAS hard drives purchased by the members of the Class and each subclass. These questions predominate over questions that might affect individual class members. These common questions include, but are not limited to, the following:

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

a.      Whether Defendant's pattern, practice, course of dealing and/or course of trade was, prior to a date yet to be ascertained, to include CMR technology but not SMR technology in its WD Red NAS drives;

b.      Whether Defendant omitted or failed to adequately disclose to the public that, after a date yet to be ascertained, Defendant's WD Red NAS drives contained SMR technology and did not contain CMR technology;

c.      Whether the ordinary consumer of Defendant's WD Red NAS drives would consider the substitution of CMR technology for SMR technology to be material;

d.      The date on which Defendant decided to substitute SMR technology for CMR technology in Defendant's WD Red NAS drives;

e.      The content of the emails, memoranda and other communications evidencing the decision to substitute SMR technology for CMR technology in Defendant's WD Red NAS drives;

f.      The content of the emails, memoranda and other communications evidencing the decision to omit or to fail to adequately disclose to the public the substitution of SMR technology for CMR technology in Defendant's WD Red NAS drives;

g.      The intent of Defendant and Defendant's employees and agents in deciding to omit or to fail to adequately disclose to the public the substitution of SMR technology for CMR technology in Defendant's WD Red NAS drives; and whether said intent was of malice, fraud or oppression;

h.      Whether Defendant's acts and omissions alleged herein violate California's Consumers Legal Remedies Act, False Advertising Law and/or Unfair Competition Law;

i.      Whether the Plaintiffs and the members of the Class or each subclass have suffered injury and have lost money or property as a result of Defendant's acts and omissions alleged herein;

j.      Whether Defendant should be ordered to disgorge its unjust enrichment;

k.      Whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and/or

l.      Whether Plaintiff and the Class are entitled to an order for class-wide injunctive relief, imposing equitable remedies such as restitution and/or requiring WDC to: (1) provide notice to every class member that the WD Red NAS hard drive they purchased is not suited for its intended purpose; and (2) either provide a full refund to Plaintiff and the Class for their WD Red NAS hard drives, or provide Plaintiff and the Class with replacement CMR-technology hard drives that are truly suited for use with NAS devices and RAID, at no additional cost.

235.    The prosecution of separate civil actions by individual members of the Class and each or any subclass would create a risk of inconsistent or varying adjudications with respect to individual members of the Class or subclass which would establish incompatible standards of conduct for the party opposing the Class or subclass.

236.    ***Typicality.*** Each Plaintiff is a member of the Class which that Plaintiff seeks to represent. Each Plaintiff representing a subclass is a member of that subclass. The claims of each Plaintiff are typical of all members of the Class and/or of the Plaintiff's subclass.

237.    All of the claims alleged by each Plaintiff, on behalf of himself individually and on behalf of the Class, arise from the same misrepresentations and omissions of material fact. All of the claims alleged by each Plaintiff, on behalf of himself individually and on behalf of a subclass, arise from the same misrepresentations and omissions of material fact.

238.    All of the claims alleged by each Plaintiff, on behalf of himself individually and on behalf of the Class, are based on the same legal theories. All of the claims alleged by each Plaintiff, on behalf of himself individually and on behalf of a subclass, are based on the same legal theories.

239.    ***Adequacy.*** None of the Plaintiffs has an interest antagonistic to or in conflict with the Class. No Plaintiff has an interest antagonistic to or in conflict with that Plaintiff's respective subclass. Each Plaintiff will thoroughly and adequately protect the interests of the Class, having retained qualified and competent legal counsel to represent himself and the Class.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Each Plaintiff will thoroughly and adequately protect the interests of that Plaintiff's respective subclass, having retained qualified and competent legal counsel to represent himself and the subclass.

240.    Further, a class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each class and subclass member's interests are small compared to the burden and expense required to litigate each of their claims individually, so it would be impractical and would not make economic sense for class members to seek individual redress for Defendant's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

241.    By its conduct and omissions alleged herein, Defendant has acted and refused to act on grounds that apply generally to the Class and each subclass, such that final injunctive relief and/or declaratory relief is appropriate with respect to the Class or subclasses as a whole.

242.    The prosecution of separate actions by individual members of the Class or a subclass would create a risk of inconsistent or varying adjudications.

243.    A class action is the only practical, available method for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member are too small to make individual actions economically feasible.

244.    Common questions will predominate, and there will be no unusual manageability issues.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1

**CAUSES OF ACTION**

2

**COUNT I**
**Violation of the Consumers Legal Remedies Act**
**California Civil Code § 1750 *et seq.***
**(Individually and On Behalf Of The Class)**

3

4

5      245.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

6   herein.

7      246.    Each Plaintiff brings this claim in his individual capacity, in his capacity as a

8   private attorney general seeking the imposition of public injunctive relief, and/or as a

9   representative of the Class.

10     247.    Defendant is a "person," as defined by California Civil Code § 1761(c).

11     248.    The Plaintiffs and class members are "consumers," as defined by California

12  Civil Code § 1761(d).

13     249.    The WD Red NAS hard drives purchased by the Plaintiffs and the Class

14  members are "goods" as defined by California Civil Code § 1761(a).

15     250.    The purchases by the Plaintiffs and the class members constitute "transactions,"

16  as defined by California Civil Code § 1761(e).

17     251.    The unlawful methods, acts or practices alleged herein to have been undertaken

18  by Defendant were all committed intentionally and knowingly. The unlawful methods, acts or

19  practices alleged herein to have been undertaken by Defendant did not result from a *bona fide*

20  error notwithstanding the use of reasonable procedures adopted to avoid such error.

21     252.    With regard to this count of the pleading which alleges one or more violations of

22  the CLRA, venue is proper in the state or federal court having jurisdiction over Santa Clara

23  County, California (the county in which this action has been commenced) pursuant to Section

24  1780(d) of the California Civil Code because, without limitation, Santa Clara County is a

25  county in which Defendant is doing business and is the county in which Defendant is

26  headquartered. A declaration establishing that this Court has proper venue for this count is

27  attached hereto as **Exhibit A**.

28

---

FIRST AMENDED
CLASS ACTION COMPLAINT

- 53 -

253. Defendant's methods, acts and/or practices, including Defendant's misrepresentations, omissions, active concealment, and/or failures to disclose, violated and continue to violate the CLRA in ways including, but not limited to, the following:

a. Defendant misrepresented that its products had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

b. Defendant misrepresented that its products were of a particular standard, quality, grade, or of a particular style or model when the products were of another (Cal. Civ. Code § 1770(a)(7));

c. Defendant advertised its products with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)); and

d. Defendant represented that its products were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

254. Specifically, Defendant advertised and represented that these WD Red NAS hard drives were suitable for the particular purpose of NAS and RAID, when in fact the hard drives were not suitable for that purpose and were actually outright dangerous when used for that purpose.

255. With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiffs and the Class; (b) Defendant concealed material information from Plaintiffs and the Class; and/or (c) Defendant made partial representations which were false and misleading absent the omitted information.

256. Defendant's misrepresentations and nondisclosures deceive and have a tendency and ability to deceive the general public.

257. Defendant's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions. Indeed, the utility and value of Defendant's WD Red NAS hard drives with SMR technology are significantly reduced, to the point of

FIRST AMENDED
CLASS ACTION COMPLAINT

- 54 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

worthlessness, because these drives should not and cannot be used for their intended and advertised purpose of NAS or RAID.

258.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent conduct, Plaintiffs and the Class suffered injury-in-fact and lost money.

259.    But for Defendant's deceptive conduct and omissions of material facts, Plaintiffs and the Class would not have purchased the subject hard drives and/or would have purchased an appropriate CMR-technology hard drive from one of Defendant's competitors instead. Defendant's conduct as alleged herein caused substantial injury to Plaintiffs, class members, and the public. Defendant's conduct is ongoing and will continue and recur absent a permanent injunction. Accordingly, Plaintiffs and the Class seek an order enjoining Defendant from committing such practices.

260.    If not enjoined by order of this Court, Defendant is free to resume its unlawful behavior and injure Plaintiffs and consumers through the misconduct alleged herein once more. Defendant has a duty to speak truthfully or in a non-misleading manner.

261.    Plaintiffs would purchase WD NAS hard drives again if they could have confidence regarding the truth of WDC's representations regarding their appropriateness and fitness for NAS systems and RAID.

262.    Plaintiffs will be harmed if, in the future, they are left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

263.    If Plaintiffs were to purchase a WD Red NAS hard drive again without WDC having changed its unlawful and deceptive conduct alleged herein, Plaintiffs would be harmed on an ongoing basis and/or would be harmed once or more in the future.

264.    In order to prevent injury to the general public, Plaintiffs, in their individual capacities, seek a public injunction requiring WDC to stop advertising, and to instruct its resellers to stop advertising, any hard drives with SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names).

265.    The balance of the equities favors the entry of permanent injunctive relief

FIRST AMENDED
CLASS ACTION COMPLAINT                     - 55 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

against Defendant. Plaintiffs and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiffs and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

266.     Plaintiffs do not currently seek damages in this First Amended Complaint under the CLRA.

267.     In accordance with California Civil Code § 1782(a), Plaintiffs, through counsel, intend to promptly serve Defendant with notice of its CLRA violations by USPS certified mail, return receipt requested.

268.     If Defendant fails to provide appropriate relief for its CLRA violations within 30 days of its receipt of Plaintiffs' notification letter, Plaintiffs will seek leave to amend this complaint to pray for actual and/or punitive damages as permitted by Cal. Civ. Code §§ 1780 and 1782(b), along with attorneys' fees and costs.

**<u>COUNT II</u>**
**Violation of California's False Advertising Law**
**California Business and Professions Code § 17500 *et seq.***
**(Individually and On Behalf Of The Class)**

269.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

270.     Each Plaintiff brings this claim in his individual capacity, in his capacity as a private attorney general seeking the imposition of public injunctive relief, and/or as a representative of the putative Class.

271.     Defendant has engaged in false or misleading advertising in violation of California's statutory False Advertising Law ("FAL").

272.     Defendant's conduct as described herein is misleading, and/or has a capacity, likelihood or tendency to deceive reasonable consumers.

273.     Defendant, with intent directly or indirectly to dispose of personal property or to perform services, or to induce the public to enter into any obligation relating thereto, makes,

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 56 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1  disseminates, has made or disseminated, causes to be made or disseminated, and/or has caused

2  to be made or disseminated, before the public in California, in newspaper or other publication,

3  or other advertising device, or by public outcry or by proclamation, or in any other manner or

4  means, including over the internet, statements concerning that personal property or those

5  services, and/or concerning any circumstance or matter of fact connected with the proposed

6  performance or disposition thereof, which are untrue or misleading and which are known (or

7  which by the exercise of reasonable care should be known) to be untrue or misleading.

8          274.    Defendant made, disseminated, makes, disseminates, caused to be made or

9  disseminated and/or causes to be made or disseminated any statements concerning the

10 disposition of personal property or the performance of services, and/or concerning any

11 circumstance or matter of fact connected with such statement as part of a plan or scheme with

12 the intent not to sell that personal property or those services, professional or otherwise, as

13 advertised.

14         275.    With respect to omissions, Defendant at all relevant times had a duty to disclose

15 the information in question because, *inter alia*: (a) Defendant had exclusive knowledge of

16 material information that was not known to Plaintiffs and the Class; (b) Defendant concealed

17 material information from Plaintiffs and the Class; and/or (c) Defendant made partial

18 representations which were false and misleading absent the omitted information.

19         276.    Defendant committed such violations of the False Advertising Law with actual

20 knowledge that its advertising was misleading, or Defendant, in the exercise of reasonable care,

21 should have known that its advertising was misleading.

22         277.    Plaintiffs and the Class reasonably relied on Defendant's representations and/or

23 omissions made in violation of the False Advertising Law.

24         278.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent

25 conduct, Plaintiffs and each member of the Class suffered injury-in-fact and lost money.

26         279.    But for Defendant's deceptive conduct and omissions of material facts, Plaintiffs

27 and the Class would not have purchased the subject hard drives and/or would have purchased

28 an appropriate hard drive from one of Defendant's competitors instead.

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 57 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

280.    Defendant should be ordered to disgorge or make restitution of all monies improperly accepted, received, or retained.

281.    Defendant's conduct has caused substantial injury to Plaintiffs, class members, and the public. Defendant's conduct is ongoing and will continue and recur absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Defendant from committing such violations of the FAL. Plaintiffs further seek an order granting restitution to Plaintiffs and the Class in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

282.    Plaintiffs, on behalf of themselves and the Class, seek injunctive relief to require Defendant to: (1) provide notice to every class member that the WD Red NAS hard drive they purchased is not suited for its intended purpose; and (2) either provide a full refund to Plaintiffs and the Class for their WD Red NAS hard drives, or provide Plaintiffs and the Class with replacement CMR-technology hard drives that are truly suited for use with NAS devices and RAID, at no additional cost.

283.    Absent injunctive relief, Defendant will continue to injure Plaintiffs and the class members. Even if such conduct were to cease, it is behavior that is capable of repetition or reoccurrence by Defendant.

284.    In order to prevent injury to the general public, Plaintiffs, in their individual capacities, seek a public injunction requiring WDC to stop advertising, and to instruct its resellers to stop advertising, any hard drives with SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names).

285.    Plaintiffs and the general public lack an adequate remedy at law to remedy and/or mitigate the totality of the injuries and misconduct described herein.

**COUNT III**
**Violation of California's Unfair Competition Law**
**California Business and Professions Code § 17200 *et seq*.**
**(Individually and On Behalf Of The Class)**

286.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

FIRST AMENDED
CLASS ACTION COMPLAINT                        - 58 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

287.     Each Plaintiff brings this claim in his individual capacity, in his capacity as a private attorney general seeking the imposition of public injunctive relief, and/or as a representative of a putative Class.

288.     Defendant's acts and omissions alleged herein constitute unfair competition and/or unlawful, unfair, or fraudulent business practices in violation of California Business and Professions Code § 17200 et seq. (the "Unfair Competition Law" or "UCL").

289.     Defendant's conduct and omissions alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the Class. There is no utility to Defendant's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm to consumers caused by Defendant's conduct alleged herein.

290.     Defendant's conduct and omissions alleged herein also violate California public policy, including as such policy is reflected in Cal. Civ. Code § 1750 *et seq.* and Cal. Civ. Code §§ 1709-1710.

291.     By its conduct and omissions alleged herein, Defendant has violated the "unlawful" prong of the UCL, including by making material misrepresentations and omissions in violation of Cal. Bus. & Prof. Code § 17500 *et seq.* and Cal. Civ. Code § 1750, *et seq.*; and engaging in deceit and fraudulent concealment in violation of Cal Civ. Code §§ 1709-1710, *et seq.*

292.     With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiffs and the Class; (b) Defendant concealed material information from Plaintiffs and the Class; and/or (c) Defendant made partial representations which were false and misleading absent the omitted information.

293.     Defendant's material misrepresentations and nondisclosures were likely to mislead reasonable consumers, existing and potential customers, and the public.

294.     Defendant's nondisclosures and omissions of material facts deceive and have a tendency to deceive the general public and reasonable consumers, and therefore were unfair

1    and fraudulent.

2       295.    Defendant's nondisclosures and omissions of material facts are material, such

3    that a reasonable person would attach importance to the information and would be induced to

4    act on the omissions in making purchase decisions.

5       296.    Plaintiffs and members of the Class reasonably relied on Defendant's

6    nondisclosures and omissions of material facts.

7       297.    By its conduct and omissions alleged herein, Defendant received more money

8    from Plaintiffs and the Class than it should have received, and that money is subject to

9    restitution.

10      298.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent

11   conduct, Plaintiffs and the Class suffered injury-in-fact and lost money.

12      299.    But for Defendant's deceptive conduct and omissions of material facts, Plaintiffs

13   and the Class would not have purchased the subject hard drives and/or would have purchased

14   an appropriate hard drive from one of Defendant's competitors instead.

15      300.    Each Plaintiff, on behalf of himself and the Class, seeks injunctive relief to

16   require Defendant to: (1) provide notice to every class member that the WD Red NAS hard

17   drive they purchased is not suited for its intended purpose; and (2) either provide a full refund

18   to Plaintiffs and the Class for their WD Red NAS hard drives, or provide Plaintiffs and the

19   Class with replacement CMR-technology hard drives that are truly suited for use with NAS

20   devices and RAID, at no additional cost.

21      301.    Defendant's conduct has caused substantial injury to Plaintiffs, class members,

22   and the public. Defendant's conduct is ongoing and will continue and recur absent a permanent

23   injunction. Accordingly, Plaintiffs seek an order enjoining Defendant from committing such

24   unlawful, unfair, and fraudulent business practices. Plaintiffs further seek an order granting

25   restitution to Plaintiffs and the Class in an amount to be proven at trial. Plaintiffs further seek

26   an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

27      302.    Plaintiffs and the general public lack an adequate remedy at law to remedy

28   and/or mitigate the totality of the injuries and misconduct described herein.

FIRST AMENDED
CLASS ACTION COMPLAINT                          - 60 -

303.    Absent injunctive relief, Defendant will continue to injure Plaintiffs and the class members. Defendant's conduct and omissions of material fact are ongoing. And, even if such conduct were to cease, it is behavior that is capable of repetition or reoccurrence by Defendant.

304.    In order to prevent injury to the general public, Plaintiffs, in their individual capacities, seek a public injunction requiring WDC to stop advertising, and to instruct its resellers to stop advertising, any hard drives with SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names).

**COUNT IV**
**Violation of Relevant State's Consumer Protection Statute**
**(Individually and On Behalf Of A Subclass)**

305.    Plaintiffs reallege and incorporate by reference Paragraphs 1 to 244, inclusive, alleged above.

306.    Each Plaintiff brings this claim in the alternative to the prior claims alleged in this First Amended Complaint. Claims I to III above are based on the presumption that the Court will allow all Plaintiffs and the nationwide Class to bring claims against Defendant under California law. In the event that the Court does not so rule, each Plaintiff brings in the alternative this Claim IV and alleges that the law of each Plaintiff's residence state applies to claims against Defendant brought by that Plaintiff and of a subclass composed of persons within the state.

307.    Each subclass of persons within his home state bringing claims under that state's consumer protection statute. While Plaintiffs intend to argue at all court levels that California law applies to the nationwide Class, Plaintiffs herein allege alternative state subclasses as per Plaintiffs' fiduciary duty to allege, protect and preserve as many viable claims as possible.

308.    **California Subclass.** In the alternative, Plaintiff Tod Weitzel seeks to represent the following California subclass under California law:

> **All California residents who, during the applicable**
> **limitations period, purchased any Western Digital WD Red**
> **NAS hard drive with SMR technology.**

309.    Plaintiff Tod Weitzel would bring his alternative claims under the California

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Consumers Legal Remedies Act, the False Advertising Law and/or the Unfair Competition Law.

310.   Plaintiff Tod Weitzel hereby re-alleges all of Claim I, Claim II and Claim II above, but limited to the California subclass.

311.   **Florida Subclass.** In the alternative, Plaintiff Chris Ayers seeks to represent the following Florida subclass under Florida law:

> **All Florida residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

312.   Plaintiff Chris Ayers would bring his alternative claims under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 through 501.213.

313.   Plaintiff Chris Ayers is a "consumer" as defined by Florida Statutes § 501.203(7). Defendant is engaged in "trade or commerce" as defined by Florida Statutes § 501.203(8) when, without limitation, Defendant engages in advertising, soliciting, providing, offering or distributing, whether by sale or rental or otherwise, of any good or service—in this case, the advertising of Defendant's WD Red NAS hard drives.

314.   By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of a trade or commerce.

315.   Defendant's misconduct was likely to deceive a reasonable consumer, and, in deceiving Plaintiff Chris Ayers, did deceive a reasonable consumer. Furthermore, when purchasing a WD Red NAS drive, Mr. Ayers relied upon Defendant's advertisements and/or prior course of conduct or dealing in presuming that a WD Red NAS drive would be compatible with NAS and RAID environments.

316.   Defendant's misconduct caused Plaintiff Chris Ayers and each member of the subclass to be injured. For example, and without limitation, Defendant's false advertising caused Plaintiff Chris Ayers to purchase a WD Red NAS drive. If Defendant's advertising had not been unfair, unconscionable or deceptive, Plaintiff Chris Ayers would not have purchased

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

that drive. He and each member of the subclass has been harmed by the amount paid out-of-pocket for the WD Red NAS drive; if he and other members of the class ultimately purchase another drive as a replacement, then the cost of that replacement should be added to the out-of-pocket harm. Mr. Ayers and the members of the subclass may therefore pray for an award of actual damages.

317.    Mr. Ayers and the members of the subclass may also pray for the imposition of injunctive relief which limits and polices Defendant's advertisements within or reaching Florida. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

318.    **Missouri Subclass.** In the alternative, Plaintiff David Eaton seeks to represent the following Missouri subclass under Missouri law:

> **All Missouri residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

319.    Plaintiff David Eaton would bring his alternative claims under the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 through 407.307.

320.    Defendant is a "person" pursuant to Mo. Rev. Stat. § 407.010(5). Defendant is engaged in "trade" or "commerce" pursuant to Mo. Rev. Stat. § 407.010(7) in that Defendant is engaged in the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated. The terms "trade" and "commerce" include any trade or commerce directly or indirectly affecting the people of the State of Missouri.

321.    By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in the act, use or employment of deception,

1  fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment,

2  suppression, or omission of any material fact in connection with the sale or advertisement of

3  any merchandise in trade or commerce.

4       322.    Plaintiff David Eaton purchased Defendant's merchandise in the State of

5  Missouri. Mr. Eaton's purchase was for personal, family, or household purposes.

6       323.    Defendant's misconduct caused Plaintiff David Eaton and the members of the

7  subclass to suffer an ascertainable loss of money or property. For example, and without

8  limitation, Defendant's false advertising caused Plaintiff David Eaton to purchase a WD Red

9  NAS drive. If Defendant's advertising had not used or employed deception, fraud, false

10  pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or

11  omission of any material fact, Plaintiff David Eaton would not have purchased that drive. He

12  and the members of the subclass have been harmed by the ascertainable amount paid out-of-

13  pocket for the WD Red NAS drive; if he and members of the subclass ultimately purchase

14  another drive as a replacement, then the ascertainable cost of that replacement should be added

15  to the out-of-pocket harm. His ascertainable loss and that of the subclass was a result of the acts

16  and omissions of Defendant declared unlawful by Mo. Rev. Stat. § 407.020, and, as such, Mr.

17  Eaton and each member of the subclass may pray for an award of his actual damages.

18       324.    Defendant's conduct was egregious and demonstrated clear and disturbing

19  disregard for Mr. Eaton's economic interests and the security of his data. As such, Mr. Eaton

20  and each member of the subclass may pray for an award of punitive damages under Mo. Rev.

21  Stat. § 407.025(1).

22       325.    Mr. Eaton and the members of the subclass may also pray for the imposition of

23  injunctive relief which limits and polices Defendant's advertisements within or reaching

24  Missouri. The balance of the equities favors the entry of permanent injunctive relief against

25  Defendant. Plaintiff and the general public will be irreparably harmed absent the entry of

26  permanent injunctive relief against Defendant. Plaintiff and the general public lack an adequate

27  remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's

28  unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent

FIRST AMENDED
CLASS ACTION COMPLAINT     - 64 -     HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1   injunction.

2        326.    **New York State Subclass.** In the alternative, Plaintiff Steven Gravel seeks to

3   represent the following New York State subclass under New York State law:

4        **All New York State residents who, during the applicable**
     **limitations period, purchased any Western Digital WD Red**
5        **NAS hard drive with SMR technology.**

6        327.    Plaintiff Steven Gravel would bring his alternative claims under the New York

7   State Consumer Protection From Deceptive Acts And Practices Law (N.Y. Gen. Bus. Law §§

8   349 to 350-F-1, inclusive).

9        328.    By engaging in the acts and omissions alleged above and incorporated herein,

10  Defendant has engaged and continues to engage in deceptive acts or practices in the conduct of

11  any business, trade or commerce. In addition, by engaging in the acts and omissions alleged

12  above and incorporated herein, Defendant has engaged and continues to engage in false

13  advertising in that Defendant has engaged and continues to engage in advertising, including

14  labeling, of a commodity when such advertising is misleading in a material respect.

15  Defendant's acts and omissions are misleading not only in their statements, words, designs,

16  devices, sounds or any combination thereof, but also the extent to which the advertising fails to

17  reveal facts material in the light of such representations with respect to the commodity to which

18  the advertising relates under the conditions prescribed in said advertisement, or under such

19  conditions as are customary or usual. Defendant has engaged and continues to engage in

20  consumer-oriented conduct that is materially misleading.

21       329.    Defendant's misconduct caused Plaintiff Steven Gravel and the members of the

22  subclass to suffer an actual injury. For example, and without limitation, Defendant's deceptive

23  acts and/or false advertising caused Plaintiff Steven Gravel to purchase a WD Red NAS drive.

24  If Defendant's acts had not been deceptive and/or Defendant's advertising had not been false,

25  Plaintiff Steven Gravel would not have purchased that drive. He and the members of the

26  subclass have been harmed by the actual amount paid out-of-pocket for the WD Red NAS

27  drive; if he or other members of the subclass ultimately purchase another drive as a

28  replacement, then the actual cost of that replacement should be added to the out-of-pocket

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 65 -                    **HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1    harm.

2         330.    For each injury, Mr. Gravel and each member of the subclass may pray for an

3    award of damages equal to fifty dollars or his actual damages, whichever is greater. N.Y. Gen.

4    Bus. Law § 349(h). Because Defendant knowingly and willfully violated Section 349 and/or

5    Section 350 of the New York State General Business Laws, Mr. Gravel and each member of

6    the subclass may also pray for an award of treble damages.

7         331.    Mr. Gravel and the members of the subclass may also pray for the imposition of

8    injunctive relief which limits and polices Defendant's advertisements within or reaching New

9    York State. The balance of the equities favors the entry of permanent injunctive relief against

10   Defendant. Plaintiff and the general public will be irreparably harmed absent the entry of

11   permanent injunctive relief against Defendant. Plaintiff and the general public lack an adequate

12   remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's

13   unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent

14   injunction.

15        332.    **Virginia Subclass.** In the alternative, Plaintiff James Backus seeks to represent

16   the following Virginia subclass under Virginia law:

17            **All Virginia residents who, during the applicable limitations
             period, purchased any Western Digital WD Red NAS hard
18           drive with SMR technology.**

19        333.    Plaintiff James Backus would bring his alternative claims under the Virginia

20   Consumer Protection Act of 1977, as amended, Va. Code Ann. §§ 59.1-196 through 59.1-207.

21        334.    Pursuant to the definitions codified at Va. Code Ann. § 59.1-198: The WD Red

22   NAS drive is a "good" in that it constitutes tangible personal property. Defendant is the WD

23   Red NAS drive's "supplier" in that Defendant is a seller, lessor or licensor who advertises,

24   solicits, or engages in consumer transactions and/or a manufacturer, distributor or licensor who

25   advertises and sells, leases or licenses goods or services to be resold, leased, or sublicensed by

26   other persons in consumer transactions. Plaintiff James Backus' purchase of the WD Red NAS

27   hard drive was a "consumer transaction" in that the WD Red NAS drive was to be used

28   primarily for personal, family or household purposes.

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

335.    By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unlawful fraudulent acts or practices. Specifically, Defendant has and continues to: misrepresent that the WD Red NAS drives have certain quantities, characteristics, uses, or benefits when they do not; misrepresent that the WD Red NAS drives are of a particular standard, quality, grade, style or model; advertise or offer for sale WD Red NAS drives that are defective or that are imperfect or "not first class" without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are defective, imperfect or "not first class"; advertise goods with intent not to sell them as advertised, or with intent not to sell at the terms advertised; and/or use any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

336.    As alleged above and incorporated herein, Defendant's advertisements and promotional materials contain affirmative misrepresentations of fact. Most obviously, the drive is named the "**WD Red NAS**" drive, but it is not compatible with or appropriate to use in a NAS environment. Other misrepresentations include: "**Built for NAS compatibility**," "**Designed for RAID environments**," "**specifically designed for use in NAS systems with up to 8 bays**" and appropriate for "**small and home office NAS systems in a 24x7 environment**."

337.    In addition, Defendant's advertisements and promotional materials violate the Virginia Consumer Protection Act because of their nondisclosure of a material facts—that the drives contained inferior and inappropriate SMR technology instead of the traditional CMR technology. Defendant's decision to omit public announcement of its switch to inferior SMR technology was part of a knowing and deliberate decision not to disclose the fact. Discovery will reveal that Defendant and its officers and employees knowingly made the switch in technology and knowingly decided not to inform consumers of the switch.

338.    Plaintiff James Backus reasonably relied upon Defendant's affirmative statements and upon Defendant's silence regarding any change in technology when Mr. Backus purchased a WD Red NAS drive.

339.    Defendant's misconduct caused Plaintiff James Backus and the members of the

FIRST AMENDED
CLASS ACTION COMPLAINT

- 67 -

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

subclass to suffer an actual loss. For example, and without limitation, Defendant's deceptive acts and/or false advertising caused Plaintiff James Backus to purchase a WD Red NAS drive. If Defendant's acts, statements and omissions had complied with the requirements of Virginia law, Plaintiff James Backus would not have purchased that drive. He and the members of the subclass have been harmed by the actual amount paid out-of-pocket for the WD Red Drive; if he or members of the subclass ultimately purchase another drive as a replacement, then the actual cost of that replacement should be added to the out-of-pocket harm.

340.    For each loss, Mr. Backus and each member of the subclass may pray for an award of damages equal to five hundred dollars or his actual damages, whichever is greater. Va. Code Ann. §§ 59.1-204(A). Because Defendant acted willfully, Mr. Backus and each member of the subclass may also pray for an award of treble damages.

341.    Mr. Backus and the members of the subclass may also pray for the imposition of injunctive relief which limits and polices Defendant's advertisements within or reaching Virginia. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

342.    **Wisconsin Subclass.** In the alternative, Plaintiff Nicholas Malone seeks to represent the following Wisconsin subclass under Wisconsin law:

> **All Wisconsin residents who, during the applicable limitations period, purchased any Western Digital WD Red NAS hard drive with SMR technology.**

343.    Plaintiff Nicholas Malone would bring his alternative claim under Wis. Stat. §§ 100.18 and 100.20.

344.    By engaging in the acts and omissions alleged above and incorporated herein, Defendant (person, firm and/or corporation) has, with intent to sell, distribute, increase the consumption of or in any wise dispose of merchandise or anything offered by Defendant,

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of the merchandise has and continues to make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in Wisconsin, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such merchandise or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

345.    Moreover and separately, by engaging in the acts and omissions alleged above and incorporated herein, Defendant has continued to make, publish, disseminate, circulate or place before the public in Wisconsin in a newspaper or other publication or in the form of book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label or over any radio or television station or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to the purchase, sale, hire, use or lease of merchandise or to the terms or conditions thereof which advertisement, announcement, statement or representation is part of a plan or scheme the purpose or effect of which is not to sell, purchase, hire, use or lease the merchandise as advertised.

346.    Specifically, Defendant advertised the WD Red NAS drives, the advertising was misleading, and Mr. Malone purchased the WD Red NAS drive and thereby suffered pecuniary harm. The false advertising materially induced Mr. Malone to purchase the WD Red NAS drive.

347.    Defendant's misconduct caused Plaintiff Nicholas Malone and the members of the subclass to suffer a pecuniary loss. For example, and without limitation, Defendant's

HATTIS & LUKACS
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

deceptive acts and/or false advertising were a material inducement to Plaintiff Nicholas Malone's purchase of a WD Red NAS drive. If Defendant's acts, statements and omissions had complied with the requirements of Wisconsin law, Plaintiff Nicholas Malone would not have purchased that drive. He and the members of the subclass have been harmed by the actual amount paid out-of-pocket for the WD Red NAS hard drive; if he or members of the subclass ultimately purchase another drive as a replacement, then the actual cost of that replacement should be added to the out-of-pocket harm.

348.     For each loss, Mr. Malone and each member of the subclass may pray for an award of pecuniary damages.

349.     Mr. Malone and the members of the subclass may also pray for the imposition of injunctive relief which limits and polices Defendant's advertisements within or reaching Wisconsin. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

## **PRAYER FOR RELIEF**

1.     In order to prevent injury to the general public, Plaintiffs Nicholas Malone, Chris Ayers, James Backus, David Eaton, Steven Gravel and Tod Weitzel (collectively, "Plaintiffs"), in each's individual capacity, request that the Court enter a public injunction requiring Defendant Western Digital Corporation to stop advertising, and to instruct its resellers to stop advertising, any hard drives with SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names).

2.     Further, on behalf of themselves and the proposed Class, Plaintiffs request that the Court order relief and enter judgment against Western Digital Corporation as follows:

a.     Declare this action to be a proper class action, certifying the Class defined herein, and appoint Plaintiffs and their counsel to represent the Class;

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

1                b.       Declare Defendant's conduct to be in violation of applicable law;

2                c.       Order disgorgement or restitution, including, without limitation,

3 disgorgement of all revenues, profits and/or unjust enrichment that Defendant obtained, directly

4 or indirectly, from Plaintiffs and the members of the Class or otherwise as a result of the

5 unlawful conduct alleged herein;

6                d.       Permanently enjoin Defendant from the unlawful conduct alleged herein;

7                e.       Retain jurisdiction to police Defendant's compliance with the permanent

8 injunctive relief;

9                f.       Order Defendant to: (1) provide notice to every class member that the

10 WD Red NAS hard drive they purchased is not suited for its intended purpose; and (2) either

11 provide a full refund to Plaintiffs and the Class for their WD Red NAS hard drives, or provide

12 Plaintiffs and the Class with replacement CMR-technology hard drives that are truly suited for

13 use with NAS devices and RAID, at no additional cost;

14               g.       Order Defendant to pay attorneys' fees, costs, and pre-judgment and

15 post-judgment interest to the extent allowed by law; and

16               h.       Provide all other relief to which Plaintiffs and the Class may show

17 themselves justly entitled.

18        3.       In the alternative, each Plaintiff requests all of the above but limited to each

19 state subclass represented by each Plaintiff; plus each Plaintiff for each state subclass—with the

20 exception of Tod Weitzel for the California subclass—also requests damages in an amount to

21 be proven at trial plus punitive and exemplary damages to the extent allowed by law.

22

23

24

25

26

27

28

FIRST AMENDED
CLASS ACTION COMPLAINT      - 71 -      **HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

## JURY DEMAND

Plaintiffs Nicholas Malone, Chris Ayers, James Backus, David Eaton, Steven Gravel and Tod Weitzel, each on behalf of himself and on behalf of the Class (and, in the alternative, on behalf of each state subclass), demands a trial by jury on all issues so triable.

DATED this 16th day of June, 2020.

Presented by:

HATTIS & LUKACS

By: _____
Daniel M. Hattis (SBN 232141)
Paul Karl Lukacs (SBN 197007)
HATTIS & LUKACS
400 108th Ave NE, Ste 500
Bellevue, WA 98004
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

*Attorneys for Plaintiffs and the Proposed Class*

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 72 -

**HATTIS & LUKACS**
400 108th Ave. NE, Ste 500
Bellevue, WA 98004
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com