Daniel M. Hattis (SBN 232141)
Paul Karl Lukacs (SBN 197007)
**HATTIS & LUKACS**
400 108th Ave NE, Ste 500
Bellevue, WA 98004
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

L. Timothy Fisher (SBN 191626)
Joel D. Smith (SBN 244902)
**BURSOR & FISHER, P.A.**
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
Email: jsmith@bursor.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS MALONE, CHRIS AYERS, JAMES BACKUS, BRIAN CONWAY, DAVID EATON, STEVEN GRAVEL, JAMES RAAYMAKERS, and TOD WEITZEL, on behalf of themselves and all others similarly situated, | Case No. 5:20-cv-03584-NC |
| | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| WESTERN DIGITAL CORPORATION, | |
| Defendant. | |

1   Plaintiffs Nicholas Malone, Chris Ayers, James Backus, Brian Conway, David Eaton,

2   Steven Gravel, James Raaymakers and Tod Weitzel, individually, as private attorneys general,

3   and/or on behalf of all others similarly situated, allege as follows, on personal knowledge and

4   investigation of their counsel, against Defendant Western Digital Corporation ("WDC,"

5   "Western Digital" or "Defendant"):

6   **INTRODUCTION**

7   1.      This case is brought against Western Digital Corporation on behalf of all United

8   States residents who purchased certain hard drives which were branded "WD Red NAS" and

9   were explicitly advertised and represented to be designed for and suitable for use in NAS

10  (Network Attached Storage) devices, but which in fact are not suitable for that intended use and

11  which put customer data at greater risk of data loss or destruction.[1] The hard drives contain

12  inappropriate recording technology called "SMR" (Shingled Magnetic Recording), which by its

13  very nature is detrimental to and incompatible with usage in NAS devices and RAID storage

14  systems. WDC surreptitiously snuck—without any disclosure whatsoever—this cheaper SMR

15  technology into its WD Red NAS hard drives in or about 2018 in an effort to shave costs while

16  keeping the selling price the same.

17  2.      This inappropriate SMR technology replaced the more-expensive-to-produce but

18  industry-standard "CMR" (Conventional Magnetic Recording) technology which WDC had

19  previously utilized—for nearly a decade—in these very same "WD Red NAS" branded hard

20  drives. Notably, WDC is the only hard drive manufacturer in the world who has ever used SMR

21  technology in NAS-labeled hard drives; all other manufacturers have solely used CMR

22  technology. Both of WDC's largest competitors, Seagate Technology and Toshiba Corporation,

23  have publicly stated that SMR is incompatible with NAS and RAID. Even WDC's own

24  engineers agreed, and were on the record stating—in since-deleted text on a WDC technical

25  blog—that drive-managed SMR technology (like that used in the Red NAS drives), "Due to the

26

27  _____

[1] The affected WD Red NAS hard drives have the following SKUs: WD20EFAX (2TB
28  capacity), WD30EFAX (3TB capacity), WD40EFAX (4TB capacity) and WD60EFAX (6TB
    capacity) (collectively, the "WD Red NAS drives" or "WD Red NAS hard drives").

wide range of performance variability and unpredictability" is "unacceptable" for enterprise use and is only appropriate for "client PC use and external backup HDDs in the client space."[2]

3.  WDC has been sneaking SMR technology into its NAS hard drives since 2018. By utilizing drive-managed SMR, WDC was able to hide the existence of the SMR technology and to cause the drives to be recognized by NAS and RAID systems as if they were traditional (but unusually poor-performing) CMR drives.

4.  Meanwhile, customers who purchased and utilized these hard drives for their advertised and intended purpose—in NAS devices and in RAID arrays—experienced, at best, terrible performance of between 70% to 1,000% slower write speed and read/write latency compared to CMR drives, and also increased risk of data loss during RAID rebuilds due to greatly increased rebuild times. At worst, customers experienced hard drives that froze up and performed so badly that they were detected by the NAS or RAID array as failed hardware and dropped from the disk array, causing catastrophic data loss. Even adding just one of these inferior SMR hard drives to an existing storage array (which otherwise contains traditional, good-performing CMR hard drives) will poison the entire drive array, causing the entire array to suffer this poor performance and greater risk of data loss.

5.  WDC was able to get away with this fraud until April 2020 because it intentionally hid, and even outright lied about, its use of the SMR technology until it was forced to admit its scheme in response to an investigation by a leading storage technology online publication on April 14, 2020. Until then, WDC did not disclose its use of the SMR technology anywhere—including on its product datasheets. Based on information and belief, WDC did not even disclose its use of the SMR technology to its vendor-partners who manufactured the NAS devices for which the hard drives were purportedly designed. Based on information and belief, WDC customer support staff were instructed to refuse to acknowledge

---

[2] For the original version of the WDC technical blog, see the Internet Archive Wayback Machine archived version dated April 23, 2020, available at: https://web.archive.org/web/20200423133021/http://zonedstorage.io/introduction/smr/. After the Red NAS SMR scandal broke, WDC cleansed the webpage of any negative references to DM-SMR; see the current version at http://zonedstorage.io/introduction/smr/.

to customers that the WD Red NAS drives utilized SMR technology—even when asked—and would blame "user error" for bad performance and problems. In fact, a senior WDC executive as recently as March 30, 2020 outright <u>denied</u> that any WD Red NAS hard drives used SMR technology—before WDC was forced to publicly reverse itself two weeks later.

6.      Since WDC's scheme was brought to light four months ago, three of the leading NAS device manufacturers (specifically, Synology, Inc., iXsystems and Drobo, Inc.) have blacklisted WD Red NAS Drives with SMR technology, removing them from their hardware compatibility lists. Those NAS manufacturers now urge their customers not to use the hard drives in their NAS devices because the drives are in fact not appropriate for the hard drives' advertised and intended purpose.

7.      Remarkably, WDC's response, even after getting caught red-handed, has been to claim that using SMR in NAS drives is a good idea and that it has done nothing wrong. In a blog post WDC put out on April 20, 2020 in response to the snowballing fiasco, WDC even attempted to blame its own customers for the problems they were experiencing. WDC accused its customers of overusing the drives "in system workloads far exceeding their intended uses," suggesting that affected customers somehow should have known to purchase different NAS hard drives (i.e., NAS drives with CMR technology) instead, even though WDC had not previously disclosed what recording technology any of its NAS hard drives had used.

8.      Meanwhile, to this day, WDC <u>continues</u> to falsely advertise that these SMR-technology WD Red NAS hard drives are "**Built for NAS compatibility**," are "**specifically designed for use in NAS systems with up to 8 bays**," are "**purpose-built for NAS**," "**Helps ensure your data is protected … in a NAS or RAID environment**," and are appropriate for "**Small and home office NAS systems in a 24x7 environment**."

9.      WDC knows these representations and advertisements are false or deceptive. WDC knows that these hard drives should never have been labeled and advertised as "NAS" or "RAID" compatible hard drives. WDC has been told by its own vendor-partners (who have blacklisted these supposedly "Built for NAS compatibility" hard drives) that these hard drives are not compatible with their NAS devices and are not fit for the drives' advertised and

intended purpose. WDC knows that thousands of customers have suffered poor performance and/or data loss, and that thousands of customers are now—justifiably—worried that the hard drives are essentially ticking time bombs that risk the destruction of customer data and files at any moment due to increased likelihood of failure, especially during the RAID rebuilding process.

10.     But WDC refuses to make things right. WDC would rather continue defrauding its customers and continue leveraging—and ultimately squandering—its past best-in-class reputation to increase its short-term profits.

11.     As a result of WDC's fraud and deception, thousands of customers nationwide, including the eight Plaintiffs, who purchased these WD Red NAS hard drives for their advertised and intended use, have been duped and have suffered harm and damages. The hard drives are not suitable for their intended purpose—and are in fact dangerous to customer data.

12.     Plaintiffs bring this action individually and on behalf of a Class and Subclasses of all other similarly situated purchasers to recover damages, restitution and injunctive relief for: **(1)** violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; **(2)** violation of California's False Advertising Law ("FAL"), Cal. Bus & Prof Code § 17500 *et seq.*; **(3)** violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; **(4)** Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*; **(5)** Violation of the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws Ch. 93A, § 9; **(6)** Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*; **(7)** Violation of New York General Business Law § 349; **(8)** Violation of New York General Business Law § 350; **(9)** Violation of the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq.*; **(10)** Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, 100.20; **(11)** Breach of Express Warranty; **(12)** Breach of Implied Warranty; and **(13)** Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code §§ 1790 *et seq.* and California Commercial Code § 2314.

**THE PARTIES**

13.    Plaintiff Nicholas Malone is a citizen and resident of Madison, Wisconsin.

14.    Plaintiff Chris Ayers is a citizen and resident of Temple Terrace, Florida.

15.    Plaintiff James Backus is a citizen and resident of Suffolk, Virginia.

16.    Plaintiff Brian Conway is a citizen and resident of Mansfield, Massachusetts.

17.    Plaintiff David Eaton is a citizen and resident of Kirkwood, Missouri.

18.    Plaintiff Steven Gravel is a citizen and resident of Delmar, New York.

19.    Plaintiff James Raaymakers is a citizen and resident of Antelope, California.

20.    Plaintiff Tod Weitzel is a citizen and resident of Sunnyvale, California.

21.    Defendant Western Digital Corporation is a Delaware corporation with its principal place of business and/or nerve center located at 5601 Great Oaks Parkway, San Jose, California 95119.

**JURISDICTION AND VENUE**

22.    **Subject Matter Jurisdiction**. The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—*i.e.*, Class Action Fairness Act jurisdiction—because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

23.    **Personal Jurisdiction**. This Court has personal jurisdiction over Defendant because: (1) Defendant WDC is headquartered in San Jose, California (which is within the Northern District of California) and is authorized to do business and regularly conducts business in the State of California such that the maintenance of this lawsuit does not offend traditional notions of fair play and substantial justice; and/or (2) Defendant has committed tortious acts within the State of California (as alleged, without limitation, throughout this Complaint).

24.    **Venue**. Venue is proper in the Northern District of California because, pursuant to 28 U.S.C. § 1391(b)(1), this judicial district is a judicial district in which Defendant WDC resides, and pursuant to 28 U.S.C. § 1391(c)(2), for venue purposes WDC shall be deemed to

reside in this judicial district because WDC is subject to the court's personal jurisdiction with respect to this civil action.

## COMMON FACTUAL ALLEGATIONS

## I.     OVERVIEW OF HARD DRIVE TECHNOLOGY

25.     A hard drive disk ("HDD") is a form of magnetic mass storage.  Each hard drive contains a stack of circular plates of magnetic material called "platters," divided into billions of tiny areas called "bits" that can be independently magnetized (to store a 1) or demagnetized (to store a 0).  Data is "read" (retrieved) or "written" (recorded) onto an HDD by converting strings of bits into electrical current fed through an electromagnet that changes the magnetization of each bit.  Once the information is written onto the HDD, the HDD uses a magnetic reader to turn the data back into a useful form (the file to be stored or retrieved), much like a record player's needle translates a record's grooves into music.[3]

26.     To store the amount of data that HDDs store today, the HDDs must contain billions of bits.  Thus, "areal density" comes into play, which is the number of bits of data that can be recorded onto a platter and is measured by the number of bits or gigabits (one billion bits) per square inch.  Higher areal density values allow for greater storage using the same amount of disk space.[4]

27.     There are several methods that exist to read and write data to HDDs and maximize areal density.  The first of these is Perpendicular or Conventional Magnetic Recording ("CMR").  CMR "works by aligning the poles of the magnetic elements, which represent bits of data, perpendicularly to the surface of the disk.  Magnetic tracks are written

---

[3] Kanawat Senanan, *How do Hard Drives Work?*, TED-ED, https://www.youtube.com/watch?v=wteUW2sL7bc (last accessed June 11, 2020); How a Hard Disk Drive Works, SEAGATE, https://www.youtube.com/watch?v=NtPc0jI21i0 (last accessed Aug. 10, 2020).

[4] *What are PMR and SMR Hard Disk Drives?*, SYNOLOGY, https://www.synology.com/en-us/knowledgebase/DSM/tutorial/Storage/PMR_SMR_hard_disk_drives (last accessed June 11, 2020).

side-by-side, without overlapping."[5]



the width of write head
the width of read head

28.     CMR HDDs "deliver excellent random-access performance," and are as such "widely used not only in PCs but also for online storage applications."[6]  CMR is used in most standard HDDs.[7]

29.     Another, more recently developed method of reading and writing data is Shingled Magnetic Recording ("SMR").  SMR technology was developed to make possible lower-cost, lower-performing, but high-capacity drives.

30.     "Rather than writing each magnetic track without overlapping, SMR overlaps each new track with part of the previously written track, much like shingles on a roof.  By overlapping the tracks, write heads become thinner, thus expanding areal density."[8]

---

[5] *Id.*
[6] Shimomura Kazuhito, *Shingled Magnetic Recording Technologies for Large-Capacity Hard Disk Drives*, 1 TOSHIBA REVIEW GLOBAL EDITION 33, 33 (2015), https://www.toshiba.co.jp/tech/review/en/01_02/pdf/a08.pdf (last accessed June 11, 2020).

[7] Joel Hruska, *Western Digital, Seagate Are Shipping Slow SMR Drives Without Informing Customers: Reports*, EXTREMETECH, Apr. 14, 2020, https://www.extremetech.com/computing/309389-western-digital-seagate-reportedly-shipping-slow-smr-drives-without-informing-customers (last accessed June 11, 2020)

[8] *What are PMR and SMR Hard Disk Drives?*, SYNOLOGY.



31.     SMR thus allows for low-cost, high-capacity HDDs.[9]  "However, if new (or modified) data needs to be placed near existing data, the drive will have to overwrite the neighboring shingled tracks … That makes [SMR] drive[s] significantly slower at writing tasks, especially for random writes."[10]

32.     In addition, the design of SMR drives makes permanent data loss more likely. Whereas data engineers can rebuild certain components on other storage types and recover lost data, the SMR data translators cannot be repaired.  This can result in permanent data loss if the translators are damaged.[11]

33.     In short, while SMR HDDs boast high areal density, they are at a disadvantage in nearly every other category.[12]  For these reasons, SMR HDDs are typically only used "for cold data storage, like archives and backups, because of their poor performance,"[13] and are

[9] *Shingled Magnetic Recording Technologies for Large-Capacity Hard Disk Drives*, 1 TOSHIBA REVIEW GLOBAL EDITION at 33.

[10] Paul Alcorn, *Western Digital Fesses Up: Some Red HDDs Use Slow SMR Tech Without Disclosure*, TOM'S HARDWARE, Apr. 14, 2020, https://www.tomshardware.com/news/wd-fesses-up-some-red-hdds-use-slow-smr-tech (last accessed Aug. 10, 2020).

[11] David Blizzard, *WD Shingled Magnetic Recording – New Road Blocks For Data Recovery Pros*, BLIZZARD DATA RECOVERY, https://www.blizzarddr.com/wd-smr-translation-new-road-blocks/ (last accessed Aug. 10, 2020).

[12] Joel Hruska, *Western Digital, Seagate Are Shipping Slow SMR Drives Without Informing Customers: Reports*.

[13] Paul Alcorn, *Western Digital Fesses Up: Some Red HDDs Use Slow SMR Tech Without Disclosure*.

typically marked as "archival" to designate the use of the technology.[14]  SMR HDDs are not recommended for use by the ordinary consumer.[15]

34.     The use of SMR technology is particularly problematic for NAS systems and RAID arrays.  "A NAS system is a storage device connected to a network that allows storage and retrieval of data from a centralized location for authorized network users and heterogeneous clients."  In other words, a NAS system "is like having a private cloud in the office," except that all files are stored locally on several small hard drives instead of remotely on someone else's server.[16]

35.     A NAS system has a number of advantages to typical cloud storage.  For one, all files are stored locally while still being accessible remotely, instead of on someone else's server.  Further, setting up a NAS system is a one-time payment (paying once per HDD), as opposed to paying monthly for cloud storage.  NAS systems also offer faster performance because files do not need to be uploaded to or downloaded from the cloud; they can be accessed instantly.[17]

36.     NAS systems also offer better data protection through "redundancy."  Redundancy "means that one hard drive can mirror another inside the NAS, so whatever [is] store[d] on one drive, it is simultaneously stored on the other, like a live instant back-up.  This means that if one drive does fail, then [a consumer] can carry on as if nothing happened" because the data is stored on another HDD in the NAS system, and the consumer can simply get a new HDD to replace the failed one.[18]

37.     NAS devices have become increasingly popular for both home and small

---

[14] Jim Salter, *Buyer Beware—That 2TB-6TB "NAS" Drive You've Been Eyeing Might be SMR*, ARS TECHNICA, Apr. 17, 2020, https://arstechnica.com/gadgets/2020/04/caveat-emptor-smr-disks-are-being-submarined-into-unexpected-channels/ (last accessed Aug. 10, 2020).

[15] *Id.*

[16] *What is NAS (Network Attached Storage) and Why is NAS Important for Small Businesses?*, SEAGATE, https://www.seagate.com/tech-insights/what-is-nas-master-ti/ (last accessed Aug. 10, 2020).

[17] STILL CONFUSED ABOUT NAS?  NAS EXPLAINED IN 3 MINUTES, https://www.youtube.com/watch?v=k13sQxybqiA (last accessed Aug. 10, 2020) (Western Digital promotional video).

[18] *Id.*

business use, as the use of digital data has exploded over the years including digital files, photographs, videos, and databases which have required ever-increasing storage capacity which NAS devices (with their grouping of hard drives together into a single large centralized datastore) are able to provide along with data redundancy.

38.     A RAID array "combine[s] multiple, less-expensive drives into a single, higher-capacity and/or faster volume" that "facilitate[s] redundancy."[19]  A RAID array is not the same technology as a NAS system, but the two overlap.  A NAS system is often made up of HDDs configured into a RAID array, and a RAID array allows a NAS system to offer redundancy and high performance.[20]

39.     There are several common types of RAID arrays.  RAID 0 focuses on high performance and employs a process known as "striping."  Striping distributes data across multiple drives (for example, block A goes to and from drive 1, block B goes to and from drive 2), which permits increased write and read speeds."[21]  In other words, "when the system wants to read that data, it can do so simultaneously from all the disks and join them together to reconstruct the entire data stream."[22]



**RAID 0**

DISK 1          DISK 2

[19] Jon L. Jacobi, *RAID Made Easy*, PCWORLD, Apr. 19, 2012, https://www.pcworld.com/article/194360/raid-made-easy.html (last accessed Aug. 10, 2020).
[20] Pedro Hernandez, *NAS vs. Raid: How They Differ and Overlap*, ENTERPRISE STORAGE, May 4. 2018, https://www.enterprisestorageforum.com/storage-networking/raid-vs-nas-how-they-differ-and-overlap.html (last accessed Aug. 10, 2020).
[21] Jon L. Jacobi, *RAID Made Easy*.
[22] Anirban Das, RAID Levels 0, 1, 4, 5, 6, 10 Explained, Booelan World, https://www.booleanworld.com/raid-levels-explained/ (last accessed Aug. 10, 2020).

40.     RAID 1 uses the concept of "data mirroring," which clones data "to an identical set of disks so that if one of the disks fails, the other can be used.  It also improves read performance since different blocks can be accessed from all the disks simultaneously."[23]  This allows for the aforementioned "redundancy."  If a new drive is added to the RAID array, data can be replicated from the old HDDs to the new one in a process called "resilvering."

**RAID 1**



41.     Finally, RAID 5 combines "the speeds of RAID 0 and data protection of RAID 1 into one configuration and is by far the most commonly used RAID level" in businesses and NAS systems.[24]  "RAID 5 writes data to and reads from multiple disks, and it distributes parity data across all the disks in the array.  Parity data is a smaller amount of data derived mathematically from a larger set that can accurately describe that larger amount of data, and thus serves to restore it.  Since parity information is distributed across all the drives, any drive can fail without causing the entire array to fail."[25]

---

[23] *Id.*

[24] Nathaniel Cooper, *The Best RAID for NAS – Networking, Storage and Overlap*, PROMAX MEDIA TECHNOLOGY SOLUTIONS, Sept. 25, 2019, https://www.promax.com/blog/best-raid-for-nas-storage-overlap (last accessed Aug. 10, 2020).

[25] Jon L. Jacobi, *RAID Made Easy*.



42.   <u>Hard drives which are designed and built for NAS and RAID must have certain characteristics</u>. In particular, such hard drives must be able to handle continuous and sustained writes and heavy random writes, which occur often during the RAID rebuilding process (also called "resilvering") when a failed hard drive in a RAID array is replaced with a new drive and the data is redistributed across the replacement drive and the other drives. Continuous and heavy writes also occur when the storage capacity of a RAID array is expanded by adding hard drives, which requires a similar resilvering process where the data is redistributed and spread across all the drives.

43.   Continuous and sustained writes and heavy random writes also occur during RAID "scrubbing," which is a standard and recommended periodic data integrity check where all the data on the hard drive is checked for errors and consistency and automatically corrected. NAS manufacturers generally recommend (and often set their devices to automatically perform) RAID scrubbing at least once a month to maintain system health and to prevent data loss.

44.   Hard drives designed and built for NAS and RAID also are expected to have reliable and fast random-write performance in general, and to be able to handle continuous random writes. NAS units and RAID arrays are often utilized to house databases and database files, iSCSI datastores, software-based virtual machines, large numbers of small files written and read from multiple computers on a network, and backup files, all of which often require

1   heavy and simultaneous random writes to the hard drives.

2       45.     The bottom line is that NAS systems and RAID arrays focus on providing high

3   performance and data protection.  Accordingly, an HDD marketed for NAS systems (and, by

4   extension, use in a RAID array) should offer the same traits.  For this reason, an HDD that uses

5   SMR technology is inappropriate for use in a NAS system or a RAID array because SMR does

6   not offer high performance or data protection.

7       46.     Many have noted the ill effects of using an SMR drive in a NAS system or

8   RAID array. SMR HDDs take longer to rebuild RAID arrays and have slower random write

9   speeds than CMR HDDs.[26]  Further, if an SMR drive is used in a RAID array that otherwise

10  uses CMR technology, "the overall read/write performance may be affected by the SMR ones

11  during the overwriting tasks."[27]  Finally, both Seagate and Toshiba (the two other largest HDD

12  manufacturers) have publicly stated that they do not recommend SMR for NAS and that they

13  do not and will not offer NAS-labeled hard drives with SMR technology due to performance

14  deficiencies.[28]

**II.    WESTERN DIGITAL'S FRAUDULENT REPRESENTATIONS AND
15      OMISSIONS**

16
        A.    <u>**Western Digital Begins Secretly Manufacturing the WD Red NAS Drives**</u>
17            <u>**With SMR Technology**</u>

18      47.     Western Digital ("WDC") is one of the largest manufacturers of hard drives in

19  the world. Western Digital manufactures two different types of hard drives: traditional large-

20  capacity spinning disk mechanical hard drives, and more modern but smaller-capacity solid-

21  state flash storage drives (often also called hard drives) which have no moving parts. This

22

23  [26] Jim Salter, *We Put Western Digital's Dreaded SMR Red Drive to the Test*, ARSTECHNICA,
    June 5, 2020, https://arstechnica.com/gadgets/2020/06/western-digitals-smr-disks-arent-great-
24  but-theyre-not-garbage/ (last accessed Aug. 10, 2020).

    [27] *What are PMR and SMR Hard Disk Drives?*, SYNOLOGY.
25
    [28] *See* Jim Salter, *Seagate Says Network Attached Storage and SMR Don't Mix*, ARSTECHNICA,
26  Apr. 21, 2020, https://arstechnica.com/information-technology/2020/04/seagate-says-network-
    attached-storage-and-smr-dont-mix/ (last accessed Aug. 10, 2020) (quoting Seagate Corporate
27  Communications lead Greg Belloni); *see* "Use of Shingled Magnetic Recording (SMR)
    technology in Toshiba Consumer Hard Drives," *Toshiba* website, April 28, 2020, available at
28  https://toshiba.semicon-storage.com/ap-en/company/news/news-topics/2020/04/storage-
    20200428-1.html.

lawsuit concerns the traditional large capacity spinning disk mechanical hard drives, and any reference to "hard drives" herein means traditional spinning disk mechanical hard drives.

48.     Western Digital markets its hard drives series by color.  In 2012, WDC released its WD Red series NAS hard drives, which were specifically designed for NAS (Network-Attached Storage) systems and for RAID (Redundant Array of Independent Disks) environments.

49.     For nearly a decade, the WD Red NAS Drives enjoyed a strong reputation as best-in-class for use in NAS devices and RAID storage arrays.

50.     WDC today continues to advertise its WD Red NAS hard drives as "**Built for NAS compatibility**" and "**Designed for RAID environments**." WDC advertises WD Red NAS hard drives as "**specifically designed for use in NAS systems with up to 8 bays**" and appropriate for "**small and home office NAS systems in a 24x7 environment**."

51.     WDC even includes "NAS" in the name of these hard drives, and prints "NAS" on the hard drives themselves:




52.     Until 2018, WDC's advertising rang true, as <u>all</u> of its WD Red NAS Drives utilized industry-standard CMR technology, rightfully earn a reputation for reliability and being

"purpose-built" and well-suited for NAS and RAID environments.

53.     However, upon information and belief, in or about 2018, WDC secretly swapped out the industry-standard CMR technology in the WD Red NAS hard drives, and replaced it with inappropriate—and cheaper—hard drive technology called DM-SMR (Drive-Managed Shingled Magnetic Recording, or drive-managed SMR).

54.     WDC silently switched the recording technology in these drives to DM-SMR for one reason: to reduce its costs and increase its profits. SMR technology enables WDC to fit 25% more data onto the same-size disk platters, thus significantly reducing its costs to produce the drives.

55.     Critically, when WDC downgraded its hard drives to SMR technology, WDC did not change any of its advertising or representations regarding the hard drives being "purpose-built" and suitable for NAS and RAID. WDC did not make any disclosure whatsoever of its use of SMR technology in the hard drives. WDC advertising and specifications, which were also utilized by WDC's resellers in their ads and product web pages for the hard drives, continued to make the exact same representations that the WD Red NAS hard drives were specifically intended and appropriate for NAS and RAID.

56.     WDC kept the switch to this inappropriate SMR technology a secret so that it could continue to charge the same price WDC previously charged for its previous generation CMR drives, thereby increasing its profits. WDC intentionally did not disclose its use of SMR technology in the new drives anywhere whatsoever. WDC did not mention the SMR technology in its advertising, in its hard drive documentation, in the hard drive product datasheets, or in the labeling on the hard drive itself.

57.     WDC even went to great lengths to hide the existence of the SMR technology, through drive-managed tricks which cause the drives to be recognized by NAS and RAID systems as if they are traditional—but unusually poor performing—CMR drives.  WDC utilized the trick of a small CMR disk cache zone to function as a temporary storage space. Data writes are first temporarily stored on this staging disk area (the small CMR cache zone). Then, when the disk is idle (i.e., when there is no writing being made to it), the hard drive

rearranges the data in the background, moving the data that was temporarily saved in the CMR cache over to the main SMR part of the drive. This data rearranging and clean-up process is often referred to as the "garbage collection" process.

58.     However, after continuous heavy writes, the CMR cache layer becomes full, and the drive slows down dramatically—it essentially "chokes" and stops the flow of data while it flushes out the CMR cache and tries to catch up writing to the much slower main SMR hard disk. This is especially problematic and dangerous when the hard drive has been set up in a NAS as part of a RAID array. In that case, the choking hard drive can report "timeouts" or loss of connectivity to the NAS, which logically assumes the hard disk has failed and then kicks the drive out of the RAID array, which can cause catastrophic data loss.

59.     Several of these technology enthusiasts noted that the official WDC spec sheet for these *EFAX hard drives indicated the EFAX drives should have <u>better</u> performance than the prior version of the drives (which contained the letters "EFRX"). The EFAX drives were listed with a faster "interface transfer rate" (180 MB/s versus as low as 150 MB/s), and with four times as much DRAM cache (256MB versus 64MB). The WDC product data sheet gave zero indication whatsoever that the EFAX drives contained SMR technology (as compared to the prior EFRX versions of the "same" drives which contained the standard CMR technology).

60.     When WDC downgraded the technology in its WD Red NAS hard drives to SMR technology, it did so secretly, without telling a soul. Based on information and belief, WDC did not inform the NAS manufacturers—who had tested and certified the <u>previous</u> generation CMR versions of the hard drives—that WDC had replaced the insides of these identically-labeled drives with cheaper and poor-performing SMR technology. Based on information and belief, WDC likewise did not inform its resellers, such as Amazon.com and Newegg.com, that it had downgraded many of its WD Red NAS hard drive models with inferior and cheaper SMR technology.

61.     Based on information and belief, WDC customer support staff were instructed to refuse to acknowledge that the new WD Red NAS hard drives now utilized SMR technology. One purchaser reported WDC's response when he contacted WDC customer support to ask if

the drive utilized SMR versus CMR technology: "Western Digital support has gotten back to me.  They have advised me that they are not providing that information so they are unable to tell me if the drive is SMR or PMR [PMR is another term used for CMR]. LOL. He said that my question would have to be escalated to a higher team to see if they can obtain that info for me." Then, "the higher team contacted me back and informed me that the information I requested about whether or not the WD60EFAX was a SMR or PMR would not be provided to me. They said that information is not disclosed to consumers. LOL. WOW."[29]

62.     Based on information and belief, when consumers contacted WDC to complain about the poor performance of its (SMR-technology) WD Red NAS hard drives in NAS and RAID environments, WDC as a matter of policy continued to insist that the hard drives were suitable for those environments, failed to disclose that the drives utilized (inappropriate) SMR technology, and blamed "user error" or the user's other equipment for the poor performance.

63.     As late as March 2020, WDC continued to publicly deny that the hard drives contained SMR technology.  For instance, Yemi Elegunde, an enterprise and channel sales manager for Western Digital UK, claimed on March 30, 2020:

> "The only SMR drive that Western Digital will have in production is our 20TB hard enterprise hard drives and even these will not be rolled out into the channel. All of our current range of hard drives are based on CMR Conventional Magnetic Recording."[30]

## B.     Western Digital Is Forced to Come Clean About Its Fraudulent Representations And Omissions

64.     Starting around March 2019, various purchasers of WD Red NAS hard drives began reporting on online message boards that they were experiencing poor write performance and consistent failures during RAID resilvering.[31]

---

[29] See Synology, Inc. Community post, July 21, 2019, available at https://community.synology.com/enu/forum/1/post/127228 (emphasis added).

[30] Jim Salter, Buyer Beware—That 2TB-6TB "NAS" Drive You've Been Eyeing Might be SMR (emphasis added).

[31] Patrick Kennedy, WD Red DM-SMR Update:  3 Vendors Bail and WD Knew of ZFS Issues, SERVE THE HOME, June 14, 2020, https://www.servethehome.com/wd-red-dm-smr-update-3-vendors-bail-and-wd-knew-of-zfs-issues/ (last accessed Aug. 10, 2020).

65.     For example, one user stated: "[W]hen I was moving data from one drive to another, several terabytes worth, it literally took most of a week. The drive would fill 30GB, then stop and basically lock up the OS."[32]

66.     Another user stated: "[T]he latest iteration of WD REDS [are] unable to be used for rebuilding RAID or RAIDZ sets: They rebuild for a while (1-2 hours), then throw errors and get kicked out of the set."[33]

67.     Another user posted on a Synology (a leading NAS manufacturer) user forum that he was unable to add a new WD Red NAS 6TB drive to a RAID setup containing three older WD Red NAS 6TB drives. When the user added the new WD Red NAS drive, the resilvering process took over three days and then failed.[34]

68.     Many purchasers reported being unable to use the hard drives in their NAS systems, and that the hard drives kept getting kicked out of their RAID arrays. One user stated: "Attempting to replace drives in my existing array resulted in new WD-RED WD40EFAX drives (multiple units) throwing HARD errors (IDNF - Sector ID not found) and being kicked out of the array. That's apart from them pausing for 30-180 seconds at a time occasionally whilst they rebuild their internals, or the painfully slow random-write speeds when you throw more than about 2GB at a time at them."[35]

69.     Another user posted: "I got recently bit by WD40EFAX … When I tried to replace one of the failed WD Red disk in my vdev I started getting bunch of errors… I replaced

---

[32] See Jim Salter, "Buyer beware—that 2TB-6TB 'NAS' drive you've been eyeing might be SMR," *Ars Technica,* April 17, 2020, available at https://arstechnica.com/gadgets/2020/04/caveat-emptor-smr-disks-are-being-submarined-into-unexpected-channels/.

[33] See Chris Mellor, "Western Digital admits 2TB-6TB WD Red NAS drives use shingled magnetic recording," *Blocks & Files*, April 14, 2020, available at https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.

[34] See Synology, Inc. Community post, July 21, 2019, available at https://community.synology.com/enu/forum/1/post/127228.

[35] See "Disguised SMR drives – the OFFICIAL Western Digital Response," *reddit*, available at https://np.reddit.com/r/DataHoarder/comments/fyhzl9/disguised_smr_drives_the_official_west ern_digital/.

that with WD purple and haven't had any problems so far."[36]

70.     Some hard drive technology enthusiasts noticed that the reported problems appeared to affect WD Red NAS drives 6TB or below in size, with a SKU containing the letters "EFAX."

71.     Consumers had no way to know or learn that the WD Red NAS Drives utilized SMR technology.  Only Western Digital knew definitively that the WD Red NAS Drives used SMR technology.

72.     Nonetheless, some of the more technologically-skilled purchasers who were experiencing these problems surmised that the drives may in fact be SMR drives on the inside, because the drives' poor write performance, RAID and NAS incompatibility and their data-choking behavior were consistent with the known limitations of SMR technology.

73.     In April 2020, Chris Mellor, a journalist at a leading storage technology website, *Blocks & Files*, began investigating this possible undisclosed use of SMR technology in WD Red NAS hard drives after an information technology expert brought his suspicions to Mellor's attention.

74.     As stated in the *Blocks & Files* article published April 14, 2020: "Alan Brown, a network manager at UCL Mullard Space Science laboratory, the UK's largest university-based space research group, told us about his problems adding a new WD Red NAS drive to a RAID array at his home. Although it was sold as a RAID drive, the device 'keep[s] getting kicked out of RAID arrays due to errors during resilvering,' he said."  Mr. Brown suspected the drive was secretly utilizing SMR technology, and his testing seemed to confirm his hypothesis.  Mr. Brown told the website that the WD Red NAS drive's poor performance had "been a hot-button issue in the datahoarder Reddit for over a year.  People are getting pretty peeved by it because SMR drives have ROTTEN performance for random write usage." [37]

---

[36] *Ibid.*

[37] *See* Chris Mellor, "Western Digital admits 2TB-6TB WD Red NAS drives use shingled magnetic recording," *Blocks & Files*, April 14, 2020, available at https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.

75.     When *Blocks & Files* contacted WDC and pointedly asked WDC whether WD Red NAS drives used SMR technology, WDC was finally forced to acknowledge the truth.

76.     WDC stated on the record to *Blocks & Files* (in the article published April 14, 2020):

> Currently, Western Digital's WD Red 2TB-6TB drives are device-managed SMR (DMSMR)… You are correct that we do not specify recording technology in our WD Red HDD documentation.  We strive to make the experience for our NAS customers seamless, and recording technology typically does not impact small business/home NAS-based use cases. In device-managed SMR HDDs, the drive does its internal data management during idle times. In a typical small business/home NAS environment, workloads tend to be bursty in nature, leaving sufficient idle time for garbage collection and other maintenance operations.[38]

77.     On April 20, 2020, six days after the *Blocks & Files* article was published, as the fiasco and condemnation continued to snowball, WDC posted a public statement about the matter on a blog post on its website.[39] In the post, WDC acknowledged that "some" of its WD Red NAS hard drives utilized SMR technology—but WDC <u>still</u> did not identify which particular WD Red NAS hard drive SKUs used SMR.

78.     Finally, on April 23, 2020, Western Digital released a chart showing which specific WD Red NAS Drives use SMR technology[40]:



---

[38] *Id.*

[39] *See* "On WD Red NAS Drives," *Western Digital BLOG*, available at https://blog.westerndigital.com/wd-red-nas-drives/.

[40] Paul Alcorn, *WD Sets the Record Straight: Lists All Drives that Use Slower SMR Tech*, Tom's Hardware, Apr. 23, 2020, https://www.tomshardware.com/news/wd-lists-all-drives-slower-smr-techNOLOGY  (last accessed Aug. 10, 2020).

**C.** **Consumers Are Harmed By Western Digital's Fraudulent Representations And Omissions**

79.     Needless to say, Western Digital's divulgence that it had been secretly using SMR technology in its WD Red NAS Drives did not go over well with consumers.  Consumers excoriated Western Digital for sneaking SMR technology into its WD Red NAS Drives, and for the myriad problems such deception has caused consumers:

- "WD Red are no longer generally NAS drives, they are 'Archival Drives' … A consumer should be able to trust a drive is suitable for the purpose it's marketed. They should drop the label NAS or be sued."[41]

- "Have they completely lost their mind now.  Selling SMR drives for NAS usage. And there was 0 mention, that they are SMR drives, not even in their data sheets.  Those lying misleading data destroying monsters at WD."[42]

- "[A] NAS drive with SMR is most certainly not fit for purpose.  SMR should not have been put in these drives, period."[43]

- "'WD Red NAS – False Advertising'"[44]

80.     Worse, consumers have been actively harmed by overpaying for the inferior WD Red NAS Drives made with SMR technology that are "unfit for the purpose for which they are marketed."[45]z

81.     According to recent testing by technology websites *Serve The Home* and *Ars Technica*, WD Red NAS SMR-technology drives at <u>best</u> offer lousy performance compared to CMR-technology drives, and at <u>worst</u> the drives fall flat on their face so badly that data loss

---

[41] <u>FYI – Western Digital SMR HDDs, reddit</u>, https://www.reddit.com/r/DataHoarder/comments/g7m542/fyi_western_digital_smr_hdds/ (last accessed June 15, 2020).

[42] *Id.*

[43] WD Support has Refused to Replace My WD Red SMR 6TB Drives with Non-SMR Equivalents, reddit, https://www.reddit.com/r/DataHoarder/comments/g7k5qv/wd_support_has_refused_to_replace_my_wd_red_smr/ (last accessed Aug. 10, 2020).

[44] *Id.*

[45] *See* Chris Mellor, "Shingled hard drives have non-shingled zones for caching writes," *Blocks & Files*, April 15, 2020, available at https://blocksandfiles.com/2020/04/15/shingled-drives-have-non-shingled-zones-for-caching-writes/.

may result.[46]  The SMR versions of the WD Red NAS drives offer between 70% to 1,000% slower write speed and read/write latency compared to CMR drives (including compared to the prior CMR versions of the same capacity WD Red NAS drives).

82.     Using an SMR WD Red NAS drive also results in increased risk of data loss during RAID rebuilds due to greatly increased rebuild times. For example, *Serve The Home* found RAID rebuilding or RAID expansion (also referred to as "resilvering") times with an SMR WD Red NAS drive could take nearly <u>16 times longer</u> than with a CMR drive. In Will Taillac's testing for *Serve The Home*, all three of the tested traditional 4TB CMR drives took less than 17 hours to complete the resilvering process (in fact, the prior generation CMR version of the 4TB WD Red NAS was the quickest of the CMR drives at 14.6 hours), versus the "new" SMR version of the 4TB WD Red NAS which took 229.7 hours (over 9 days) to complete the resilvering process—i.e., nearly 16x longer.

83.     This massively increased resilvering time is particularly dangerous and unacceptable in a RAID array because a resilvering process is typically performed to replace a failed hard drive; and often (e.g., in a RAID 5 array) if just one additional hard drive fails, catastrophic data loss can result. The resilvering process is extremely stressful on hard drives because all the data is being redistributed and re-written among the drives in the array. Because SMR drives can increase the required resilvering time by an order of magnitude (from hours to days) as compared to CMR drives, the likelihood of another drive failing during that extended resilvering process—and thus the likelihood of catastrophic data loss—likewise increases substantially.

84.     Even the <u>read</u> performance of SMR WD Red NAS drives can be poor and unacceptable, where the increased latency due to the SMR technology causes freezes and stops and starts in opening and viewing files and data.  As technology journalist Jim Salter explained

---

[46] *See* Will Taillac, "WD Red SMR vs CMR Tested Avoid Red SMR," *Serve The Home*, May 28, 2020, available at https://www.servethehome.com/wd-red-smr-vs-cmr-tested-avoid-red-smr/; *see* Jim Salter, "We put Western Digital's dreaded SMR Red drive to the test," *Ars Technica*, June 5, 2020, available at https://arstechnica.com/gadgets/2020/06/western-digitals-smr-disks-arent-great-but-theyre-not-garbage/.

based on his testing of SMR WD Red NAS drives for *Ars Technica*, "for a desktop user, someone who wants things to *happen* when they click buttons and drag things around, the Red can occasionally provide a truly frustrating experience during what should be a very, very easy workload, even for a conventional drive."[47]

85.     Remarkably, and unfortunately, even adding just one of these inferior SMR WD Red NAS hard drives to an existing storage array (which otherwise contains traditional, good-performing CMR hard drives) can poison the entire drive array, causing the entire array to suffer this poor performance and greater risk of data loss. RAID arrays are often only as good as their weakest link.[48]

86.     Since WDC's scheme was brought to light, three of the leading NAS device manufacturers—Synology, Inc., iXsystems, and Drobo, Inc.—have blacklisted WD Red NAS drives with SMR technology and removed them from their hardware compatibility lists because the NAS manufacturers have deemed the drives unfit and inappropriate for use in their NAS devices.  Notably, this blacklisting of WD Red NAS drives by major NAS manufacturers contradicts WDC's defensive April 20, 2020 statement on its public blog that all of the WD Red NAS drives, including those with SMR technology, have been "rigorously tested" "and have been validated by the major NAS providers."[49]  The blacklisting likewise contradicts WDC's continued advertising that SMR WD Red NAS drives are "**Built for NAS compatibility**."  And it contradicts WDC's advertising on its WD Red NAS product datasheet that: "Simply put, a WD Red drive is one of the most compatible drives available for NAS enclosures.  But don't take our word for it. WD Red drives are a reflection of extensive NAS partner technology engagement and compatibility-testing resulting in a leading compatibility

---

[47] *See* responsive comments by Jim Salter to his article, "We put Western Digital's dreaded SMR Red drive to the test," *Ars Technica*, June 5, 2020, available at https://arstechnica.com/gadgets/2020/06/western-digitals-smr-disks-arent-great-but-theyre-not-garbage/ (emphasis in original).

[48] *E.g., see* "What are PMR and SMR Hard Disk Drives?", *Synology* website, available at https://www.synology.com/en-us/knowledgebase/DSM/tutorial/Storage/PMR_SMR_hard_disk_drives.

[49] *See* "On WD Red NAS Drives," *Western Digital BLOG*, available at https://blog.westerndigital.com/wd-red-nas-drives/.

1    list for NAS systems."[50]

2         87.    In fact, rather than having practiced "extensive NAS partner technology

3    engagement and compatibility-testing," WDC had instead kept its NAS manufacturer partners

4    completely in the dark about WDC's secret downgrade of its Red NAS drives to the inferior

5    SMR technology. The NAS manufacturers had reasonably assumed that their previous testing

6    and certification of WD Red NAS drives for use in their devices was still valid—because they

7    had no idea, and no warning from WDC, that the insides of the drives had been suddenly and

8    secretly swapped out for cheaper and inferior SMR technology. After all, for over a decade,

9    WDC—like every other NAS hard drive manufacturer—had previously and exclusively

10   utilized industry-standard CMR technology in its WD Red NAS drives. But once the SMR

11   scandal publicly unfolded and the NAS manufacturers learned the truth, the NAS

12   manufacturers re-tested the drives. The test results showed that the SMR versions of the drives

13   were unfit for NAS and RAID usage. NAS manufacturers like Synology, Inc.[51], iXsystems[52]

14   and Drobo, Inc., then blacklisted the drives as incompatible with their devices.

15        88.    Further, even though SMR HDDs are cheaper to produce, Western Digital did

16

17

18   _____

19   [50] See official "Data Sheet" for WD Red NAS drives, *Western Digital* website, December
     2019, available at https://documents.westerndigital.com/content/dam/doc-
20   library/en_us/assets/public/western-digital/product/internal-drives/wd-red-hdd/data-sheet-
     western-digital-wd-red-hdd-2879-800002.pdf.
     [51] *See* "Synology Products Compatibility List," *Synology* website, available at
21   https://www.synology.com/en-
     us/compatibility?search_by=category&category=hdds_no_ssd_trim&p=1.
22
     [52] iXsystems is also the creator of the very popular open source FreeNAS storage software
23   which utilizes the ZFS filesystem, and which is utilized by many NAS manufacturers and tens
     of thousands of their customers and individuals. The ZFS filesystem was designed to use small
24   blocksize random writes in virtually all usage scenarios, including disk array resilvering—
     which is near-fatal to SMR drives. iXsystems has also confirmed reports (and has notified
25   WDC) of an additional problem that under heavy write loads and/or resilvering the WD Red
     NAS drives can return Sector ID Not Found (IDNF) errors, making the drives unusable and
26   causing data to be destroyed. *See* "WD Red SMR Drive Compatibility with ZFS," *iXsystems*
     website, April 29, 2020, available at https://www.ixsystems.com/blog/library/wd-red-smr-
27   drive-compatibility-with-zfs/. Unsurprisingly, iXsystems recommends that users not install
     SMR WD Red NAS drives in <u>any</u> ZFS or FreeNAS systems.
28

1  not pass those savings onto consumers.[53]  Western Digital priced the WD Red NAS Drives

2  using SMR (in the below screenshot, the EFAX HDD) roughly the same as those WD Red

3  NAS Drives that use CMR (in the below screenshot, the EFRX HDD)[54]:



### D.     Western Digital's Continued Bad Conduct

89.     Incredibly, and despite this rebuke from WDC's technology "partners," WDC's

response has been to double-down on its deception.

90.     In a blog post WDC put out on April 20, 2020, WDC continued to claim that

using SMR in NAS drives was appropriate because "The data intensity of typical small

business/home NAS workloads is <u>intermittent</u>, leaving sufficient idle time for DMSMR drives

to perform background data management tasks as needed and continue an optimal performance

experience for users."[55]  This was similar to WDC's prior inaccurate statement to *Blocks &*

*Files* that "recording technology typically does not impact small business/home NAS-based use

cases.  In device-managed SMR HDDs, the drive does its internal data management during idle

---

[53] Paul Alcorn, *Western Digital Fesses Up: Some Red HDDs Use Slow SMR Tech Without Disclosure.*

[54] Jim Salter, *Buyer Beware—That 2TB-6TB "NAS" Drive You've Been Eyeing Might be SMR.*

[55] *See* "On WD Red NAS Drives," *Western Digital BLOG*, available at
https://blog.westerndigital.com/wd-red-nas-drives/ (emphasis added).

times.  In a typical small business/home NAS environment, workloads tend to be bursty in nature, leaving sufficient idle time for garbage collection and other maintenance operations."[56]

91.     But WDC's acknowledgment on its public blog and to *Blocks & Files* that SMR-technology WD Red NAS hard drives are appropriate only for "intermittent" occasional "bursty" writes is in fact an <u>admission</u> that these hard drives are not suitable for their advertised and intended use in NAS and RAID systems.  WDC admitted that the drives require "sufficient idle time for garbage collection and other maintenance operations" (unlike CMR drives)— which is incompatible with usage in NAS and RAID systems.[57]

92.     In fact, WDC's own engineers were on the record stating that DM-SMR drives like the SMR Red NAS drives, "Due to the wide range of performance variability and unpredictability … [are] impractical and unacceptable for enterprise-class deployments" and that such drives are only appropriate for "client PC use and external backup HDDs in the client space."  Shortly after the Red SMR scandal broke—and in a transparent effort to avoid liability for selling NAS-labeled hard drives that its own engineers had acknowledged were not fit for their intended purpose—WDC scrubbed the blog to remove all such negative references to DM-SMR.  The original, pre-scrubbed version of the blog was archived and is still available on the Internet Archive Wayback Machine.[58]

93.     Remarkably, WDC continues to falsely advertise and promise that these SMR-technology WD Red NAS drives are designed and appropriate for RAID and NAS. WDC continues to keep "NAS" in the name of these SMR drives, and continues to promise and

---

[56] *See* Chris Mellor, "Western Digital admits 2TB-6TB WD Red NAS drives use shingled magnetic recording," *Blocks & Files*, April 14, 2020, available at https://blocksandfiles.com/2020/04/14/wd-red-nas-drives-shingled-magnetic-recording/.

[57] *Id.*

[58] For the original version of the WDC technical blog, see the Wayback Machine archived version dated April 23, 2020, available at: https://web.archive.org/web/20200423133021/http://zonedstorage.io/introduction/smr/. The current "scrubbed" version of the blog with all negative references to DM-SMR removed is available at http://zonedstorage.io/introduction/smr/.  Plaintiffs' counsel also discovered a prior June 2018 WDC white paper that discussed the limitations of DM-SMR hard drives, available at https://documents.westerndigital.com/content/dam/doc-library/en_us/assets/public/western-digital/collateral/white-paper/white-paper-shingled-magnetic-recording-helioseal-technology.pdf.

advertise (and to provide marketing materials to its resellers that promise and advertise) that the SMR drives are: "**purpose-built for NAS**," "**Built for NAS compatibility**," "**Designed for RAID environments**," "**specifically designed for use in NAS systems with up to 8 bays**," and are appropriate for "**Small and home office NAS systems in a 24x7 environment**." WDC continues to state: "**Desktop drives aren't purpose-built for NAS. But WD Red drives with NASware technology are. Our exclusive technology takes the guesswork out of selecting a drive… In a Network Attached Storage device, a desktop hard drive is not typically designed for NAS environments. Do right by your NAS and choose the drive designed for NAS with an array of features to help preserve your data …**"

94.     WDC knows these statements are false, and that these SMR-technology Red NAS drives are not appropriate for NAS or RAID.

95.     Even worse, WDC has blamed its own customers for the problems they are experiencing with these inferior SMR-technology Red drives. WDC has accused its customers of overusing the drives "in system workloads far exceeding their intended uses." WDC has suggested that affected customers somehow should have known to purchase different NAS hard drives (i.e., NAS drives with CMR technology) to perform what were in fact typical NAS workloads, even though WDC had not previously disclosed what recording technology any of its NAS hard drives had used. In truth, the earlier CMR versions of the same-capacity "WD Red NAS" drives (i.e., the prior *EFRX CMR versions of the drives, as opposed to the newer *EFAX SMR versions of the drives) could <u>easily</u> perform such "workloads," as could <u>all</u> competing NAS drives from other manufacturers (all of which utilized CMR technology).

96.     Any and all recent purported disclosures which WDC has made regarding the WD Red NAS hard drives since WDC first publicly admitted on April 14, 2020 that it had snuck SMR technology into the drives, have been insufficient and inadequate. Based on the investigation of Plaintiffs' counsel, the only additional disclosures or changes in its marketing that WDC has made since April 14, 2020 are to update its technical product datasheet for the hard drives to add a single line specifying either "CMR" or "SMR" recording technology for each listed hard drive SKU, without explaining or disclosing what that means or its

1    significance.

2        97.     The disclosure of the utilization of SMR versus CMR technology continues to

3    not appear anywhere in the advertising, online brochures and specifications which customers

4    actually see on the product webpages of WDC resellers such as Amazon.com and

5    Newegg.com. But even if prospective customers somehow did come across the words "SMR"

6    or "CMR," they would have no idea of their significance or what those letters meant. A

7    reasonable consumer (the WD Red NAS drives are marketed to consumers and small

8    businesses) would not see these strange abbreviations and understand that they completely

9    nullify all the advertising and representations WDC is making about the drives being "purpose-

10   built" for NAS and RAID.

11       98.     The bottom line is that Plaintiffs and Class members who purchased the WD

12   Red NAS Drives were not told that the WD Red NAS Drives—previously the "best in class"—

13   use SMR technology, which affects drive performance and data stability.  Western Digital

14   failed to disclose anywhere that the WD Red NAS Drives utilize SMR technology.  It does not

15   appear on the WD Red NAS Drives' packaging, on Defendant's website, or the websites of

16   other major retailers.  Quite the contrary, Western Digital affirmatively represented to

17   consumers that the WD Red NAS Drives were built for NAS and RAID, when in fact the use of

18   SMR technology made the WD Red NAS Drives unsuited for these purposes.  Had WDC

19   disclosed that the WD Red NAS Drives used inferior SMR technology, Plaintiffs and Class

20   members would have been aware of this material fact and consequently would not have

21   purchased the WD Red NAS Drives.

22       99.     As a result of WDC's fraud and deception, thousands of customers nationwide,

23   including the ten Plaintiffs, who purchased these WD Red NAS hard drives for their advertised

24   and intended use, have been duped and have suffered harm and damages. Ultimately, the hard

25   drives are not suitable for their intended purpose—and are in fact dangerous to customer data.

26

27

28

1

**PLAINTIFFS' FACTUAL ALLEGATIONS**

2

**Plaintiff Nicholas Malone**

3       100.    Plaintiff Nicholas Malone is, and at all relevant times has been, a citizen and

4   resident of Madison, Wisconsin.

5       101.    In March 2020, Malone desired to purchase a NAS device along with hard

6   drives which were designed for use in that NAS device with a RAID setup. Malone wanted to

7   store his important home personal data, media files, and computer backups in a centralized,

8   large datastore with data redundancy and security features, and had determined that a NAS

9   system utilizing RAID for redundancy and failure recovery was the best solution.

10      102.    On March 6, 2020, Malone went to Amazon.com to shop for a NAS device and

11  NAS-appropriate hard drives. Malone decided to purchase a QNAP 4-bay NAS device.

12      103.    Malone then began researching the options available on Amazon for four 6TB

13  NAS-appropriate hard drives to put into the QNAP NAS device. Malone previously had

14  purchased and had been happy with many WDC hard drives over the years, and he understood

15  them to have a good reputation for reliability and quality. Malone browsed the Amazon product

16  webpage for the WD Red NAS 6TB hard drive, and viewed the advertising and product

17  information (which was provided to Amazon by WDC). Besides seeing that the drive had

18  "NAS" in the product name, Malone viewed the prominent bullet points on the product

19  webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**,"

20  "**Small and home office NAS systems in a 24/7 environment**," and "**NASware firmware for**

21  **compatibility**."

22      104.    Lower down on the product webpage for the WD Red NAS 6TB hard drive was

23  a colorful product brochure labeled: "From the manufacturer." Malone viewed the

24  representations there, including: "**There's a leading edge WD Red drive for every**

25  **compatible NAS system to help fulfill your data storage needs… WD Red drives pack the**

26  **power to store your precious data in one powerhouse unit**" and "**3D Active Balance Plus.**

27  **Helps ensure your data is protected … in a NAS or RAID environment**."  Based on these

28  representations, Malone reasonably believed and understood the WD Red NAS 6TB hard drive

was specifically designed and built for NAS device RAID environments like the QNAP system he intended to purchase and set up (unlike cheaper consumer desktop hard drives which were not purpose-built for NAS and RAID).

105.    Malone had no idea the hard drives in fact utilized inferior and inappropriate SMR technology, which was not disclosed to him. Regardless, even if the letters "SMR" had appeared in the hard drive description, Malone would not have known what SMR was or what it stood for or what if any impact SMR had on hard drive performance.

106.    Malone also viewed the product webpage for a NAS hard drive from a competing manufacturer, the Seagate IronWolf 6TB NAS hard drive. The Seagate hard drive was likewise advertised as having been designed and built for NAS and RAID for devices with up to 8 drive bays.

107.    Relying on the representations regarding the WD Red NAS 6TB hard drive on the Amazon webpage, and also based on his prior good experience with WDC hard drives, Malone decided to purchase four of the WD Red NAS 6TB hard drives for $150.12 each, paying a total of $600.48 plus tax. The SKU for the hard drives was WD60EFAX. Malone also purchased the QNAP NAS device (the QNAP TS-453Be-4G-US) for $548.89 plus tax.

108.    After receiving the WD Red NAS hard drives and QNAP NAS device, Malone installed the hard drives into the QNAP and set up the device with RAID 5 redundancy.

109.    Over the next month and a half, Malone gradually moved and copied his personal data and media files over to the NAS, and also stored backups of his computer system, filing the NAS with almost 18TB of important and valuable data. Malone noticed that the write/copy speed when transferring these files seemed to be slower and worse than he had previously experienced with other hard drives and other NAS devices.

110.    In late April or early May 2020, Malone viewed a YouTube video about NAS setup and storage. During the video, the narrator began talking about the recent scandal about WDC having admitted that some of its WD Red NAS hard drives utilized SMR technology. The narrator explained that the SMR technology was inappropriate for NAS systems and should not have been advertised and sold for that purpose by WDC.

111. After viewing this video, Malone became concerned that he had purchased these SMR-technology WD Red NAS hard drives. After researching the matter further, he learned that the four hard drives he had purchased (with SKU WD60EFAX) did indeed utilize SMR recording technology.

112. Malone had been defrauded. Malone had bought the hard drives based on WDC's representations that the drives were purpose-built for NAS and RAID, and had specifically purchased and set up his system for the redundancy and failure recovery features that NAS with RAID provided. But the hard drives he purchased, contrary to WDC's express representations, were not appropriate for NAS or RAID.  In fact, by using the hard drives for their intended and advertised purpose, in a NAS device with RAID, his data was now at increased risk.

113. Malone was now, and continues to be, extremely upset and worried about losing his data. The failure of a single drive could result in the loss of data due to the much longer RAID rebuild times (i.e., resilvering) as compared to CMR drives, which would put his data at increased risk. Malone is also unable to perform recommended and standard RAID "scrubbing" to ensure the integrity of his data and to automatically correct any disk errors, because the process could cause one or more hard drives to be kicked out of the RAID array, potentially causing data loss. In order to secure and protect his data, Malone now must now expend hundreds more dollars and many hours of his time to purchase several external hard drives and/or a second NAS, and then copy his data over to the new storage.

114. Malone reasonably relied on WDC's misrepresentations and omissions of material facts. If Malone had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for their intended and advertised use, Malone would not have purchased the hard drives. Malone would have purchased different hard drives that were truly appropriate for NAS and RAID use, such as the Seagate IronWolf 6TB NAS hard drive that he had also considered while shopping on Amazon.com. In fact, no other leading hard drive manufacturer uses this inferior SMR technology in its hard drives that are labeled for NAS or RAID use.

115.    As a direct and proximate result of WDC's acts and omissions, Malone was harmed, suffered an injury-in-fact, and lost money or property.

116.    Malone has a legal right to rely now, and in the future, on the truthfulness and accuracy of WDC's representations.

117.    Malone would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding their appropriateness and fitness for NAS systems and RAID.

118.    Malone will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

119.    If Malone were to purchase a WD NAS hard drive again without WDC having changed its unlawful and deceptive conduct alleged herein, Malone would be harmed on an ongoing basis and/or would be harmed once or more in the future.

**Plaintiff Chris Ayers**

120.    Plaintiff Chris Ayers is, and at all relevant times has been, a citizen and resident of Temple Terrace, Florida.

121.    In May 2020, one of the hard drives in Ayers' four-bay Netgear ReadyNAS network-attached storage unit failed. At that time, the NAS unit, which Ayers utilized at his home to store personal files, contained four 3TB Western Digital Caviar Green hard drives in RAID 5. Ayers had first installed the four 3TB Caviar Green drives approximately 8 years earlier. Three years after he had installed the Caviar Green hard drives, one of the drives had failed, and Ayers replaced it with an identical Caviar Green drive. Over the next five years Ayers did not have any other drive failures, until May 2020 when a second 3TB Caviar hard drive failed.

122.    The ReadyNAS unit utilized a Linux software RAID technology which Netgear called X-RAID, which allowed mixing of different size drives to expand storage while maintaining redundancy such that one hard drive could fail without suffering data loss. When this 3TB Caviar Green drive failed in May 2020, Ayers replaced it with a Seagate 6TB drive.

After he installed the replacement Seagate 6TB drive, the ReadyNAS took approximately 8 hours to rebuild the RAID array and redistribute the data among the hard drives (i.e., to perform the RAID rebuilding, or "resilvering" process).

123.    Ayers then decided to further expand the storage capacity of his ReadyNAS by replacing the remaining three 3TB hard drives with three larger 6TB hard drives. To do so, Ayers would need to purchase the three 6TB hard drives, and then replace the drives sequentially, waiting for the RAID volume to rebuild each time (and thus performing three separate rebuilds, one for each new drive).

124.    On May 17, 2020, Ayers went to Amazon.com to shop for a new 6TB hard drive that was purpose-built for NAS devices like his. For over a decade, Ayers had purchased and had been happy with WDC hard drives, and he understood them to have a good reputation for reliability and quality. Ayers browsed the Amazon product webpage for the WD Red NAS 6TB hard drive, and viewed the advertising and product information (which was provided to Amazon by WDC). Besides seeing that the drive had "NAS" in the product name, Ayers viewed the prominent bullet points on the product webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," and "**NASware firmware for compatibility**."

125.    Lower down on the product webpage for the WD Red NAS 6TB hard drive was a colorful product brochure labeled: "From the manufacturer." Ayers viewed the representations there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**" and "**3D Active Balance Plus. Helps ensure your data is protected … in a NAS or RAID environment**."  Based on these representations, Ayers reasonably believed and understood the WD Red NAS 6TB hard drive was specifically designed and built for NAS device RAID environments like his ReadyNAS system.

126.    Ayers had no idea the WD Red NAS 6TB hard drive in fact utilized inferior and inappropriate SMR technology, which was not disclosed to him. Regardless, even if the letters

"SMR" had appeared in the hard drive description, Ayers would not have known what SMR was or what it stood for or what if any impact SMR had on hard drive performance.

127.    Relying on the representations regarding the WD Red NAS 6TB hard drive on the Amazon product webpage, and also based on his prior good experience with WDC hard drives, Ayers decided to purchase one WD Red NAS 6TB hard drive for $156.83 plus tax. The SKU for the hard drive was WD60EFAX.

128.    A few days later, on May 23, 2020, Ayers went to the same Amazon product webpage for the WD Red NAS 6TB hard drive, viewed the same advertising and representations on the webpage, and purchased two more of the drives for a total of $303.98 plus tax. The SKU for the hard drives was WD60EFAX.

129.    After receiving the hard drives, Ayers replaced the first of his three remaining 3TB drives with one of the WD Red NAS 6TB hard drives. This time, the resilvering process took much longer, approximately 14 hours.

130.    After the resilvering process completed, Ayers replaced another of the 3TB drives with another of the new WD Red NAS 6TB hard drives. This time, the resilvering process took more than 24 hours.

131.    After the resilvering process completed, Ayers replaced the third (and last remaining) 3TB drive with the third WD Red NAS 6TB hard drive. This time, the resilvering process went on for more than 24 hours, and then failed altogether. The ReadyNAS unit became unresponsive. Ayers nervously rebooted the ReadyNAS unit. After rebooting, the resilvering process continued, and then finally completed after a few more hours.

132.    Ayers was very concerned about the problems he had experienced in the resilvering process. Ayers was worried about potential data loss. Ayers also noticed that the performance of the ReadyNAS was now noticeably worse than before he had added the WD Red NAS 6TB drives. Ayers would occasionally experience strange delays, disconnects, and temporary "hangs" when accessing or writing data and when opening files, which he had not previously experienced prior to adding the WD Red NAS 6TB drives.

133.    Ayers did an online search to try to learn why he was experiencing such poor

performance. Ayers found and read an article on *Ars Technica* which discussed how WDC had snuck inferior SMR technology into its WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss. After some further research, Ayers learned that WDC had recently admitted to the technology press that the WD Red NAS 6TB drives he purchased, with SKU WD60EFAX, were among these inferior and inappropriate SMR-technology drives.

134.    Ayers had been defrauded. Ayers had bought the hard drives based on WDC's representations that the drives were purpose-built for NAS and RAID. But the hard drives he purchased, contrary to WDC's express representations, were <u>not</u> appropriate for NAS or RAID. Ayers' data was now at risk, and he also was experiencing worse performance in his NAS than he had prior to installing the WD Red NAS hard drives.

135.    Ayers was, and continues to be, extremely upset and worried about losing his data. The failure of a single drive could result in the loss of data due to the much longer RAID rebuild times (i.e., resilvering) of these SMR drive as compared to CMR drives. Ayers has already witnessed this much longer and riskier resilvering process first-hand. Meanwhile, Ayers is also unhappy with the slower performance he continues to experience in reading and writing files.

136.    Ayers reasonably relied on WDC's misrepresentations and omissions of material facts. If Ayers had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for their intended and advertised purpose, Ayers would not have purchased the hard drives. Ayers would have purchased different CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

137.    As a direct and proximate result of WDC's acts and omissions, Ayers was harmed, suffered an injury-in-fact, and lost money or property.

138.    Ayers would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems and RAID.

139.    Ayers will be harmed if, in the future, he is left to guess as to whether WDC's

representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

**Plaintiff James Backus**

140.    Plaintiff James Backus is, and at all relevant times has been, a citizen and resident of Suffolk, Virginia.

141.    In April 2020, Backus purchased a 5-bay Synology DS1019+ network attached storage device from Newegg.com for use in his home. Backus also planned to purchase two 4TB NAS drives and two 6TB NAS hard drives which were purpose-built for use in a NAS RAID device like the Synology unit.

142.    Over the past decade, Backus had been loyal to the Western Digital brand and its WD Red NAS hard drives based on their reputation for being best-in-class for NAS and RAID, and based on his excellent experience with their performance. Backus had previously purchased at least eight WD Red NAS drives, many of which he was still using in another Synology DS410j NAS unit and in a PC server with a RAID array.

143.    On April 11, 2020, Backus visited Amazon.com and browsed the product webpage for the WD Red NAS 4TB hard drive. Backus viewed the advertising and product information (which was provided to Amazon by WDC) on the product webpage. Backus viewed the prominent bullet points on the product webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," "**NASware firmware for compatibility**," and "**Supports up to 180TB/yr workload rate**."

144.    Lower down on the product webpage for the WD Red NAS 4TB hard drive was a colorful product brochure labeled: "From the manufacturer." Backus viewed the representations there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**" and "**3D Active Balance Plus. Helps ensure your data is protected … in a NAS or RAID environment**."  Based on these representations, and based on his own past excellent experience with WD Red NAS hard drives

in his NAS devices and PC RAID storage arrays which was consistent with these representations, Backus reasonably believed and understood the WD Red NAS 4TB hard drive was specifically designed, built, and optimized for NAS device RAID environments like the Synology DS1019+ unit.

145.    Backus had no idea the WD Red NAS 4TB hard drive in fact utilized inferior and inappropriate SMR technology (unlike all of the WD Red NAS drives he had previously purchased and used), which was not disclosed to him.

146.    Relying on the representations regarding the WD Red NAS 4TB hard drive on the Amazon product webpage, and also based on his prior good experience with WDC hard drives, Backus decided to purchase two WD Red NAS 4TB hard drives for $203.98 plus tax. The SKU for the hard drives was WD40EFAX.

147.    That same day on April 11, 2020, Backus visited Newegg.com and browsed the product webpage for the WD Red NAS 6TB hard drive. Backus viewed the advertising and product information on the product webpage (which was provided to Newegg by WDC). Backus viewed the prominent bullet points on the product webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," "**NASware firmware for compatibility,**" and "**Supports up to 180TB/yr workload rate**."

148.    Lower down on the product webpage for the WD Red NAS 4TB hard drive was a colorful product brochure provided and created by WDC. Backus viewed the representations there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your precious data in one powerhouse unit**"; "**The drive for NAS. Desktop drives aren't typically tested or designed for the rigors of a NAS system. Do right by your NAS and choose the drive with an array of features to help preserve your data and maintain optimum performance**"; and "**Built for NAS Compatibility. WD Red drives with NASware 3.0 technology are purpose-built to balance performance and reliability in NAS and RAID environments**."

149.    Backus had no idea that the WD Red NAS 6TB hard drive in fact utilized inferior and inappropriate SMR technology, which was not disclosed to him.

150.    Relying on the representations regarding the WD Red NAS 6TB hard drive on the Newegg.com product webpage, and also based on his prior good experience with WDC hard drives, Backus decided to purchase two WD Red NAS 6TB hard drives for $317.98 plus tax. The SKU for the hard drives was WD60EFAX.

151.    When Backus received the four hard drives, he installed them into the Synology DS1019+ NAS unit. He configured the Synology to set the four drives up in a RAID 10 array, where they would be split into two groups of 8TB arrays, each having one 4TB drive, and one 6TB drive that was formatted as a 4TB drive. The two 8TB arrays would be clones of each other for redundancy and reliability. Backus then started the build process for the RAID 10 array, which took longer than he expected to complete as compared to his past experience of resilvering with his other WD Red NAS drives.

152.    A key reason Backus set up the drive array with RAID 10 in this way was to enable and facilitate ready expansion when needed. When he needed more capacity later, his plan was to first replace one of the 4TB drives with another 6TB Red NAS drive (but to format it as a 4TB drive), and then rebuild the array with the new drive. Then he would replace the other 4TB drive with another 6TB Red NAS drive in the same way. Finally, once all the drives were WD 6TB Red NAS drives, he would expand the volume size on the drives from 4TB to 6TB. This process necessarily would require two full RAID rebuilds (i.e., two resilvering processes) to expand his data capacity.

153.    Backus populated the fifth bay of the Synology DS1019+ with a stand-alone older hard drive containing many small files and family photos which he wanted to copy onto the new storage array. After the resilvering process had completed on the storage array, Backus began copying several terabytes of data from this older hard drive over to the new RAID array. Backus noticed that the copy performance was poor and slow, with stops and starts. After a period of time, the copying process would slow dramatically, freeze up, and then after a while speed up again, only to repeat the process ad nauseam.

154.    After the copying finally completed, Backus noticed that the storage array on the Synology DS1019+ continued to perform more poorly than he expected based on his past experience. Backus would occasionally experience strange delays, disconnects, and temporary "hangs" when accessing or writing data and on opening files, which he had not previously experienced with his other NAS units and RAID arrays. Backus also noticed delays and stops and starts when playing videos stored on the storage array, which he had never previously experienced with his other hard drives.

155.    In late April, Backus read an article on *Ars Technica* about how WDC had snuck inferior and inappropriate SMR technology into its WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss. After some further research, Backus learned that WDC had recently admitted to the technology press that the WD Red NAS 4TB and 6TB drives he purchased, with SKUs WD40EFAX and WD60EFAX, were among these inferior SMR-technology drives.

156.    Notably, after WDC publicly admitted in late April 2020 that certain SKUs of its WD Red NAS hard drives now contained SMR technology[59], Synology (the manufacturer of Backus' NAS device) removed those SMR hard drives from Synology's compatibility list—including the hard drives with SKUs WD40EFAX and WD60EFAX which Backus had purchased. Based on the investigation of Plaintiffs' counsel, Synology customer support staff now tell Synology customers, when asked, that they should not use these SMR-technology WD Red NAS drives in Synology products and that the drives are not supported.

157.    Backus had been defrauded. Backus felt betrayed and taken advantage of by WDC. WDC had tricked Backus into relying on the past reputation and performance of WD Red NAS drives. WDC had secretly snuck the inferior SMR-technology into the drives to increase its short-term profits while exploiting customers like Backus whom WDC kept in the dark. WDC had continued to promise and advertise that the WD Red NAS hard drives he purchased were "purpose-built" for NAS devices and RAID and that the drives were

---

[59] Specifically, the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX, and WD60EFAX.

compatible with his Synology unit. But the hard drives he purchased, contrary to WDC's express representations, were <u>not</u> appropriate for NAS or RAID, and Synology now states that the drives are inappropriate for and are not supported in its NAS units.

158.    Backus' data was now at risk, and he also was experiencing worse performance in his NAS than he had ever experienced before with other drives that (in contrast) had truly been appropriate for NAS and RAID.

159.    Backus was, and continues to be, extremely upset and worried about losing his data, especially in the event he needs to perform a RAID rebuild. The failure of a single drive could result in the loss of data due to the inferior technology and much longer RAID rebuild times (i.e., resilvering) of these SMR drives as compared to CMR drives. Backus had specifically purchased these drives for their appropriateness and reliability in RAID and resilvering, because his entire expansion plan was contingent on performing multiple RAID rebuilds in sequence. Yet now he could no longer do so, because he would be putting his data at increased risk due to the inappropriate SMR technology utilized by these hard drives. In order to secure and protect his data, Backus must now expend hundreds more dollars and many hours of his time to purchase several external hard drives and/or another NAS device, and then copy his data over to the new storage, which he cannot now afford to do.

160.    Backus reasonably relied on WDC's misrepresentations and omissions of material facts. If Backus had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for the drives' intended and advertised use, Backus would not have purchased the hard drives. Backus would have purchased different CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

161.    As a direct and proximate result of WDC's acts and omissions, Backus was harmed, suffered an injury-in-fact, and lost money or property.

162.    Backus would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems and RAID.

163.    Backus will be harmed if, in the future, he is left to guess as to whether WDC's

representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

**Plaintiff Brian Conway**

164.    Plaintiff Brian Conway is, and at all relevant times has been, a citizen and resident of Mansfield, Massachusetts.

165.    Between June 2017 and January 2018, Conway purchased six CMR-technology WD Red NAS drives with SKU WD60EFRX from Amazon.com and Newegg.com. In purchasing the hard drives, Conway relied on the WDC-provided representations displayed on the Amazon.com and Newegg.com product webpages for the WD Red NAS hard drives that the drives were designed and purpose-built for NAS and RAID.

166.    Conway also understood WD Red NAS hard drives to have a good reputation for reliability and quality in RAID and ZFS arrays and to have a three-year warranty.

167.    Based on WDC's representations and on the excellent reputation of WD Red NAS hard drives, Conway purchased the six WD Red NAS hard drives.

168.    Conway configured all six drives in a FreeNAS ZFS disk array in a PC server at his home for personal use. Conway experienced excellent performance with the drives for over two years.

169.    Then in late April 2020 one of the WD60EFRX hard drives failed within the 3-year warranty period. Conway contacted WDC and received an RMA for the drive, and Conway shipped the drive to WDC for replacement.

170.    WDC shipped Conway a replacement drive for the failed WD60EFRX hard drive. The replacement drive had the SKU of WD60EFAX.

171.    Conway installed the new WD60EFAX drive in his server, and then attempted to resilver the ZFS pool with the new drive. After over 24 hours, the resilvering process had failed to make much progress (unlike his experience in the past with the other drives where resilvering completed in approximately 10-12 hours), and Conway concluded there must be something wrong with the drive because he was unable to add it to the ZFS pool. Conway terminated the resilvering process.

172.    Conway had another older, and mostly empty, WD60EFRX drive which he had been using as a standalone drive in the same server. Conway moved the data off that WD60EFRX and then added the now-empty WD60EFRX drive to the ZFS pool instead. This time, the resilvering process took approximately 12 hours and completed without any problems. Since then, Conway has experienced no problems with the performance or reliability of the FreeNAS ZFS storage array.

173.    Meanwhile, Conway is unable to use the replacement hard drive WDC shipped him (SKU WD60EFAX) at all. Conway later researched the SKU for the drive on Google in an effort to learn why the drive was unusable in his storage array, and he learned that WDC had recently admitted that the WD60EFAX drive utilized SMR technology.

174.    WDC had deceptively and unfairly replaced his CMR-technology WD60EFRX drive during the warranty period with an inappropriate SMR-technology hard drive that was not suitable for its intended and advertised purpose. WDC's actions were unfair and deceptive.

175.    As a direct and proximate result of WDC's acts and omissions, Conway was harmed, suffered an injury-in-fact, and lost money or property.

176.    Conway would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems and RAID.

177.    Conway will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

**Plaintiff David Eaton**

178.    Plaintiff David Eaton is, and at all relevant times has been, a citizen and resident of Kirkwood, Missouri.

179.    In September 2017, Eaton purchased a 4-bay Synology DS416play NAS unit along with two WD Red NAS 4TB drives. The hard drives utilized traditional CMR technology. The Synology NAS unit utilized a Linux software RAID technology which Synology called Synology Hybrid RAID (or "SHR"), which allowed mixing of different size

1    drives to expand storage while maintaining redundancy such that one hard drive could fail

2    without suffering data loss.

3        180.    Eaton installed the two WD Red NAS 4TB drives in the NAS, along with a 1TB

4    drive and a 2TB drive that he already had, creating a SHR storage pool. Later, he swapped out

5    the 1TB drive for a 2TB drive which he purchased. The resilvering process to rebuild the RAID

6    array and redistribute the data among the hard drives including the new 2TB drive took

7    approximately 8 hours.

8        181.    On April 6, 2020, Eaton was shopping at his local Micro Center computer store

9    in Brentwood, Missouri, when he saw WD Red NAS 6TB hard drives on display and for sale.

10   For many years, Eaton had purchased and had been happy with WDC hard drives, and he

11   understood them to have a good reputation for reliability and quality. Eaton understood that

12   WD Red NAS drives were purpose-built for NAS devices with RAID setups like his Synology

13   NAS. Eaton had been happy with his existing WD Red NAS 4TB hard drives and their

14   performance.

15       182.    Eaton saw that the outside box for the WD Red NAS 6TB drives stated "WD

16   RED 3.5" NAS HARD DRIVE" and "RAID OPTIMIZED."  Eaton understood that the WD

17   Red NAS hard drives were premium hard drives that were purpose-built for NAS and RAID,

18   unlike cheaper desktop drives. The advertising and statements on the box of the WD Red NAS

19   drives confirmed his understanding.

20       183.    Eaton had no idea the WD Red NAS 6TB hard drive in fact utilized inferior and

21   inappropriate SMR technology, which was not disclosed to him. Regardless, even if Eaton had

22   seen the letters "SMR" in the hard drive description, he would not have known what SMR was

23   or what it stood for or what if any impact SMR had on hard drive performance.

24       184.    Relying on the representations on the box of the WD Red NAS 6TB hard drive,

25   including the "NAS" in the name of the drive, the drive being advertised as "Raid Optimized,"

26   and also based on Eaton's prior good experience with the two WD Red NAS 4TB drives which

27   were currently in his Synology NAS, Eaton decided to buy one WD Red NAS 6TB hard drive.

28   Eaton purchased the WD Red NAS 6TB drive for $149.99 plus tax.

185.     Eaton replaced one of his existing 2TB drives with the WD Red NAS 6TB hard drive, and the Synology NAS began the resilvering process.

186.     Eaton decided that he wanted to increase the storage capacity of his storage array even further, by also replacing the last 2TB drive in the Synology with another WD Red NAS 6TB drive.

187.     The next day, on April 7, 2020, Eaton visited the Micro Center computer store again to purchase a second WD Red NAS 6TB hard drive.

188.     After Eaton returned home with the second hard drive from the Micro Center computer store, he was surprised to see that the resilvering process with the first WD Red NAS 6TB drive had not completed. Previously, with the 2TB hard drive, it had taken less than 10 hours to complete the resilvering process.

189.     In fact, this time with the WD Red NAS 6TB drive, the resilvering process ultimately took <u>seven days</u> – almost 17 times as long as the prior drive had taken.

190.     After the resilvering process had completed, Eaton replaced the last 2TB drive with the second WD Red NAS 6TB drive he had purchased. The resilvering process again took approximately seven days.

191.     Eaton uses the Synology NAS to store personal documents, family photos, and to store and serve videos and movies.

192.     Eaton noticed that after the WD Red NAS 6TB hard drives were incorporated into his storage pool, playback of videos was often choppy with stops and starts—which he had not previously experienced prior to adding the WD Red NAS 6TB drives.

193.     After experiencing this worse video playback performance and the extremely long resilvering process of seven days per drive, Eaton became concerned about the reliability of the hard drives in his storage array and the possibility of data loss.

194.     In late April, Eaton read an article on *Ars Technica* about how WDC had snuck inferior and inappropriate SMR technology into its WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss. Eaton learned that WDC had admitted that it had switched WD Red NAS 6TB hard drives with

the SKU WD60EFAX to the SMR technology. Eaton checked the web interface of his

Synology NAS and saw that the two WD Red NAS 6TB hard drives were in fact the

WD60EFAX drives with the inferior SMR technology.

195.    Notably, <u>after</u> WDC publicly admitted in late April 2020 that certain SKUs of its

WD Red NAS hard drives now contained SMR technology[60], Synology (the manufacturer of

Eaton's NAS device) removed those SMR hard drives from its compatibility list—including the

hard drive with SKU WD60EFAX which Eaton had purchased. Based on the investigation of

Plaintiffs' counsel, Synology customer support staff now tell Synology customers, when asked,

that they should not use these SMR-technology WD Red NAS drives in their Synology

products and that the drives are not supported.

196.    Eaton had been defrauded. Eaton felt betrayed and taken advantage of by WDC.

WDC had tricked Eaton into relying on the past reputation and performance of WD Red NAS

drives. WDC had secretly snuck the inferior SMR-technology into the drives to increase its

short-term profits while exploiting customers like Eaton whom WDC kept in the dark. WDC

had continued to promise and advertise that the WD Red NAS hard drives he purchased were

designed for NAS devices like his Synology unit. But the hard drives he purchased were <u>not</u>

appropriate for NAS or RAID, and Synology now states that the drives are inappropriate for

and are not supported in its NAS units.

197.    Eaton was, and continues to be, extremely upset and worried about losing his

data. The failure of a single drive could result in the loss of data due to the much longer RAID

rebuild times—e.g., resilvering now takes <u>seven days</u>, as Eaton experienced when he installed

the SMR drives, compared to the less than one day resilvering process which would be typical

with a CMR drive. Eaton felt lucky he had not lost data the last time he resilvered with the

SMR drives, and he does not want to push his luck further. Meanwhile, Eaton is also unhappy

with the slower performance he continues to experience including choppy video playback.

198.    Eaton reasonably relied on WDC's misrepresentations and omissions of material

---

[60] Specifically, the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX, and WD60EFAX (the "WD Red NAS Drives" or "WD Red Drives").

facts. If Eaton had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for the drives' intended and advertised use, Eaton would not have purchased the hard drives. Eaton would have purchased different CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

199.    As a direct and proximate result of WDC's acts and omissions, Eaton was harmed, suffered an injury-in-fact, and lost money or property.

200.    Eaton would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems and RAID.

201.    Eaton will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

**Plaintiff Steven Gravel**

202.    Plaintiff Steven Gravel is, and at all relevant times has been, a citizen and resident of Delmar, New York.

203.    In August 2019, Gravel purchased four WD Red NAS 4TB drives from Amazon.com for his 4-bay QNAP TS-453Be network attached storage device which he used in his home for personal use. Gravel purchased the 4TB WD Red NAS hard drives because they were advertised as being "purpose-built" for NAS and RAID, and he understood WD Red NAS hard drives to have a good reputation for such usage. The hard drives utilized traditional CMR technology.  The SKU for the hard drives was WD40EFRX. Gravel installed the hard drives in the QNAP and set up the storage array with RAID 5 redundancy.

204.    Gravel utilized the QNAP NAS for random-write intensive workloads including iSCSI volumes and mixed content file shares. He also used the QNAP as a media server to store and play movies which he owned. Gravel was happy with the performance of the hard drives in his QNAP. Gravel's only regret was that he had not purchased larger capacity hard drives, because he soon began running out of storage capacity.

205.    A few months later, in December 2019, Gravel decided to expand his storage

capacity. Gravel purchased an external 4-bay QNAP expansion unit (the QNAP TR-004) that externally connected directly to the QNAP TS-452Be NAS device via a USB-C cable, so he could move his existing WD40EFRX drives to the expansion unit as a second storage array. He planned to rebuild the first storage array in the main QNAP TS-452Be unit with four new larger capacity NAS hard drives. Both of the arrays would be independently set up with RAID 5, and both would be managed by the computing processor and software interface of the main QNAP TS-452Be NAS device.

206.    On December 14, 2019, Gravel went to Newegg.com to shop for four larger hard drives that were purpose-built for NAS devices like his. Gravel was considering purchasing either Seagate IronWolf NAS hard drives or more WD Red NAS hard drives. Both the Seagate and Western Digital hard drives were advertised as having been designed and built for NAS and RAID for devices with up to 8 drive bays.

207.    Given Gravel's good experience with his current WD Red NAS drives, he gravitated towards purchasing more WD Red NAS drives.

208.    Gravel browsed the Newegg.com product webpage for the WD Red NAS 6TB hard drive. Based on the advertising and representations on the product webpage, Gravel reasonably assumed and understood that the WD Red NAS 6TB drive advertised there was virtually identical in performance to his existing, and excellent performing, WD Red NAS 4TB drives, but with 2TB greater capacity.

209.    Gravel viewed the advertising and product information on the product webpage (which was provided to Newegg by WDC). Gravel viewed the prominent bullet points on the product webpage which stated: "**Specifically designed for use in NAS systems with up to 8 bays**," "**Small and home office NAS systems in a 24/7 environment**," "**NASware firmware for compatibility,**" and "**Supports up to 180TB/yr workload rate**."

210.    Lower down on the product webpage for the WD Red NAS 6TB hard drive was a colorful product brochure provided and created by WDC. Gravel viewed the representations there, including: "**There's a leading edge WD Red drive for every compatible NAS system to help fulfill your data storage needs… WD Red drives pack the power to store your**

precious data in one powerhouse unit"; "**The drive for NAS. Desktop drives aren't typically tested or designed for the rigors of a NAS system. Do right by your NAS and choose the drive with an array of features to help preserve your data and maintain optimum performance**"; and "**Built for NAS Compatibility. WD Red drives with NASware 3.0 technology are purpose-built to balance performance and reliability in NAS and RAID environments**."

211.    Based on these representations, Gravel reasonably believed and understood the WD Red NAS 6TB hard drive was specifically designed and built for NAS device RAID environments like his QNAP system, and that the drive would perform just as well in that environment as the WD Red NAS 4TB drives he had previously purchased only a couple of months earlier and which he was currently using.

212.    Gravel had no idea that the WD Red NAS 6TB hard drive now being offered by Newegg in fact utilized inferior and inappropriate SMR technology, which WDC had snuck into the drives and which was not disclosed to him. Regardless, even if the letters "SMR" had appeared in the hard drive description, Gravel would not have known what SMR was or what it stood for or what if any impact SMR had on hard drive performance.

213.    Relying on the representations regarding the WD Red NAS 6TB hard drive on the Newegg product webpage, and also based on his prior good experience with WD Red NAS hard drives, Gravel decided to purchase four WD Red NAS 6TB hard drives for $539.96 plus tax. The SKU for the hard drives was WD60EFAX.

214.    Gravel installed the hard drives into the QNAP main unit, replacing and removing the older 4TB WD40EFRX drives that had previously been installed there. Gravel continued to store the iSCSI volumes and mixed content file shares in the main unit on this RAID 5 storage array with the new 6TB WD60EFAX drives. Like before, this meant that he regularly and necessarily performed intensive random writes and reads on the drives.

215.    Gravel noticed that the write and read performance on this new storage array was sluggish and very poor, in particular when being utilized for iSCSI and mixed content file shares. Workloads in general would perform more slowly than with the prior WD40EFRX

storage array, and he also noticed that large file transfers would start fast but then after a few minutes would bog down with poor and slow write performance. In short, Gravel found that the new WD Red NAS 6TB hard drive array (SKU WD60EFAX) was unable to adequately perform the same tasks and jobs that his older WD Red NAS 4TB hard drive array (SKU WD40EFRX) had readily and easily performed.

216.    Gravel was puzzled and disappointed by this very poor performance. Gravel was unable to use the new hard drives for their intended and advertised purpose.

217.    After Gravel had installed these poor-performing WD Red NAS 6TB hard drives in the QNAP, Gravel had moved his four older WD Red NAS 4TB drives (SKU WD40EFRX) to the QNAP TR-004 external 4-bay expansion unit. The expansion unit was connected externally to the main QNAP TS-452Be unit via a USB-C cable. Gravel set up a second RAID 5 array on these old WD Red NAS 4TB drives in the expansion unit.

218.    Given the consistently poor, and puzzling, performance of the first RAID 5 array in the main QNAP unit with the new WD Red NAS 6TB hard drives, Gravel decided to move his iSCSI data and mixed content file share onto the second datastore on the external expansion unit containing his older WD40EFRX drives, given those older drives previously performed well with that workload.

219.    Sure enough, once Gravel moved the iSCSI data and mixed content file share over to the expansion unit datastore with the older WD Red NAS 4TB drives, the performance improved dramatically to the same excellent level it had been before on those same WD40EFRX hard drives back when they had been installed in the main QNAP TS-452Be unit. Writes and reads and file transfers were no longer sluggish or choppy, and the performance was now consistent and excellent.

220.    Gravel decided to repurpose the newer (and poor performing) WD Red NAS 6TB datastore in the main QNAP unit for the lightweight and undemanding job of being a media server for playing movies that he owned. The drives were simply too poor performing for anything else.

221.    In late April 2020, Gravel read an article on *Ars Technica* which discussed how

WDC had snuck inferior and inappropriate SMR technology into its new WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss. After some further research, Gravel learned that WDC had recently admitted to the technology press that the WD Red NAS 6TB drives he purchased, with SKU WD60EFAX, were among these inferior SMR-technology drives. When Gravel read this, he thought to himself that this suddenly made a whole lot of sense. Now there was an explanation for the strangely terrible performance he had experienced with the WD60EFAX drives he purchased. The problems and poor performance he had observed were consistent with the problems and complaints about these SMR drives now being reported by the online press and by consumers in online comments.

222.     Gravel had been defrauded. Gravel had bought the hard drives based on WDC's representations that the drives were purpose-built for NAS and RAID. But the hard drives he purchased, contrary to WDC's express representations, were <u>not</u> appropriate for NAS or RAID, and were not appropriate for sustained random writes or usage in iSCSI datastores. Gravel was unable to use the new hard drives for their intended and advertised purpose.

223.     Gravel was also upset about the increased risk of losing his video and movie files stored on the SMR WD Red NAS 6TB drives. The failure of a single drive could result in the loss of data due to poorer performance in RAID rebuilds, where a second drive could fail or drop out of the array like other purchasers had reported happened to them.

224.     Gravel reasonably relied on WDC's misrepresentations and omissions of material facts. If Gravel had known that the WD Red NAS hard drives he purchased utilized recording technology which was inappropriate for their intended and advertised use, Gravel would not have purchased the hard drives. Gravel would have purchased different CMR-technology hard drives that were truly appropriate for NAS and RAID use instead.

225.     As a direct and proximate result of WDC's acts and omissions, Gravel was harmed, suffered an injury-in-fact, and lost money or property.

226.     Gravel would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness

1    for NAS systems and RAID.

2    227.    Gravel will be harmed if, in the future, he is left to guess as to whether WDC's

3    representations are accurate and whether there are omissions of material facts regarding the

4    features or specifications of WDC's NAS hard drives.

5    **Plaintiff James Raaymakers**

6    228.    Plaintiff James Raaymakers is, and at all relevant times has been, a citizen and

7    resident of California.

8    229.    On May 1, 2020, Raaymakers visited TigerDirect.com to shop for a hard drive

9    to back up his home office computer system. Raaymakers had installed the VMware ESXi

10   virtualization hypervisor on a PC. He had set up and was constantly running three "virtual"

11   Windows servers on the system including an LDAP server, an email server, and a shared

12   fileserver which contained many thousands of small files.

13   230.    Raaymakers was in need of a reliable and high-performance business-class hard

14   drive to install in the ESXi server to utilize as a datastore for regular file backups and for ESXi

15   virtual machine snapshot backups.  He had run out of room on the existing 2TB hard drive he

16   had installed as such a datastore.

17   231.    Raaymakers searched on TigerDirect.com for a 6TB NAS hard drive, and came

18   to the product webpage for the WD Red NAS 6TB hard drive.

19   232.    Raaymakers viewed the statements and bullet points on the product webpage

20   which indicated the drive was appropriate for heavy and sustained home-office or business use,

21   including: "**WD Red can share and backup files at the speed of your business**," "**Supports**

22   **up to 180TB/yr workload rate**," "**Small and home office NAS systems in a 24/7**

23   **environment**," and "**NASware firmware for compatibility**."

24   233.    Raaymakers had no idea the hard drive in fact utilized inferior and inappropriate

25   SMR technology, which was not disclosed to him or stated anywhere on the product webpage.

26   234.    Relying on the representations regarding the WD Red NAS 6TB hard drive on

27   the TigerDirect webpage, Raaymakers decided to purchase one WD Red NAS 6TB hard drive

28   for $179.99 plus tax. The SKU for the hard drive was WD60EFAX.

235.     After receiving the WD Red NAS hard drive, Raaymakers installed it in his PC and set it up as an ESXi datastore.

236.     Raaymakers encountered many problems with the new hard drive and the ESXi virtual datastore located on the drive.

237.     First, the unlike the datastores on the prior 2TB hard drives he had utilized, the datastore on this new WD Red NAS hard drive repeatedly disconnected from Mr. Raaymakers' virtual servers. Raaymakers started a large backup process of copying thousands of small files onto an ESXi datastore located on the hard drive.  However, the backup and copying process was excruciatingly slow, and after two days, the process stalled out and failed.

238.     Raaymakers had never previously experience such problems and poor performance with the prior hard drives he had installed and used as ESXi datastores and backup storage in the PC.  Previously, on other hard drives, such copy processes only took a few hours to complete.

239.     Ayers had been defrauded. In fact, unbeknownst to Raaymakers, the WD60EFAX drive utilized inferior and inappropriate SMR technology.  This technology was inappropriate for use in ESXi datastores, virtual machine backup snapshots, or writing of thousands of small files, because sustained heavy and/or random writes cause the small CMR cache zone to fill up and for the drive to "choke" while waiting for the very slow SMR disk writing process.  This caused the unacceptable performance Raaymakers experienced.

240.     Raaymakers is unable to use the WD Red NAS 6TB drive at all in his ESXi virtual server environment. Raaymakers has disconnected the drive from his system and it is currently sitting unused.

241.     Raaymakers reasonably relied on WDC's misrepresentations and omissions of material facts. If Raaymakers had known that the WD Red NAS hard drive he purchased utilized recording technology which was inappropriate for its intended and advertised purpose, Raaymakers would not have purchased the hard drive. Raaymakers would have purchased a different CMR-technology hard drive that was truly appropriate for NAS and ESXi datastore usage.

242.    As a direct and proximate result of WDC's acts and omissions, Raaymakers was harmed, suffered an injury-in-fact, and lost money or property.

243.    Raaymakers would purchase a WD NAS hard drive again if he could have confidence regarding the truth of WDC's representations regarding the drive's appropriateness and fitness for its intended and advertised purpose.

244.    Raaymakers will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

245.    **Plaintiff Tod Weitzel**

246.    Plaintiff Tod Weitzel is, and at all relevant times has been, a citizen and resident of Sunnyvale, California.

247.    In June 2018, Weitzel purchased a Dell PC with a hardware RAID card. Weitzel set up the PC as a FreeNAS network attached storage server for his home use, with six hard drives set up in a ZFS storage pool.

248.    Weitzel used the FreeNAS server to store and access personal files and media, and also to run virtual machines (software emulations of physical computers).

249.    By April 2020, Weitzel had populated the FreeNAS server ZFS storage pool with five WD Red NAS 4TB hard drives (SKU WD40EFRX), and one WD Red NAS 3TB hard drive (SKU WD30EFRX). All of these WD Red NAS hard drives utilized traditional CMR technology.

250.    However, the storage pool of the FreeNAS server was almost full, and Weitzel decided to replace the sole 3TB hard drive with another WD Red NAS 4TB hard drive to add more capacity.

251.    Weitzel had previously purchased WD Red NAS hard drives because they were advertised as being "purpose-built" for NAS devices and FreeNAS ZFS pools, and he understood WD Red NAS hard drives to have a good reputation for such usage. Weitzel also knew and relied on the fact that the creator of the FreeNAS storage software, iXsystems, was a vendor partner of WDC and that iXsystems explicitly recommended WD Red NAS hard drives

for use in FreeNAS systems. In fact, many of the FreeNAS hardware systems which iXsystems itself manufactured and offered for sale on its website came pre-populated with WD Red NAS hard drives. Meanwhile, Weitzel had been happy with his WD Red NAS hard drives and their performance in his existing FreeNAS ZFS storage pool.

252.   Based on his prior good experience with WD Red NAS hard drives and WDC's promotion and advertising of the hard drives for NAS systems like his, Weitzel desired to purchase another WD Red NAS 4TB drive.

253.   On April 14, 2020, Weitzel visited eBay.com to purchase another WD Red NAS 4TB hard drive. Weitzel navigated to an eBay product webpage for the drive. The description contained a manufacturer-provided image of the hard drive titled "WD RED 3.5" NAS HARD DRIVE," and stated the hard drive was "new" and was a "Western Digital NAS WD40EFAX 4TB SATA 256M Cache 3.5" WD Red." Weitzel reasonably assumed and understood that this WD Red NAS 4TB drive was virtually identical in performance to his existing, and excellent performing, five other WD Red NAS 4TB drives, and that as WDC advertised for all its WD Red NAS hard drives, the hard drive was "purpose-built" for NAS and FreeNAS systems like his.

254.   Weitzel had no idea the WD Red NAS 4TB hard drive in fact utilized inferior and inappropriate SMR technology, which was not disclosed to him.

255.   Relying on the representations regarding the WD Red NAS 4TB hard drive, and based on his prior good experience with WD Red NAS hard drives and WDC's promotion and advertising of the hard drives for NAS systems like his, Weitzel purchased the hard drive for $115.00 plus tax.

256.   Weitzel received the hard drive on April 16, 2020. He then replaced the WD Red NAS 3TB drive in his storage pool with this new hard drive and began the resilvering process. While the ZFS pool was still in the resilvering process, Weitzel saw and read the *Ars Technica* article which discussed how WDC had recently snuck inferior and inappropriate SMR technology into its WD Red NAS hard drives, causing poor performance, hard disks to get knocked out of RAID arrays, and increased risk of data loss particularly during the resilvering

process. Weitzel then learned that the WD Red NAS 4TB drive he purchased (SKU WD40EFAX), which was currently in the middle of the resilvering process, was among these inferior SMR-technology drives.

257.    In addition to being upset after learning of the poor drive performance, Weitzel became very concerned that the resilvering process may fail and that he could suffer data loss.

258.    Thankfully, the resilvering process finally completed.

259.    However, after the drive was integrated and the ZFS array resilvering process had completed, Weitzel now experienced terrible read and write performance in his ZFS pool.

260.    For example, reading and opening files became much slower than it used to be prior to adding the WD40EFAX drive, especially for folders with large amounts of files. A shared folder that used to take about 12 seconds to display all the file contents, now took up to 45 seconds. Weitzel also operated a Nextcloud virtual machine instance (a local file sharing software platform) on the FreeNAS system. The Nextcloud operations likewise were now significantly slower and often sputtered. Weitzel also used a Plex media server stored on the FreeNAS system for recording and playing back over-the-air TV. The performance became abysmal, such that the data would stall when recording and then stop altogether such that recording video became impossible. Video and media playback was also plagued with intermittent buffering and stops and starts.

261.    Over the next few weeks, Weitzel became increasing frustrated with the now-terrible performance of the ZFS pool. Weitzel purchased a Seagate IronWolf NAS 4TB drive to replace the poor-performing (and virtually unusable) WD Red NAS SMR-technology drive. Weitzel knew that all Seagate NAS-labeled drives exclusively used CMR technology like his older WD Red NAS drives had. Weitzel had read in another *Ars Technica* article that Seagate had publicly affirmed that "Seagate only produces NAS drives that are CMR. We do not have any SMR drives in our IronWolf and IronWolf Pro drives, which are NAS solutions…[W]e don't recommend SMR for NAS."[61]

---

[61] *See* https://arstechnica.com/information-technology/2020/04/seagate-says-network-attached-storage-and-smr-dont-mix/.

262.    On May 31, 2020, Weitzel replaced the SMR-technology WD Red NAS 4TB (SKU WD40EFAX) drive with the IronWolf NAS 4TB drive. With the WD40EFAX removed, the resilvering process completed within a few hours without issue.

263.    After the resilvering process for the FreeNAS ZFS disk array had completed, Weitzel immediately noticed that the disk performance had dramatically improved. The performance had returned back to the excellent level it had been prior to having added the (now removed) SMR-technology WD40EFAX hard drive.

264.    Notably, since WDC publicly admitted in late April 2020 that certain SKUs of its WD Red NAS hard drives now contained SMR technology[62], iXsystems (the developer of the FreeNAS software that Weitzel utilizes on his server) now states that SMR WD Red NAS drives are not compatible with FreeNAS and ZFS, and iXsystems recommends that FreeNAS users not install SMR WD Red NAS drives in their FreeNAS systems.

265.    Weitzel had been defrauded. Weitzel felt betrayed and taken advantage of by WDC. WDC had tricked Weitzel into relying on the past reputation and performance of WD Red NAS drives. WDC had secretly snuck the inferior SMR-technology into the drives to increase its short-term profits while exploiting customers like Weitzel whom WDC kept in the dark. WDC had continued to promise and advertise that the WD Red NAS hard drives he purchased were designed for NAS and storage devices like his FreeNAS server. But the SMR hard drives he purchased were <u>not</u> appropriate for NAS devices or storage servers, and in fact WDC's vendor-partner iXsystems now states that the SMR drives are inappropriate for use in FreeNAS systems like Weitzel's.

266.    In fact, the SMR-technology WD Red NAS 4TB hard drive that Weitzel purchased was useless and completely worthless for its intended purpose. This drive now sits in a box on the floor next to Weitzel's FreeNAS server.

267.    Weitzel reasonably relied on WDC's misrepresentations and omissions of material facts. If Weitzel had known that the WD Red NAS hard drive he purchased utilized

---

[62] Specifically, the following SKUs: WD20EFAX, WD30EFAX, WD40EFAX and WD60EFAX.

recording technology which was inappropriate for its intended and advertised use, Weitzel would not have purchased the hard drive. Weitzel would have purchased a different CMR-technology hard drive (such as the IronWolf NAS 4TB drive he later purchased to replace it), which was truly appropriate for use in a FreeNAS server.

268. As a direct and proximate result of WDC's acts and omissions, Weitzel was harmed, suffered an injury-in-fact, and lost money or property.

269. Weitzel would purchase WD NAS hard drives again if he could have confidence regarding the truth of WDC's representations regarding the drives' appropriateness and fitness for NAS systems, RAID, and FreeNAS drive arrays.

270. Weitzel will be harmed if, in the future, he is left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

## CLASS ACTION ALLEGATIONS

271. Plaintiffs Nicholas Malone, Chris Ayers, James Backus, Brian Conway, David Eaton, Steven Gravel, James Raaymakers and Tod Weitzel (collectively, "Plaintiffs") hereby each brings this lawsuit on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3).

272. Plaintiffs seek to represent the following nationwide Class:

> **All United States residents who, during the applicable limitations period, either (a) purchased from any seller any Western Digital Red NAS hard drive with SMR technology, or (b) received from Western Digital a replacement Red NAS hard drive with SMR technology.**

273. Plaintiffs James Raaymakers and Tod Weitzel also seek to represent a subclass of all Class Members who purchased or received a replacement WD Red NAS Drive in the State of California (the "California Subclass").

274. Plaintiff Chris Ayers also seeks to represent a subclass of all Class Members who purchased or received a replacement WD Red NAS Drive in the State of Florida (the "Florida Subclass").

275. Plaintiff Brian Conway also seeks to represent a subclass of all Class Members

who purchased or received a replacement WD Red NAS Drive in the State of Massachusetts (the "Massachusetts Subclass").

276.    Plaintiff David Eaton also seeks to represent a subclass of all Class Members who purchased or received a replacement WD Red NAS Drive in the State of Missouri (the "Missouri Subclass").

277.    Plaintiff Steven Gravel also seeks to represent a subclass of all Class Members who purchased or received a replacement WD Red NAS Drive in the State of New York (the "New York Subclass").

278.    Plaintiff James Backus also seeks to represent a subclass of all Class Members who purchased or received a replacement WD Red NAS Drive in the State of Virginia (the "Virginia Subclass").

279.    Plaintiff Nicholas Malone also seeks to represent a subclass of all Class Members who purchased or received a replacement WD Red NAS Drive in the State of Wisconsin (the "Wisconsin Subclass").

280.    The nationwide Class and the various Subclasses shall be collectively referred to as the "Classes."

281.    Specifically excluded from the Classes are Defendant, any entity in which a Defendant has a controlling interest or which has a controlling interest in Defendant, Defendant's agents and employees and attorneys, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

282.    ***Numerosity.*** The Plaintiffs do not know the exact number of members of the Classes. That being said, Plaintiffs are informed and believe that the Classes easily comprise tens of thousands of persons, while each subclass comprises one thousand or more individuals. In any event, the members of the Class and each subclass are so numerous that joinder of all members is impracticable.

283.    ***Commonality and Predominance.*** Well-defined, identical legal or factual questions affect the members of the Classes.  All claims in this matter arise from the identical written advertising and omissions of material facts regarding the WD Red NAS hard drives

purchased by the members of the Classes.  These questions predominate over questions that might affect individual class members.  These common questions include, but are not limited to:

(a)  whether Defendant misrepresented and/or failed to disclose material facts concerning the WD Red NAS hard drives;

(b)  whether Defendant's conduct was unfair and/or deceptive;

(c)  whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Classes;

(d)  whether Plaintiffs and the Classes sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages;

(e)  whether Defendant violated the various consumer protection statutes applicable to the Class and/or to each of the Subclasses;

(f)  whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and

(g)  whether Plaintiffs and the Classes are entitled to an order for injunctive relief.

284.  **_Typicality._** Each Plaintiff is a member of the Class which that Plaintiff seeks to represent. Each Plaintiff representing a subclass is a member of that subclass. The claims of each Plaintiff are typical of all members of the Class and/or of the Plaintiff's subclass.

285.  All of the claims alleged by each Plaintiff, on behalf of themselves individually and on behalf of the Classes, arise from the same misrepresentations and omissions of material fact.

286.  All of the claims alleged by each Plaintiff, on behalf of themselves individually and on behalf of the Classes, are based on the same legal theories.

287.  **_Adequacy._** Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel that is experienced in litigating complex class actions. Plaintiffs have no interests which conflict with those of the Classes.

288.  A class action is superior to all other available methods for fairly and efficiently

1  adjudicating this controversy.  The prosecution of separate civil actions by individual members

2  of the Classes would create a risk of inconsistent or varying adjudications with respect to

3  individual members of the Classes which would establish incompatible standards of conduct for

4  the party opposing the Classes.

5         289.   Further, each Class and Subclass member's interests are small compared to the

6  burden and expense required to litigate each of their claims individually, so it would be

7  impractical and would not make economic sense for class members to seek individual redress

8  for Defendant's conduct.  Individual litigation would add administrative burden on the courts,

9  increasing the delay and expense to all parties and to the court system. Individual litigation

10  would also create the potential for inconsistent or contradictory judgments regarding the same

11  uniform conduct.  A single adjudication would create economies of scale and comprehensive

12  supervision by a single judge.  Moreover, Plaintiffs do not anticipate any difficulties in

13  managing a class action trial.

14        290.   By its conduct and omissions alleged herein, Defendant has acted and refused to

15  act on grounds that apply generally to the Class and each Subclass, such that final injunctive

16  relief and/or declaratory relief is appropriate with respect to the Class or Subclasses as a whole.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumers Legal Remedies Act
California Civil Code § 1750 *et seq*.**

21        291.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

22  herein.

23        292.   Plaintiffs bring this claim individually and on behalf of the members of the

24  Classes against Defendant.

25        293.   Defendant is a "person," as defined by California Civil Code § 1761(c).

26        294.   Plaintiffs and members of the Classes are "consumers," as defined by California

27  Civil Code § 1761(d).

28        295.   The WD Red NAS hard drives purchased by the Plaintiffs and the members of

the Classes are "goods" as defined by California Civil Code § 1761(a).

296.    The purchases by the Plaintiffs and the members of the Classes constitute "transactions," as defined by California Civil Code § 1761(e).

297.    The unlawful methods, acts or practices alleged herein to have been undertaken by Defendant were all committed intentionally and knowingly. The unlawful methods, acts or practices alleged herein to have been undertaken by Defendant did not result from a *bona fide* error notwithstanding the use of reasonable procedures adopted to avoid such error.

298.    With regard to this count of the pleading which alleges one or more violations of the CLRA, venue is proper in the state or federal court having jurisdiction over Santa Clara County, California (the county in which this action has been commenced) pursuant to Section 1780(d) of the California Civil Code because, without limitation, Santa Clara County is a county in which Defendant is doing business and is the county in which Defendant is headquartered.  A declaration establishing that this Court has proper venue for this count is attached hereto as **Exhibit A**.

299.    Defendant's methods, acts and/or practices, including Defendant's misrepresentations, omissions, active concealment, and/or failures to disclose, violated and continue to violate the CLRA in ways including, but not limited to, the following:

   a.    Defendant misrepresented that its products had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

   b.    Defendant misrepresented that its products were of a particular standard, quality, grade, or of a particular style or model when the products were of another (Cal. Civ. Code § 1770(a)(7));

   c.    Defendant advertised its products with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)); and

   d.    Defendant represented that its products were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

300.    Specifically, Defendant advertised and represented that these WD Red NAS hard drives were suitable for the particular purpose of NAS and RAID, when in fact the hard

drives were not suitable for that purpose and were actually outright dangerous when used for that purpose.

301.    With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiffs and the Classes; (b) Defendant concealed material information from Plaintiffs and the Classes; and/or (c) Defendant made partial representations which were false and misleading absent the omitted information.

302.    Defendant's misrepresentations and nondisclosures deceive and have a tendency and ability to deceive the general public.

303.    Defendant's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions. Indeed, the utility and value of Defendant's WD Red NAS hard drives with SMR technology are significantly reduced, to the point of worthlessness, because these drives should not and cannot be used for their intended and advertised purpose of NAS or RAID.

304.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent conduct, Plaintiffs and the Classes suffered injury-in-fact and lost money.

305.    But for Defendant's deceptive conduct and omissions of material facts, Plaintiffs and the Classes would not have purchased the subject hard drives and/or would have purchased an appropriate CMR-technology hard drive from one of Defendant's competitors instead. Defendant's conduct as alleged herein caused substantial injury to Plaintiffs, class members, and the public. Defendant's conduct is ongoing and will continue and recur absent a permanent injunction. Accordingly, Plaintiffs and the Classes seek an order enjoining Defendant from committing such practices.

306.    If not enjoined by order of this Court, Defendant is free to resume its unlawful behavior and injure Plaintiffs and consumers through the misconduct alleged herein once more. Defendant has a duty to speak truthfully or in a non-misleading manner.

307.    Plaintiffs would purchase WD NAS hard drives again if they could have

confidence regarding the truth of WDC's representations regarding their appropriateness and fitness for NAS systems and RAID.

308. Plaintiffs will be harmed if, in the future, they are left to guess as to whether WDC's representations are accurate and whether there are omissions of material facts regarding the features or specifications of WDC's NAS hard drives.

309. If Plaintiffs were to purchase a WD Red NAS hard drive again without WDC having changed its unlawful and deceptive conduct alleged herein, Plaintiffs would be harmed on an ongoing basis and/or would be harmed once or more in the future.

310. In order to prevent injury to the general public, Plaintiffs, in their individual capacities, seek a public injunction requiring WDC to stop advertising, and to instruct its resellers to stop advertising, any hard drives with drive-managed SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names).

311. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiffs and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiffs and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

312. In accordance with California Civil Code § 1782(a), on June 16, 2020, Plaintiffs' counsel served Defendant with notices of its CLRA violations on behalf of Plaintiffs.

313. Defendant failed to give, or to agree to give within a reasonable time, an appropriate correction, repair, replacement, or other remedy for its CLRA violations within 30 days of its receipt of the CLRA demand notices. Defendant has continued to fail to give, or to agree to give within a reasonable time, an appropriate correction, repair, replacement, or other remedy for its CLRA violations. Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiffs are entitled to recover actual damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems proper for Defendant's CLRA violations.

## COUNT II
### Violation of California's False Advertising Law
### California Business and Professions Code § 17500 *et seq.*

314.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

315.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

316.    Defendant has engaged in false or misleading advertising in violation of California's statutory False Advertising Law ("FAL").

317.    Defendant's conduct as described herein is misleading, and/or has a capacity, likelihood or tendency to deceive reasonable consumers.

318.    Defendant, with intent directly or indirectly to dispose of personal property or to perform services, or to induce the public to enter into any obligation relating thereto, makes, disseminates, has made or disseminated, causes to be made or disseminated, and/or has caused to be made or disseminated, before the public in California, in newspaper or other publication, or other advertising device, or by public outcry or by proclamation, or in any other manner or means, including over the internet, statements concerning that personal property or those services, and/or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which are untrue or misleading and which are known (or which by the exercise of reasonable care should be known) to be untrue or misleading.

319.    Defendant made, disseminated, makes, disseminates, caused to be made or disseminated and/or causes to be made or disseminated any statements concerning the disposition of personal property or the performance of services, and/or concerning any circumstance or matter of fact connected with such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, as advertised.

320.    With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiffs and the Classes; (b) Defendant concealed

material information from Plaintiffs and the Classes; and/or (c) Defendant made partial representations which were false and misleading absent the omitted information.

321.    Defendant committed such violations of the False Advertising Law with actual knowledge that its advertising was misleading, or Defendant, in the exercise of reasonable care, should have known that its advertising was misleading.

322.    Plaintiffs and the Classes reasonably relied on Defendant's representations and/or omissions made in violation of the False Advertising Law.

323.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent conduct, Plaintiffs and each member of the Classes suffered injury-in-fact and lost money.

324.    But for Defendant's deceptive conduct and omissions of material facts, Plaintiffs and the Classes would not have purchased the subject hard drives and/or would have purchased an appropriate hard drive from one of Defendant's competitors instead.

325.    Defendant should be ordered to disgorge or make restitution of all monies improperly accepted, received, or retained.

326.    Defendant's conduct has caused substantial injury to Plaintiffs, members of the Classes, and the public. Defendant's conduct is ongoing and will continue and recur absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Defendant from committing such violations of the FAL.  Plaintiffs further seek an order granting restitution to Plaintiffs and the Classes in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

327.    Plaintiffs, on behalf of themselves and the Classes, seek injunctive relief to require Defendant to: (1) provide notice to every class member that the WD Red NAS hard drive they purchased is not suited for its intended purpose; and (2) either provide a refund to Plaintiffs and the Class for their WD Red NAS hard drives in an amount to be determined at trial, or provide Plaintiffs and the Class with brand-new replacement CMR-technology hard drives that are truly suited for use with NAS devices and RAID, at no additional cost.

328.    Absent injunctive relief, Defendant will continue to injure Plaintiffs and the class members. Even if such conduct were to cease, it is behavior that is capable of repetition or

1    reoccurrence by Defendant.

2        329.    In order to prevent injury to the general public, Plaintiffs, in their individual

3    capacities, seek a public injunction requiring WDC to stop advertising, and to instruct its

4    resellers to stop advertising, any hard drives with drive-managed SMR technology as being

5    appropriate for NAS devices or RAID (including by removing "NAS" from such products'

6    names).

7        330.    Plaintiffs and the general public lack an adequate remedy at law to remedy

8    and/or mitigate the totality of the injuries and misconduct described herein.

9                                       **COUNT III**
                      **Violation of California's Unfair Competition Law**

10                   **California Business and Professions Code § 17200 *et seq*.**

11       331.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

12   herein.

13       332.    Plaintiffs bring this claim individually and on behalf of the members of the

14   Classes against Defendant.

15       333.    Defendant's acts and omissions alleged herein constitute unfair competition

16   and/or unlawful, unfair, or fraudulent business practices in violation of California Business and

17   Professions Code § 17200 et seq. (the "Unfair Competition Law" or "UCL").

18       334.    Defendant's conduct and omissions alleged herein are immoral, unethical,

19   oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the

20   Classes. There is no utility to Defendant's conduct, and even if there were any utility, it would

21   be significantly outweighed by the gravity of the harm to consumers caused by Defendant's

22   conduct alleged herein.

23       335.    Defendant's conduct and omissions alleged herein also violate California public

24   policy, including as such policy is reflected in Cal. Civ. Code § 1750 *et seq.* and Cal. Civ. Code

25   §§ 1709-1710.

26       336.    By its conduct and omissions alleged herein, Defendant has violated the

27   "unlawful" prong of the UCL, including by making material misrepresentations and omissions

28   in violation of Cal. Bus. & Prof. Code § 17500 *et seq*. and Cal. Civ. Code § 1750, *et seq*.; and

1  engaging in deceit and fraudulent concealment in violation of Cal Civ. Code §§ 1709-1710, *et*

2  *seq*.

3      337.    With respect to omissions, Defendant at all relevant times had a duty to disclose

4  the information in question because, *inter alia*: (a) Defendant had exclusive knowledge of

5  material information that was not known to Plaintiffs and the Classes; (b) Defendant concealed

6  material information from Plaintiffs and the Classes; and/or (c) Defendant made partial

7  representations which were false and misleading absent the omitted information.

8      338.    Defendant's material misrepresentations and nondisclosures were likely to

9  mislead reasonable consumers, existing and potential customers, and the public.

10     339.    Defendant's nondisclosures and omissions of material facts deceive and have a

11  tendency to deceive the general public and reasonable consumers, and therefore were unfair

12  and fraudulent.

13     340.    Defendant's nondisclosures and omissions of material facts are material, such

14  that a reasonable person would attach importance to the information and would be induced to

15  act on the omissions in making purchase decisions.

16     341.    Plaintiffs and members of the Classes reasonably relied on Defendant's

17  nondisclosures and omissions of material facts.

18     342.    By its conduct and omissions alleged herein, Defendant received more money

19  from Plaintiffs and the Classes than it should have received, and that money is subject to

20  restitution.

21     343.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent

22  conduct, Plaintiffs and the Classes suffered injury-in-fact and lost money.

23     344.    But for Defendant's deceptive conduct and omissions of material facts, Plaintiffs

24  and the Classes would not have purchased the subject hard drives and/or would have purchased

25  an appropriate hard drive from one of Defendant's competitors instead.

26     345.    Each Plaintiff, on behalf of himself and the Classes, seeks injunctive relief to

27  require Defendant to: (1) provide notice to every class member that the WD Red NAS hard

28  drive they purchased is not suited for its intended purpose; and (2) either provide a refund to

Plaintiffs and the Class for their WD Red NAS hard drives in an amount to be determined at trial, or provide Plaintiffs and the Classes with brand-new replacement CMR-technology hard drives that are truly suited for use with NAS devices and RAID, at no additional cost.

346.    Defendant's conduct has caused substantial injury to Plaintiffs, class members, and the public. Defendant's conduct is ongoing and will continue absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Defendant from committing such unlawful, unfair, and fraudulent business practices. Plaintiffs further seek an order granting restitution to Plaintiffs and the Class in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

347.    Plaintiffs and the general public lack an adequate remedy at law to remedy and/or mitigate the totality of the injuries and misconduct described herein.

348.    Absent injunctive relief, Defendant will continue to injure Plaintiffs and the class members. Defendant's conduct and omissions of material fact are ongoing. And, even if such conduct were to cease, it is behavior that is capable of repetition or reoccurrence by Defendant.

349.    In order to prevent injury to the general public, Plaintiffs, in their individual capacities, seek a public injunction requiring WDC to stop advertising, and to instruct its resellers to stop advertising, any hard drives with drive-managed SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names).

**COUNT IV**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq*.**

350.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

351.    Plaintiff Chris Ayers brings this claim on behalf individually and on behalf of the members of the Florida Subclass against Defendant.

352.    Plaintiff Chris Ayers is a "consumer" as defined by Florida Statutes § 501.203(7). Defendant is engaged in "trade or commerce" as defined by Florida Statutes §

501.203(8) when, without limitation, Defendant engages in advertising, soliciting, providing, offering or distributing, whether by sale or rental or otherwise, of any good or service—in this case, the advertising of Defendant's WD Red NAS hard drives.

353.    By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of a trade or commerce.

354.    Defendant's misconduct was likely to deceive a reasonable consumer, and, in deceiving Plaintiff Chris Ayers, did deceive a reasonable consumer. Furthermore, when purchasing a WD Red NAS drive, Mr. Ayers relied upon Defendant's advertisements and/or prior course of conduct or dealing in presuming that a WD Red NAS drive would be compatible with NAS and RAID environments.

355.    Defendant's misconduct caused Plaintiff Chris Ayers and each member of the Florida Subclass to be injured.  For example, and without limitation, Defendant's false advertising caused Plaintiff Chris Ayers to purchase a WD Red NAS drive. If Defendant's advertising had not been unfair, unconscionable or deceptive, Plaintiff Chris Ayers would not have purchased that drive. He and each member of the Florida Subclass has been harmed by the amount paid out-of-pocket for the WD Red NAS drive. Mr. Ayers and the members of the Florida Subclass may therefore pray for an award of actual damages.

356.    Mr. Ayers and the members of the Florida Subclass may also pray for the imposition of injunctive relief which limits and polices Defendant's advertisements within or reaching Florida. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

**COUNT V**
**Violation of the Massachusetts Unfair and Deceptive Business Practices Act**
**Mass. Gen. Laws Ch. 93A, § 9**

357.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

358.     Plaintiff Brian Conway brings this claim on behalf individually and on behalf of the members of the Massachusetts Subclass against Defendant.

359.     Section 2 of Chapter 93A prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce." An act is "deceptive" under chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991).

360.     Section 9 provides: "Any person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two . . . may bring an action in the superior court . . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper. . . Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons."

361.     Pursuant to the definitions codified at Chapter 93A § 1: Defendant Western Digital Corporation is a "person"; and, Defendant is engaged in "trade" and "commerce" in Massachusetts by offering for sale the WD Red NAS drive that directly or indirectly affect the people of Massachusetts.

362.     By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

363.     As alleged above and incorporated herein, Defendant's advertisements and promotional materials contain affirmative misrepresentations of fact. Most obviously, the drive is named the "**WD Red NAS**" drive, but it is not compatible with or appropriate to use in a

NAS environment. Other misrepresentations include: "**Built for NAS compatibility**," "**Designed for RAID environments**," "**specifically designed for use in NAS systems with up to 8 bays**" and appropriate for "**small and home office NAS systems in a 24x7 environment**."

364.    In addition, Defendant's advertisements and promotional materials violate the Massachusetts Unfair and Deceptive Business Practices Act because of their nondisclosure of a material fact—that the drives contained inferior and inappropriate SMR technology instead of the traditional CMR technology. Defendant's decision to omit public announcement of its switch to inferior SMR technology was part of a knowing and deliberate decision not to disclose the fact. Discovery will reveal that Defendant and its officers and employees knowingly made the switch in technology and knowingly decided not to inform consumers of the switch.

365.    Defendant's misrepresentations and nondisclosures deceive and have a tendency to deceive a reasonable consumer and the general public.

366.    Defendant's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

367.    Plaintiff Brian Conway reasonably relied upon Defendant's affirmative statements and upon Defendant's silence regarding any change in technology, or future change in technology which would affect a replacement drive sent by Defendant to Mr. Conway under warranty, when Mr. Conway purchased a WD Red NAS drive.

368.    Defendant's misconduct caused Plaintiff Brian Conway and the members of the Massachusetts Subclass to suffer an injury, adverse consequence, or loss. For example, and without limitation, Defendant's deceptive acts and/or false advertising caused Plaintiff Brian Conway to purchase a WD Red NAS drive, which was then replaced by Defendant under warranty with an SMR-technology WD Red NAS drive. If Defendant's acts, statements, and omissions had complied with the requirements of Massachusetts law, Plaintiff Brian Conway would not have purchased the drive. He and the members of the Massachusetts Subclass have been harmed by the actual amount paid out-of-pocket for the WD Red Drive, or for a drive

1   which was replaced under warranty with an inferior SMR hard drive.

2   369.   For each loss, Plaintiff Brian Conway and each member of the Massachusetts

3   Subclass may recover an award of actual damages or twenty-five dollars, whichever is greater.

4   Ch. 93A, § 9(3). Because Defendant acted willfully or knowingly, Plaintiff Brian Conway and

5   each member of the Massachusetts Subclass may recover up to three but not less than two times

6   this amount. Additionally, Plaintiff Brian Conway may recover attorneys' fees and costs.

7   370.   Plaintiff Brian Conway and the members of the Massachusetts Subclass may

8   also pray for the imposition of injunctive relief which limits and polices Defendant's

9   advertisements within or reaching Massachusetts. The balance of the equities favors the entry

10   of permanent injunctive relief against Defendant. Plaintiff Brian Conway and the general public

11   will be irreparably harmed absent the entry of permanent injunctive relief against Defendant.

12   Plaintiff Brian Conway and the general public lack an adequate remedy at law. A permanent

13   injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable

14   of repetition or re-occurrence absent the entry of a permanent injunction.

15   371.   In accordance with Ch. 93A, § 9(3), Plaintiff Brian Conway's counsel served

16   Defendant with written notice of its violation of Ch. 93A and a demand for relief on June 16,

17   2020. Defendant did not make a written tender of settlement or otherwise respond to the

18   demand for relief.

19   **COUNT VI**
**Violation of the Missouri Merchandising Practices Act**
20   **Mo. Rev. Stat. §§ 407.010, *et seq.***

21   372.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

22   herein.

23   373.   Plaintiff David Eaton brings this claim on behalf individually and on behalf of

24   the members of the Missouri Subclass against Defendant.

25   374.   Defendant is a "person" pursuant to Mo. Rev. Stat. § 407.010(5). Defendant is

26   engaged in "trade" or "commerce" pursuant to Mo. Rev. Stat. § 407.010(7) in that Defendant is

27   engaged in the advertising, offering for sale, sale, or distribution, or any combination thereof,

28   of any services and any property, tangible or intangible, real, personal, or mixed, and any other

article, commodity, or thing of value wherever situated. The terms "trade" and "commerce" include any trade or commerce directly or indirectly affecting the people of the State of Missouri.

375.    By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in the act, use or employment of deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce.

376.    Plaintiff David Eaton purchased Defendant's merchandise in the State of Missouri.  Mr. Eaton's purchase was for personal, family, or household purposes.

377.    Defendant's misconduct caused Plaintiff David Eaton and the members of the Subclass to suffer an ascertainable loss of money or property. For example, and without limitation, Defendant's false advertising caused Plaintiff David Eaton to purchase a WD Red NAS drive.  If Defendant's advertising had not used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact, Plaintiff David Eaton would not have purchased that drive. He and the members of the Subclass have been harmed by the ascertainable amount paid out-of-pocket for the WD Red NAS drive.  His ascertainable loss and that of the Subclass was a result of the acts and omissions of Defendant declared unlawful by Mo. Rev. Stat. § 407.020, and, as such, Mr. Eaton and each member of the Subclass may pray for an award of his actual damages.

378.    Defendant's conduct was egregious and demonstrated clear and disturbing disregard for Mr. Eaton's economic interests and the security of his data.  As such, Mr. Eaton and each member of the Subclass may pray for an award of punitive damages under Mo. Rev. Stat. § 407.025(1).

379.    Mr. Eaton and the members of the Subclass may also pray for the imposition of injunctive relief which limits and polices Defendant's advertisements within or reaching Missouri.  The balance of the equities favors the entry of permanent injunctive relief against

Defendant.  Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant.  Plaintiff and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

## COUNT VII
### Violation of New York General Business Law § 349

380.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

381.    Plaintiff Steven Gravel brings this claim individually and on behalf of members of the New York Subclass against Defendant.

382.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by failing to disclose that the WD Red NAS Drives use SMR technology, and in fact specifically represented the WD Red NAS Drives as being suitable for NAS and RAID when they were not due to the use of SMR technology.

383.    The foregoing deceptive acts and practices were directed at consumers.

384.    The foregoing deceptive acts and practices are misleading in a material way because SMR technology has inferior speed (performance) and data security to standard CMR technology used in most consumer-grade HDDs.  Further, as a result of these characteristics, SMR is not recommended and is unsuitable for use in NAS or RAID, the intended purpose of the WD Red NAS Drives.  Accordingly, Defendant's representations and omission were material to Plaintiff Steven Gravel and members of the New York Subclass.

385.    Defendant alone possessed the knowledge that the WD Red NAS Drives use SMR technology, and did not provide that information to consumers until April 2020.

386.    Plaintiff Steven Gravel and members of the New York Subclass were injured as a result because (a) they would not have purchased the WD Red NAS Drives if they had known that the WD Red NAS Drives use SMR technology, and (b) they overpaid for the Hard Drives on account of Defendant's failure to disclose that the WD Red NAS Drives use SMR technology, and/or Defendant's representations that the WD Red NAS Drives were suitable for

NAS and RAID.

387.    On behalf of himself and other members of the New York Subclass, Plaintiff Steven Gravel seeks to enjoin the unlawful acts and practices described herein, to recover his actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT VIII**
**Violation of New York General Business Law § 350**

388.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

389.    Plaintiff Steven Gravel brings this claim individually and on behalf of members of the New York Subclass against Defendant.

390.    Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way, which constitutes false advertising in violation of Section 350 of the New York General Business Law, by failing to disclose that the WD Red NAS Drives use SMR technology, and falsely representing that the WD Red NAS Drives are suitable for NAS and RAID when they are not.

391.    The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

392.    These representations and omission resulted in consumer injury or harm to the public interest.

393.    Defendant alone possessed the knowledge that the WD Red NAS Drives use SMR technology, and did not provide that information to consumers until April 2020.

394.    As a result of this omission, Plaintiff Steven Gravel and members of the New York Subclass have suffered economic injury because (a) they would not have purchased the WD Red NAS Drives if they had known that the WD Red NAS Drives use SMR technology, and (b) they overpaid for the Hard Drives on account of Defendant's failure to disclose that the WD Red NAS Drives use SMR technology, and/or Defendant's representations that the WD Red NAS Drives were suitable for NAS and RAID.

395.     On behalf of himself and other members of the New York Subclass, Plaintiff Steven Gravel seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT IX**
**Violation of the Virginia Consumer Protection Act**
**Va. Code Ann. §§ 59.1-196, *et seq.***

396.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

397.     Plaintiff James Backus brings this claim individually and on behalf of members of the Virginia Subclass against Defendant.

398.     Pursuant to the definitions codified at Va. Code Ann. § 59.1-198:  the WD Red NAS Drives are "goods" in that they constitute tangible personal property; Defendant is the WD Red NAS Drives' "supplier" in that Defendant is a seller, lessor or licensor who advertises, solicits, or engages in consumer transactions and/or a manufacturer, distributor or licensor who advertises and sells, leases or licenses goods or services to be resold, leased, or sublicensed by other persons in consumer transactions; Plaintiff James Backus's purchase of the WD Red Drive was a "consumer transaction" in that the WD Red Drive was to be used primarily for personal, family or household purposes.

399.     By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unlawful fraudulent acts or practices. Specifically, Defendant has and continues to: misrepresent that the WD Red NAS Drives have certain quantities, characteristics, uses, or benefits when they do not; misrepresent that the WD Red NAS Drives are of a particular standard, quality, grade, style or model; advertise or offer for sale WD Red NAS Drives that are defective or that are imperfect or "not first class" without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are defective, imperfect or "not first class"; advertise goods with intent not to sell them as advertised, or with intent not to sell at the terms advertised; and/or use any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer

1    transaction.

2         400.    As alleged above and incorporated herein, Defendant's advertisements and

3    promotional materials contain affirmative misrepresentations of fact. Most obviously, the drive

4    is named the "**WD Red NAS**" drive, but it is not compatible with or appropriate to use in a

5    NAS environment. Other misrepresentations include: "**Built for NAS compatibility**,"

6    "**Designed for RAID environments**," "**specifically designed for use in NAS systems with up**

7    **to 8 bays**" and appropriate for "**small and home office NAS systems in a 24x7 environment**."

8         401.    In addition, Defendant's advertisements and promotional materials violate the

9    Virginia Consumer Protection Act because of their nondisclosure of a material facts—that the

10   drives contained inferior and inappropriate SMR technology instead of the traditional CMR

11   technology. Defendant's decision to omit public announcement of its switch to inferior SMR

12   technology was part of a knowing and deliberate decision not to disclose the fact. Discovery

13   will reveal that Defendant and its officers and employees knowingly made the switch in

14   technology and knowingly decided not to inform consumers of the switch.

15        402.    Plaintiff James Backus reasonably relied upon Defendant's affirmative

16   statements and upon Defendant's silence regarding any change in technology when Mr. Backus

17   purchased a WD Red NAS drive.

18        403.    Defendant's misconduct caused Plaintiff James Backus and the members of the

19   Virginia Subclass to suffer an actual loss. For example, and without limitation, Defendant's

20   deceptive acts and/or false advertising caused Plaintiff James Backus to purchase a WD Red

21   NAS drive. If Defendant's acts, statements and omissions had complied with the requirements

22   of Virginia law, Plaintiff James Backus would not have purchased that drive. He and the

23   members of the Subclass have been harmed by the actual amount paid out-of-pocket for the

24   WD Red Drive.

25        404.    For each loss, Mr. Backus and each member of the Subclass may pray for an

26   award of damages equal to five hundred dollars or his actual damages, whichever is greater.

27   Va. Code Ann. §§ 59.1-204(A).  Because Defendant acted willfully, Mr. Backus and each

28   member of the Subclass may also pray for an award of treble damages.

405.   Mr. Backus and the members of the Virginia Subclass may also pray for the imposition of injunctive relief which limits and polices Defendant's advertisements within or reaching Virginia.  The balance of the equities favors the entry of permanent injunctive relief against Defendant.  Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant.  Plaintiff and the general public lack an adequate remedy at law.  A permanent injunction against Defendant is in the public interest.  Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

**COUNT X**
**Violation of the Wisconsin Deceptive Trade Practices Act**
**Wis. Stat. §§ 100.18, 100.20**

406.   Plaintiffs incorporates by reference and re-allege each and every allegation set forth above as though fully set forth herein.

407.   Plaintiff Nicholas Malone brings this claim individually and on behalf of members of the Wisconsin Subclass against Defendant.

408.   The Wisconsin Deceptive Trade Practices Act ("WDTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  Wis. Stat. § 100.18(1).

409.   Western Digital is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

410.   Plaintiff Nicholas Malone and members of the Wisconsin Subclass are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

411.   Section 100.18(1), in relevant part, provides that "no person, firm, corporation, or association, or agent or employee thereof, with intent to sell, distribute, or increase the consumption of … anything offered" by it to the public, shall place before the public a statement that contains "assertion, representation or statement of fact which is untrue, deceptive or misleading."

412.   Defendant misrepresented the quality of the WD Red NAS Drives by designating them as suitable for NAS and RAID, when the WD Red NAS Drives were not due

to Defendant secretly manufacturing the drives with SMR technology.  Defendant also omitted that the drives use SMR technology.

413.    Defendant intended that Plaintiff Nicholas Malone and Wisconsin Subclass members rely on its misrepresentations and omissions.

414.    As a proximate result of Defendant's misrepresentations and omissions, Plaintiff Nicholas Malone and Wisconsin Subclass members suffered direct economic loss (pecuniary), suffered an injury-in-fact and/or actual damages by paying a price premium for the WD Red NAS Drives based on the understanding that they were suitable for NAS and RAID.  Had Plaintiff Nicholas Malone and other Wisconsin Subclass members known that the WD Red NAS Drives used SMR technology, they would not have bought the WD Red NAS Drives, or they would not have purchased them on the same terms.

415.    In the course of its business, Western Digital concealed its use of SMR technology in the WD Red NAS Drives as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Western Digital also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the WD Red NAS Drives.

416.    Western Digital's concealment of the use of SMR technology in the WD Red NAS Drives was material to Plaintiff Nicholas Malone and Wisconsin Subclass members.

417.    Plaintiff Nicholas Malone and Wisconsin Subclass members suffered ascertainable loss caused by Western Digital's misrepresentations and its failure to disclose material information related to the WD Red NAS Drives.  Had they been aware that the WD Red NAS Drives used SMR technology, Plaintiff Nicholas Malone and Wisconsin Subclass members either would have paid less for their WD Red NAS Drives or would not have purchased them at all.  Plaintiff Nicholas Malone and Wisconsin Subclass members did not receive the benefit of their bargain as a result of Western Digital's concealment of the use of SMR technology in the WD Red NAS Drives.

418.    Western Digital's violations are a disservice to Plaintiff Nicholas Malone as well as to the general public.  Western Digital's unlawful acts and practices complained of herein affected the public interest.

419.    Plaintiff Nicholas Malone and Wisconsin Subclass members are entitled to damages, attorneys' fees, and other relief that the Court deems proper.  Because Western Digital's conduct was committed knowingly and/or intentionally, Plaintiff Nicholas Malone and Wisconsin Subclass members are also entitled to treble and/or punitive damages.

420.    Mr. Malone and the members of the Wisconsin Subclass may also pray for the imposition of injunctive relief which limits and polices Defendant's advertisements within or reaching Wisconsin.  The balance of the equities favors the entry of permanent injunctive relief against Defendant.  Plaintiff and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant.  Plaintiff and the general public lack an adequate remedy at law.  A permanent injunction against Defendant is in the public interest.  Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

**COUNT XI**
**Breach of Express Warranty**

421.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

422.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

423.    In connection with the sale of the WD Red NAS drives, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller made multiple statements about its SMR WD Red NAS hard drives which constitute express warranties. Said statements include, but are not limited to: "**Built for NAS compatibility**," "**Designed for RAID environments**," "**specifically designed for use in NAS systems with up to 8 bays,**" designed for "**Small and home office NAS systems in a 24x7 environment**," "**Desktop drives aren't purpose-built for NAS. But WD Red drives with NASware technology are**," and "**purpose-built to balance performance and reliability in NAS and RAID environments**."

424.    As detailed above, Defendant's WD Red NAS drives do not satisfy these express warranties because they use SMR technology.

425.    Plaintiffs and members of the Classes have been injured as a direct and proximate result of Defendant's breach of express warranty in that each person has, without limitation, paid out-of-pocket for, or had a product replaced with, a product that was not as advertised or warranted.

426.    On June 16, 2020, Defendant was notified of its breach of express warranty as to all present and future Plaintiffs and members of the Classes.  Defendant did not remedy its breach. Defendant failed to give an appropriate correction, repair, replacement, or other remedy.

<u>COUNT XII</u>
**Breach of the Implied Warranty**

427.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

428.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

429.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the WD Red NAS Drives were suited for use in NAS systems and RAID arrays.  Defendant breached the warranty implied in the contract for the sale of the WD Red NAS Drives because the WD Red NAS Drives could not "pass without objection in the trade under the contract description," the WD Red NAS Drives were not "of fair average quality within the description," the WD Red NAS Drives were not "adequately contained, packaged, and labeled as the agreement may require," and the WD Red NAS Drives did not "conform to the promise or affirmations of fact made on the container or label."  *See* U.C.C. § 2-314(2) (listing requirements for merchantability).  As a result, Plaintiffs and the members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

430.    Plaintiffs and the members of the Classes purchased the WD Red NAS Drives in reliance upon Defendant's skill and judgment in properly packaging and labeling the WD Red

1    NAS Drives.

2        431.    The WD Red NAS Drives were not altered by Plaintiff and the Class Members

3    and Subclass Members.

4        432.    The WD Red NAS Drives were not fit for their intended purpose when they left

5    the exclusive control of Defendant.

6        433.    Defendant knew that the WD Red NAS Drives would be purchased and used

7    without additional testing by Plaintiffs and the members of the Classes.

8        434.    The WD Red NAS Drives were defectively designed and unfit for their intended

9    purpose, and Plaintiffs and the members of the Classes.

10       435.    Plaintiffs and members of the Classes were injured as a direct and proximate

11   result of Defendant's breach because (i) they would not have purchased the WD Red NAS

12   Drives if they had known that it utilized inferior SMR technology and is therefore unsuitable

13   for its stated and advertised purpose for use in a NAS system or RAID array, and (ii) they

14   overpaid for the WD Red NAS Drives on account of WDC's misrepresentations that the drives

15   are "built for NAS compatibility," "purpose-built for NAS," "purpose-built to balance

16   performance and reliability in NAS and RAID environments," "specifically designed for use in

17   NAS systems with up to 8 bays," "helps ensure your data is protected … in a NAS or RAID

18   environment," and that the drives are appropriate for "small and home office NAS systems in a

19   24x7 environment."

20       436.    Defendant breached and continues to breach the implied warranty of fitness for a

21   particular purpose with regard to its sale of, or replacement with, its SMR WD Red NAS

22   drives.

23                              **COUNT XIII**
                **Breach of Implied Warranty Under the Song-Beverly Act,**
24        **Cal. Civ. Code §§ 1790 *et seq*. and California Commercial Code § 2314**

25       437.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

26   herein.

27       438.    Plaintiffs bring this claim individually and on behalf of members of the

28   proposed Classes against Defendant.

439.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose (here, to be used in NAS, RAID, or ZFS arrays) and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

440.    The WD Red NAS Drive at issue here is a "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

441.    Plaintiffs and the members of the Classes who purchased one or more of the WD Red NAS Drives are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

442.    Defendant is in the business of manufacturing, assembling, producing, and/or selling the WD Red NAS Drives to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

443.    Defendant sells its products through a network of authorized and certified dealers. Defendant has entered into various contractual agreements with its dealers. The dealers were not the intended beneficiaries of the warranties associated with the WD Red NAS Drives. Plaintiffs and the members of the Classes were the intended beneficiaries of the warranties associated with the WD Red NAS Drives.

444.    Defendant impliedly warranted to retail buyers that the WD Red NAS Drives were merchantable in that they would: (i) pass without objection in the trade or industry under the contract description, and (ii) were fit for the ordinary purposes for which the WD Red NAS Drives are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the WD Red NAS Drives would not pass without objection in the trade or industry under its description and was not fit for its ordinary purpose for which it is used.

445.     Plaintiffs and the members of the Classes purchased the WD Red NAS Drives in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

446.     The WD Red NAS Drives was not altered by Plaintiffs or the members of the Classes.

447.     The WD Red NAS Drives was defective at the time of sale when they left the exclusive control of Defendant.

448.     Defendant knew that the WD Red NAS Drives would be purchased and used without additional testing by Plaintiffs and members of the Classes.

449.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and the members of the Classes have been injured in that they paid out-of-pocket for WD Red NAS Drives that they would not have purchased if they knew the truth about the WD Red NAS Drives, namely, that they were unfit for use as in NAS and RAID environments.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, seek judgment against Defendant Western Digital Corporation as follows:

A.     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent members of the Classes;

B.     For an order declaring Defendant's conduct violates the statutes referenced herein;

C.     For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D.     For an order entering a public injunction requiring Defendant to stop advertising, and to instruct its resellers to stop advertising, any hard drives with drive-managed SMR technology as being appropriate for NAS devices or RAID (including by removing "NAS" from such products' names);

E.     For an order permanently enjoining Defendant from the unlawful conduct alleged herein;

1     F.      For an order retaining jurisdiction to police Defendant's compliance with the

2 permanent injunctive relief;

3     G.      For an order to provide notice to every Class member that the WD Red NAS

4 hard drive they purchased is not suited for its intended purpose;

5     H.      For an order to provide a refund to Plaintiffs and the Classes for their WD Red

6 NAS hard drives in an amount to be determined at trial, or to provide Plaintiffs and the Classes

7 with brand-new replacement CMR-technology hard drives that are truly suited for use with

8 NAS devices and RAID, at no additional cost;

9     I.      For compensatory and punitive damages in amounts to be determined by the

10 Court and/or jury;

11     J.      For pre-judgment and post-judgment interest on all amounts awarded to the

12 extent allowed by law;

13     K.      For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees

14 and expenses and costs of suit; and/or

15     L.      To provide all other relief to which Plaintiffs and the Classes may show

16 themselves justly entitled.

17 **<u>DEMAND FOR A JURY TRIAL</u>**

18     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, individually and on behalf

19 of the Classes, demand a trial by jury of all issues so triable.

20

21 Dated:  August 10, 2020         Respectfully submitted,

22           HATTIS & LUKACS

23           By: _____

24           Daniel M. Hattis (SBN 232141)
          Paul Karl Lukacs (SBN 197007)

25           HATTIS & LUKACS
          400 108th Ave NE, Ste 500

26           Bellevue, WA 98004
          Telephone: (425) 233-8650

27           Facsimile: (425) 412-7171
          Email: dan@hattislaw.com

28           Email: pkl@hattislaw.com

1

2
L. Timothy Fisher (SBN 191626)
Joel D. Smith (SBN 244902)
3
BURSOR & FISHER, P.A.
1990 North California Boulevard, Suite 940
4
Walnut Creek, CA  94596
Telephone: (925) 300-4455
5
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
Email: jsmith@bursor.com
6

7
*Attorneys for Plaintiffs and the Putative Classes*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28