| | |
|---|---|
| **BURSOR & FISHER, P.A.**<br>Yitzchak Kopel (*Pro Hac Vice*)<br>888 Seventh Avenue, Third Floor<br>New York, NY 10019<br>Telephone: (646) 837-7150<br>Facsimile: (212) 989-9163<br>Email: ykopel@bursor.com<br><br>**BURSOR & FISHER, P.A.**<br>L. Timothy Fisher (SBN 191626)<br>1990 North California Boulevard, Suite 940<br>Walnut Creek, CA  94596<br>Telephone: (925) 300-4455<br>Facsimile: (925) 407-2700<br>Email: ltfisher@bursor.com<br><br>*Class Counsel* | **HATTIS & LUKACS**<br>Daniel M. Hattis (SBN 232141)<br>Paul Karl Lukacs (SBN 197007)<br>400 108th Ave NE, Ste 500<br>Bellevue, WA 98004<br>Telephone: (425) 233-8650<br>Facsimile: (425) 412-7171<br>Email: dan@hattislaw.com<br>Email: pkl@hattislaw.com |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NICHOLAS MALONE, CHRIS AYERS, JAMES BACKUS, BRIAN CONWAY, DAVID EATON, STEVEN GRAVEL, JAMES RAAYMAKERS, and TOD WEITZEL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WESTERN DIGITAL CORPORATION,<br><br>Defendant. | Case No. 5:20-cv-03584-NC<br><br>**DECLARATION OF YITZCHAK KOPEL IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR AN AWARD OF ATTORNEYS' FEES, COSTS AND EXPENSES, AND INCENTIVE AWARDS**<br><br>Date:  December 22, 2021<br>Time:   2:00 p.m.<br>Courtroom:  5, 4th Floor<br>Judge: Hon. Nathaniel Cousins |

I, Yitzchak Kopel, declare as follows:

1.    I am an attorney at law licensed to practice in the State of New York and admitted *pro hac vice* in this action.  I am a partner at Bursor & Fisher, P.A., counsel for Plaintiffs in this action.  I make this declaration in support of Plaintiffs' Motions for Final Approval and for an Award of Attorneys' Fees, Costs and Expenses, and Incentive Awards for the Class

Representatives.  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would competently testify thereto under oath.

2.     As set forth below, Class Counsel conducted extensive research, discovery, and investigation during the prosecution of this Action, including, without limitation: (1) extensive pre-litigation investigation into Defendant's products and their marketing to assist with the drafting of Plaintiffs' thorough 86-page complaint; (2) serving discovery requests on Defendant and seeking discovery from third parties; (3) participating in an all-day mediation with Hon. Elizabeth Laporte (Ret.); (4) submitting supplemental briefing to Judge Laporte concerning the *pro rata* distribution issue (which allowed Class Counsel to secure the upward adjustment of claims described above); (5) and negotiating this settlement and managing the dissemination of notice and the claims process.

# I. BACKGROUND AND OVERVIEW OF THE LITIGATION

### A.     Litigation History

3.      On May 29, 2020, Plaintiff Nicholas Malone commenced this putative class action captioned *Malone v. Western Digital Corporation*, United States District Court, Northern District of California, Case No. 5:20-cv-03584, asserting claims California Code § 1750 *et seq.*, California Business and Professions Code § 17200 *et seq.*, and California Business and Professions Code § 17500 *et seq*.  Mr. Malone alleged, *inter alia*, that Defendant deceived customers by surreptitiously using Shingled Magnetic Recording ("SMR") technology in certain of its Hard Drive products.  On June 16, 2020, Plaintiffs Nicholas Malone, Chris Ayers, James Backus, Brian Conway, David Eaton, Steven Gravel, and Tod Weitzel, filed a First Amended Complaint asserting the same claims.  Dkt. No. 7.

4.     On June 19, 2020, Plaintiff James Raaymakers commenced an action entitled *Raaymakers v. Western Digital Corporation*, United States District Court, Northern District of California, Case No. 5:20-cv-04091, asserting substantially similar claims as the *Malone* action.  On July 27, 2021, the Court granted a stipulation signed by all the Parties to consolidate the *Raaymakers* action with the *Malone* action.  Dkt. No. 14.  On August 10, 2020, all Plaintiffs filed

the Second Amended Complaint (the "SAC") under the caption of the *Malone* action.  Dkt. No. 19. Defendant answered the SAC on September 16, 2020, denying liability.  Dkt. No. 41.

5.      The Parties engaged in significant discovery. The Parties exchanged and met and conferred concerning a number of discovery requests, including interrogatories and requests for production. In response, Western Digital produced critical documents concerning the case to Plaintiffs. Plaintiffs reviewed the documents produced by Western Digital, as well as information obtained through their own research and investigation. Plaintiffs also sought and reviewed discovery from third parties. Plaintiffs, through their counsel, have conducted extensive research, discovery, and investigation during the prosecution of the Action, including, without limitation: (i) the review of documents produced by Defendant; (ii) the review of publicly available reports, journal articles, and other publications concerning Defendant's products; (iii) the review of publicly available information regarding Defendant and its business practices; and (iv) serving interrogatories and requests for production of documents. These efforts led to the production of critical documents concerning the case, which Class Counsel reviewed and used to ascertain the strengths and weaknesses of the case.

6.      From the onset of this case, the parties engaged in extensive, arms' length settlement negotiations.  Ultimately, the parties agreed to participate in a mediation before Hon. Elizabeth Laporte (Ret.) on January 13, 2021.  The mediation was unsuccessful, but the Parties continued to negotiate over several weeks following the mediation session.  Thus, the Parties have engaged in extensive settlement discussions to determine if the Parties could reach a resolution short of protracted litigation. The Settlement Agreement was reached as a result of extensive arm's-length negotiations between the Parties, their counsel, and Hon. Elizabeth Laporte (Ret.).

B.      **Settlement Terms**

7.      The Settlement Agreement provides for a $2.7 million Settlement Fund from which Class Members can receive between $4.00 and $7.00 cash award for each Subject Product purchased during the Class Period, subject to a maximum *pro rata* adjustment of 85% of the Subject Products' retail purchase price (i.e., 85% of $84.99 for the 2TB Subject Product, $106.99 for the 3TB Subject Product, $119.99 for the 4TB Subject Product, and $179.99 for the 6TB

Subject Product). No proof of purchase is required to submit a claim, and Claimants may submit claims for each Subject Product purchased.

8. The $2.7 million non-reversionary settlement far exceeds the value of the Class's compensatory damages in this case as calculated by the $4.00 to $7.00 price premium attributable to the labeling claims in this action. (The $4.00 to $7.00 price premium is the difference in price between the Subject Products and their WD Red Plus variants which utilize CMR technology.) Specifically, had they prevailed at trial, Plaintiffs and the class would have recovered compensatory damages in the form of the price premium paid for the Subject Products, for an estimated total of $947,221, plus any punitive damages. Massachusetts, New York, and Virginia subclass members could also have recovered statutory damages and attorneys' fees.

9. The Settlement Agreement also provides for significant injunctive relief, which values the settlement significantly higher than the amount of the $2.7 million settlement fund. Under the settlement, within 60 days of the effective date of the settlement Western Digital must clearly and conspicuously disclose the use of SMR technology on the product packaging and website product page on westerndigital.com of all WD Red NAS Drives with SMR technology. The requirements of this injunctive relief must be complied with for no less than 4 years after the Effective Date of the Settlement. Thus, the injunctive relief will increase the possibility that consumers will make informed decisions about the purchase of Defendant's products that are at issue based on reliable information from, and practices by, Defendant.

10. The value of this injunctive relief is readily calculable. The Court need only multiply the $4.00 - $7.00 price premium attributable to the labeling claims in this action by the estimated sales of the Subject Products over the next four years, and the estimation is based on sales data provided by Defendant. Accordingly, the injunctive relief is valued at just over $3 million.

11. Meanwhile, attorneys' fees and costs and incentive awards for Plaintiffs are to be paid separately by Defendant. Plaintiffs request a total of $900,000 in attorneys' fees and costs.

12. Should the Court award Plaintiffs' motion for attorneys' fees, costs, expenses, and incentive awards in full, I estimate that Settlement Class Members need to submit timely and valid

claims for between 10,413 and 22,052 Subject Products, depending on which Subject Products are claimed, to exhaust the Settlement Fund. I have calculated this number by subtracting the requested attorneys' fees, incentive awards, and notice administration expenses from the Settlement Fund, then dividing the remaining amount by the average pro-rata upward adjustment for the lowest and highest priced Subject Products.

13. I estimate a total claims rate in this action of 4-9%. *See In re Facebook Biometric Information Privacy Litig.*, --- F. Supp. 3d ---, 2021 WL 757025, at *2 (N.D. Cal. Feb. 26, 2021) (claims rate of "4-9% [] is typical for consumer class actions"). This estimate falls in line with what I observed in my most recent completed consumer-product class action settlement in which proof of purchase was not required (just like in this case). *See, e.g., Hart v. BHH, LLC d/b/a Bell + Howell*, Case No. 1:15-cv-04804-WHP, Dkt. No. 309, at 1 (S.D.N.Y. Aug. 25, 2020) (claims rate of 7.4% in settlement in which I served as class counsel).

14. The cost of settlement administration is currently estimated to be $302,073, or approximately 11% of the value of the settlement fund. This amount is reasonable for the proposed services to be provided. The Notice program set forth in Section IV of the Settlement Agreement and approved by the Court in the Preliminary Approval Order (Dkt. No. 63, ¶¶ 12–13), is currently being implemented. Pursuant to the Preliminary Approval Order, Western Digital provided the Settlement Administrator with the contact information of all known Settlement Class Members. The Settlement Administrator has provided the initial Email Notice to all Settlement Class Members whose contact information was available to Defendant. U.S. Mail Notice has been sent to over 5,000 individuals. The Settlement Administrator timely served notice of the proposed Settlement, in accordance with 28 U.S.C. § 1715, upon the appropriate State and Federal officials.

15. Any amounts still remaining in the Settlement Fund after an upward adjustment will go to cy pres, Public Counsel, the "Nation's Largest Pro Bono Law Firm," that, among other practice areas, offers "Consumer Rights & Economic Justice" representation that "assists with a wide variety of consumer matters, including consumer fraud, unfair business practices, foreclosure and real estate fraud. This recipient is appropriate in this case because it focuses on matters of consumer fraud, which is what was alleged here. Neither Class Counsel nor Plaintiffs nor

1  Defendant have any relationship with Public Counsel, nor have they, to the best of their
2  knowledge, made monetary donations to Public Counsel in the past.  Defendant disclosed that,
3  based on available records for the past four years, it has donated three total hard drives to Public
4  Counsel, as follows: Fiscal Year (FY) 2020, one 2 TB My Cloud drive, MSRP $60; FY 2019, one
5  1 TB My Passport drive, MSRP $140; FY 2017, 1 TB My Passport Ultra, MSRP $100.  None of
6  these hard drives are the Subject Products in this Litigation.

7    **C.    Challenges of Litigating Plaintiffs' Claims**

8    16.    Class Counsel undertook significant risk in prosecuting this case.  As an initial
9  matter, this was not a garden-variety case where Class Counsel could simply rely upon work from
10 prior similar cases or just cut-and-paste from old briefs.  Instead, Class Counsel had to develop
11 expertise related to several areas outside of the law that were largely new to them.  In particular,
12 this case required Class Counsel to review and understand complex technological studies and
13 analyses regarding SMR technology and systems like NAS and RAID.

14   17.    Moreover, Plaintiffs' claims faced significant uncertainty from the get-go.  Judge
15 Rogers in this District, for instance, dismissed similar claims against Defendant over its use of
16 SMR technology in different hard drive products.  *See generally Tromble v. Western Digital Corp.*,
17 2021 WL 2165796 (N.D. Cal. May 27, 2021).  Although Defendant answered the complaint here,
18 Judge Rogers' reasoning likely would have factored heavily into Defendant's summary judgment
19 briefing.

20   18.    Plaintiffs also would have faced risk at class certification.  Defendant likely would
21 have argued that Class Members who did not experience any issues with their Subject Products
22 lacked standing to pursue their claims.  *See generally TransUnion LLC v. Ramirez*, 141 S. Ct. 2190
23 (2021).  The technology-centric nature of this case (*i.e.*, whether SMR technology is unsuitable for
24 use in NAS and RAID systems, as Plaintiffs allege) would have led to an intense and uncertain
25 "battle of the experts."  Defendant likely would present evidence that SMR technology was
26 suitable for the aforementioned uses, and thus, it did not engage in false advertising.

27   19.    Additionally, Defendant is represented by highly skilled and well-paid lawyers from
28 the Los Angeles offices of Lewis Brisbois Bisgaard & Smith LLP.  These lawyers vigorously

represented their clients, continually challenged Plaintiffs' claims, and sought to obtain a defense verdict and deprive the Class of any recovery.

20. Finally, even if Plaintiffs and Class Counsel had been able to prevail at trial, they still faced the prospect of affirming any verdict on post-trial motions in this Court and later on appeal. That process would have taken years and involved tremendous risk that a hard-fought victory could be lost. The work performed by Class Counsel in this case represents the highest caliber of legal work and strongly supports their requested fee award.

## II. BACKGROUND AND EXPERIENCE OF CLASS COUNSEL

21. I received my Juris Doctor from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. While in law school, I served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. I joined Bursor & Fisher upon graduating from law school in 2012 and was named Partner in 2018. In my tenure at Bursor & Fisher, I have won five contested class certification motions, four of which certified nationwide classes.

22. Recently, in approving one of my class settlements, Judge William H. Pauley III of the United States District Court for the Southern District of New York remarked that "[a]s the judge presiding in the case I can attest to the fact that Mr. Kopel was relentless throughout this litigation and, in my view, did an outstanding job." *Hart v. BHH, LLC*, No. 1:15-cv-4804, ECF No. 317 at 13:3-5 (S.D.N.Y. Sep. 14, 2020).

23. Class actions are rarely brought to trial. However, Bursor & Fisher has served as trial counsel for class action plaintiffs in six jury trials and has won all six, with recoveries ranging from $21 million to $299 million.

    i. In 2007, Bursor & Fisher served as lead trial counsel in *Thomas v. Global Vision Products* (Alameda County Superior Court), representing a class of approximately 150,000 California consumers who had purchased the Avacor hair regrowth system, asserting claims for violations of California's consumer protection statutes. After a four-week trial the jury returned a $37 million verdict for the class. The trial judge increased the award to $40 million.

    ii. In 2008, Bursor & Fisher served as lead trial counsel in *Ayyad v. Sprint Spectrum L.P.* (Alameda County Superior Court), representing a class of 2

|   |   |   |
|---|---|---|
|   |   | million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under California Civil Code § 1671(d), as well as other statutory and common law claims. After a five-week trial, the jury returned a verdict in June 2008, and the Court issued a Statement of Decision in December 2008 awarding the class more than $299 million in cash and debt cancellation. The class prevailed on six of six counts asserted in the complaint and was awarded 100% of the relief sought. |
|   | iii. | In 2008, Bursor & Fisher served as lead trial counsel in *White v. Verizon Wireless* (Alameda County Superior Court), representing a class of 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under California Civil Code § 1671(d), as well as other statutory and common law claims. After Bursor & Fisher presented the class's case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements. |
|   | iv. | In 2009, Bursor & Fisher served as lead trial counsel in a second trial in *Thomas v. Global Vision Products*, in which the class asserted claims against a minority shareholder in the company. After another four-week trial the jury returned a verdict awarding more than $50 million to the class. The legal trade publication VerdictSearch reported this was the second largest jury verdict in California in 2009. |
|   | v. | In 2013, Bursor & Fisher served as lead trial counsel in a second trial in *Ayyad v. Sprint Spectrum L.P.* (Alameda County Superior Court). After we had prevailed on the class claims challenging Sprint's termination fees in 2008, Sprint asserted a $1.06 billion cross-claim against the class for breach of contract. *See Garrett v. Coast & Southern Federal Sav. & Loan Ass'n*, 9 Cal. 3d 731, 740-41 (1973) (holding that invalidation of a liquidated damages provision does not permit the breaching party to "escape[] unscathed," because he "remains liable for the actual damages resulting from his default"). After a four-week trial, the jury returned a verdict awarding only 2% of Sprint's claimed damages. This verdict secured the Class's net cash recovery of at least $55 million after a setoff for Sprint's actual damages. |
|   | vi. | In 2019, Bursor & Fisher served as lead counsel in *Perez v. Rash Curtis & Associates* (N.D. Cal.), representing a nationwide class of 40,420 people that received autodialed and prerecorded messages on their cellular telephones without their prior express consent, asserting that the phone calls violated the Telephone Consumer Protection Act ("TCPA"). After a one-week trial, the jury returned a verdict in May of 2019 finding that Defendant made 534,712 calls that violated the TCPA. Pursuant to the TCPA, each of the 534,712 calls entitled class members to a minimum of $500 per unlawful phone call, entitling class members to a $267 million judgment. |

DECLARATION OF YITZCHAK KOPEL  
CASE NO. 5:20-CV-03584-NC

8

24. In addition to these six trial victories, Bursor & Fisher has been counsel to class action plaintiffs in dozens of cases in jurisdictions throughout the United States. Since December 2010, Bursor & Fisher has won appointment as Class Counsel or Interim Class Counsel in:

i. *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

ii. *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

iii. *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

iv. *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

v. *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012) to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

vi. *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012) to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

vii. *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012) to represent a certified nationwide class of purchasers of Sensa weight loss products,

viii. *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers,

ix. *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

x. *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

xi. *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

xii. *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015) to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

xiii. *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015) to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

xiv. *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

xv. *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015) to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards,

xvi. *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-jurisdiction class of purchasers of Zicam Pre-Cold products,

xvii. *In re Trader Joe's Tuna Litigation* (C.D. Cal. December 21, 2016) to represent purchaser of allegedly underfilled Trader Joe's canned tuna.

xviii. *In re Welspun Litigation* (S.D.N.Y. January 26, 2017) to represent a proposed nationwide class of purchasers of Welspun Egyptian cotton bedding products,

xix. *Retta v. Millennium Products, Inc.* (C.D. Cal. January 31, 2017) to represent a certified nationwide class of Millennium kombucha beverages,

xx. *Moeller v. American Media, Inc.*, (E.D. Mich. June 8, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxi. *Hart v. BHH, LLC* (S.D.N.Y. July 7, 2017) to represent a nationwide class of purchasers of Bell & Howell ultrasonic pest repellers,

xxii. *McMillion v. Rash Curtis & Associates* (N.D. Cal. September 6, 2017) to represent a certified nationwide class of individuals who received calls from Rash Curtis & Associates,

xxiii. *Lucero v. Solarcity Corp.* (N.D. Cal. September 15, 2017) to represent a certified nationwide class of individuals who received telemarketing calls from Solarcity Corp.,

xxiv. *Taylor v. Trusted Media Brands, Inc.* (S.D.N.Y. Oct. 17, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxv. *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017) to represent a proposed nationwide class of purchasers of cosmetic products,

xxvi. *Gastelum v. Frontier California Inc.* (S.F. Superior Court February 21, 2018) to represent a certified California class of Frontier landline telephone customers who were charged late fees,

xxvii. *Williams v. Facebook, Inc.* (N.D. Cal. June 26, 2018) to represent a proposed nationwide class of Facebook users for alleged privacy violations,

xxviii. *Ruppel v. Consumers Union of United States, Inc.* (S.D.N.Y. July 27, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxix. *Bayol v. Health-Ade* (N.D. Cal. August 23, 2018) to represent a proposed nationwide class of Health-Ade kombucha beverage purchasers,

xxx. *West v. California Service Bureau* (N.D. Cal. September 12, 2018) to represent a certified nationwide class of individuals who received calls from California Service Bureau,

xxxi. *Gregorio v. Premier Nutrition Corporation* (S.D.N.Y. Sept. 14, 2018) to represent a nationwide class of purchasers of protein shake products,

xxxii. *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast* (S.D.N.Y. Oct. 24, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxxiii. *Bakov v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line* (N.D. Ill. Mar. 21, 2019) to represent a certified class of individuals who received calls from Holiday Cruise Line,

xxxiv. *Martinelli v. Johnson & Johnson* (E.D. Cal. March 29, 2019) to represent a certified class of purchasers of Benecol spreads labeled with the representation "No Trans Fat,"

    xxxv.    *Edwards v. Hearst Communications, Inc.* (S.D.N.Y. April 24, 2019) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

    xxxvi.    *Galvan v. Smashburger* (C.D. Cal. June 25, 2019) to represent a proposed class of purchasers of Smashburger's "Triple Double" burger,

    xxxvii.    *Kokoszki v. Playboy Enterprises, Inc.* (E.D. Mich. Feb. 7, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

    xxxviii.    *Russett v. The Northwestern Mutual Life Insurance Co.* (S.D.N.Y. May 28, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

    xxxix.    *In re: Metformin Marketing and Sales Practices Litigation* (D.N.J. June 3, 2020) to represent a proposed nationwide class of purchasers of generic diabetes medications that were contaminated with a cancer-causing carcinogen,

    xl.    *Hill v. Spirit Airlines, Inc.* (S.D. Fla. July 21, 2020) to represent a proposed nationwide class of passengers whose flights were cancelled by Spirit Airlines due to the novel coronavirus, COVID-19, and whose tickets were not refunded,

    xli.    *Kramer v. Alterra Mountain Co.* (D. Colo. July 31, 2020) to represent a proposed nationwide class of purchasers to recoup the unused value of their Ikon ski passes after Alterra suspended operations at its ski resorts due to the novel coronavirus, COVID-19,

    xlii.    *Qureshi v. American University* (D.D.C. July 31, 2020) to represent a proposed nationwide class of students for tuition refunds after their classes were moved online by American University due to the novel coronavirus, COVID-19,

    xliii.    *Hufford v. Maxim Inc.* (S.D.N.Y. Aug. 13, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

    xliv.    *Desai v. Carnegie Mellon University* (W.D. Pa. Aug. 26, 2020) to represent a proposed nationwide class of students for tuition refunds after their classes were moved online by Carnegie Mellon University due to the novel coronavirus, COVID-19,

    xlv.    *Heigl v. Waste Management of New York, LLC* (E.D.N.Y. Aug. 27, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

    xlvi.    *Stellato v. Hofstra University* (E.D.N.Y. Sept. 18, 2020) to represent a proposed nationwide class of students for tuition refunds after their classes were moved online by Hofstra University due to the novel coronavirus, COVID-19.

    xlvii.    *Kaupelis v. Harbor Freight Tools USA, Inc.* (C.D. Cal. Sept. 23, 2020), to represent consumers who purchased defective chainsaws.

    xlviii.    *Soo v. Lorex Corporation* (N.D. Cal. Sept. 23, 2020), to represent consumers whose security cameras were intentionally rendered non-functional by manufacturer.

25. A copy of my firm's resume, which includes more detailed information about our practice and the qualifications of the other Bursor & Fisher lawyers who worked on this case, is attached as **Exhibit 1**.

### III. CLASS COUNSEL'S LODESTAR AND EXPENSES

26. Attached as **Exhibit 2** are my firm's detailed billing diaries for this case. I have personally reviewed all of my firm's time entries, and have used billing judgment to ensure that duplicative or unnecessary time has been excluded and that only time reasonably devoted to the litigation has been included. The time and descriptions displayed in these records were regularly and contemporaneously recorded by me and the other timekeepers of the firm pursuant to firm policy and have been maintained in the computerized records of my firm. The detailed billing diaries for my co-counsel Hattis & Lukacs are attached to the separate Declaration of Daniel Hattis filed herewith.

27. As of September 1, 2021, Class Counsel has billed a total of 1,063.2 hours at a blended rate of $628.51 per hour. The blended rate of $628.51 is quite reasonable. Class Counsel's lodestar through September 1, 2021, is $668,221. Should the Court award the requested attorneys' fees, Class Counsel would receive a multiplier of 1.34 based on their current lodestar. However, Class Counsel anticipates spending 100 additional hours before final approval, thus lowering the lodestar multiplier to approximately 1.22.

28. Attached hereto as **Exhibit 3** is an itemized listing of each out-of-pocket expense my firm incurred in this case. These expenses are reflected in the records of Bursor & Fisher, and were necessary to prosecute this litigation. All expenses were carefully and reasonably expended, and they reflect market rates for various categories of expenses incurred. Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

29. To date, Bursor & Fisher has expended $4,201.00 in out-of-pocket expenses in connection with the prosecution of this action. The out-of-pocket expenses incurred by my co-counsel Hattis & Lukacs, totaling $3,653.30, are attached to the separate Declaration of Daniel Hattis filed herewith. Thus, the total expenses of Class Counsel incurred in this case is $7,854.30.

30. Included within **Exhibit 2** is a chart setting forth the hourly rates charged for lawyers and staff at my firm. Based on my knowledge and experience, the hourly rates charged by my firm are within the range of market rates charged by attorneys of equivalent experience, skill, and expertise. These are the same hourly rates that we charge to our regular hourly clients who

have retained us for non-contingent matters, and which are paid by those clients. As a matter of firm policy, we do not discount our regular hourly rates for non-contingent hourly work, which has historically comprised approximately 10% of our revenue. In determining my firm's hourly rates from year to year, my partners and I have consciously taken market rates into account and have aligned our rates with the market.

31. Through my practice, I have become familiar with the non-contingent market rates charged by attorneys in throughout the United States. This familiarity has been obtained in several ways: (1) by litigating attorneys' fee applications; (2) by discussing fees with other attorneys; (3) by obtaining declarations regarding prevailing market rates filed by other attorneys seeking fees; and (4) by reviewing attorneys' fee applications and awards in other cases, as well as surveys and articles on attorneys' fees in the legal newspapers and treatises. The information I have gathered shows that my firm's rates are in line with the non-contingent market rates charged by attorneys of reasonably comparable experience, skill, and reputation for reasonably comparable class action work. In fact, comparable hourly rates have been found reasonable by various courts for reasonably comparable services, including:

　　i. *In re Anthem, Inc. v. Data Breach Litig.*, 2018 WL 3960068, at *16-17 (N.D. Cal. Aug. 17, 2018), a data breach class action, in which the court found hourly rates between $400 to $975 per hour to be reasonable.

　　ii. *In re Animation Workers Antitrust Litig.*, 2016 WL 6663005, at *6 (N.D. Cal. Nov. 11, 2016), an employment antitrust class action, in which the court found hourly rates between $845 and $1,200 per hour to be reasonable for the lead class counsel.

　　iii. *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 2423161, at *9 (N.D. Cal. June 5, 2017), an employment antitrust class action, in which the court found hourly rates between $870 and $1,200 per hour to be reasonable for the lead class counsel.

　　iv. *Rainbow Bus. Solutions v. MBF Leading LLC*, 2017 WL 6017884, at *1 (N.D. Cal. Dec. 5, 2017), a class action concerning credit card fraud, in

which the court found hourly rates between $275 and $950 per hour to be reasonable.

  v. *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07 1827 SI, MDL, No. 1827 (N.D. Cal. 2013), an antitrust class action, in which the court found blended hourly rates of $1000, $950, $861, $825, $820, and $750 per hour reasonable for the lead class counsel.

  vi. *Loretz v. Regal Stone, Ltd.*, 756 F. Supp. 2d 1203, 1211 (N.D. Cal. 2010), a class action concerning claims resulting from an oil spill, in which the court found hourly rates of between $775 and $900 per hour to be reasonable for lead trial counsel.

  vii. *Luquetta v. The Regents of the Univ. of California*, San Francisco Superior Ct. No.CGC-05-443007, Order Granting Plaintiff's Motion for Common Fund Attorneys' Fees and Expenses, filed October 31, 2012, a class action to recover tuition overcharges, in which the court found the hourly rates of $850, $785, $750, and $700 reasonable for plaintiffs' more experienced counsel.

  viii. *Pierce v. County of Orange*, 905 F. Supp. 2d 1017 (C.D. Cal. 2012), a civil rights class action brought by pre-trial detainees, in which the court approved a lodestar-based, *inter alia*, on 2011 rates of $850 and $825 per hour.

  ix. *Californians for Disability Rights v. California Dep't of Transp.*, 2010 WL 8746910 (N.D. Cal. Dec. 13, 2010), *report and recommendation adopted sub nom.*, 2011 WL 8180376 (N.D. Cal. Feb. 2, 2011), a class action in which the court found reasonable 2010 hourly rates of up to $835 per hour.

  x. *Credit/Debit Card Tying Cases*, San Francisco County Superior Court, JCCP No. 4335, Order Granting Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards, filed August 23, 2010, an antitrust class action, in which the court, before applying a 2.0 lodestar multiplier, found reasonable

        2010 hourly rates of $975 for a 43-year attorney, $950 for a 46-year attorney, $850 for 32 and 38 year attorneys, $825 for a 35-year attorney, $740 for a 26-year attorney, $610 for a 13-year attorney, and $600 for a 9-year attorney, and $485 for a 5-year attorney.

    xi. *Qualcomm, Inc. v. Broadcom, Inc.*, 2008 WL 2705161 (S.D. Cal. 2008), in which the court found the 2007 hourly rates requested by Wilmer Cutler, Pickering, Hale & Dorr LLP reasonable; those rates ranged from $45 to $300 for staff and paralegals, from $275 to $505 for associates and counsel, and from $435 to $850 for partners.

32. The reasonableness of my firm's hourly rates is also supported by several surveys of legal rates, including the following:

    i. In an article entitled "On Sale: The $1,150-Per Hour Lawyer," written by Jennifer Smith and published in the Wall Street Journal on April 9, 2013, the author describes the rapidly growing number of lawyers billing at $1,150 or more revealed in public filings and major surveys. The article also notes that in the first quarter of 2013, the 50 top-grossing law firms billed their partners at an average rate between $879 and $882 per hour. A true and correct copy of this article is attached hereto as **Exhibit 4**.

    ii. In an article published April 16, 2012, the Am Law Daily described the 2012 Real Rate Report, an analysis of $7.6 billion in legal bills paid by corporations over a five-year period ending in December 2011. A true and correct copy of that article is attached hereto as **Exhibit 5**. That article confirms that the rates charged by experienced and well-qualified attorneys have continued to rise over this five-year period, particularly in large urban areas like the San Francisco Bay Area. It also shows, for example, that the top quartile of lawyers bill at an average of "just under $900 per hour."

    iii. Similarly, on February 25, 2011, the Wall Street Journal published an on-line article entitled "Top Billers." A true and correct copy of that article is

attached hereto as **Exhibit 6**. That article listed the 2010 and/or 2009 hourly rates for more than 125 attorneys, in a variety of practice areas and cases, who charged $1,000 per hour or more. Indeed, the article specifically lists *eleven* (11) Gibson Dunn & Crutcher attorneys billing at $1,000 per hour or more.

    iv. On February 22, 2011, the ALM's Daily Report listed the 2006-2009 hourly rates of numerous San Francisco attorneys. A true and correct copy of that article is attached hereto as **Exhibit 7**. Even though rates have increased significantly since that time, my firm's rates are well within the range of rates shown in this survey.

    v. The Westlaw CourtExpress Legal Billing Reports for May, August, and December 2009 (attached hereto as **Exhibit 8**) show that as far back as 2009, attorneys with as little as 19 years of experience were charging $800 per hour or more, and that the rates requested here are well within the range of those reported. Again, current rates are significantly higher.

    vi. The National Law Journal's December 2010, nationwide sampling of law firm billing rates (attached hereto as **Exhibit 9**) lists 32 firms whose highest rate was $800 per hour or more, eleven firms whose highest rate was $900 per hour or more, and three firms whose highest rate was $1,000 per hour or more.

    vii. On December 16, 2009, The American Lawyer published an online article entitled "Bankruptcy Rates Top $1,000 in 2008-2009." That article is attached hereto as **Exhibit 10**. In addition to reporting that several attorneys had charged rates of $1,000 or more in bankruptcy filings in Delaware and the Southern District of New York, the article also listed 18 firms that charged median partner rates of from $625 to $980 per hour.

    viii. According to the National Law Journal's 2014 Law Firm Billing Survey, law firms with their largest office in New York have average partner and

associate billing rates of $882 and $520, respectively. Karen Sloan, *$1,000 Per Hour Isn't Rare Anymore; Nominal Billing Levels Rise, But Discounts Ease Blow*, National Law Journal, Jan. 13, 2014. The survey also shows that it is common for legal fees for partners in New York firms to exceed $1,000 an hour. *Id.* A true and correct copy of this survey is attached hereto as **Exhibit 11**.

33. My hourly rate is set at $725, which is the same rate that my firm charges to clients who retain us on an hourly basis, and which we never discount.

34. No court has ever cut my firm's fee application by a single dollar on the ground that our hourly rates were not reasonable.

35. My firm undertook this representation on a wholly contingent basis recognizing that the risk of non-payment has been high throughout this litigation. There were substantial uncertainties in the viability of this case as a class action, as well as substantial uncertainties in the merits of the underlying claims, and the ability to collect on any judgment that might be obtained. Although we believed the case to be meritorious, a realistic assessment shows that the risks inherent in the resolution of the liability issues, protracted litigation in this action as well as the probable appeals process, are great.

36. Had we not resolved this matter through settlement, we would have vigorously prosecuted the case through class certification, summary judgment, trial, and appealed any determinations that may have been adverse to the Class's interests. We were therefore at great risk for non-payment. In addition, as described above, we have advanced expenses that would not have been reimbursed absent a successful result.

37. Based on our lodestar, the blended hourly rate that my firm billed to this matter is $516.56 per hour for 431.9 hours of work. This relatively modest blended rate resulted from my practice of assigning appropriate work to more junior lawyers who bill at lower hourly rates in order to minimize fees for the Class, wherever possible. Approximately 32% of hours my firm worked on this case was billed by attorneys or paralegals billing at $325 per hour and under. However, this was a complex case that required significant settlement negotiations, which required

significant involvement by a more experienced lawyer. I was the primary partner at Bursor & Fisher who billed any time on this case. I billed approximately 40% of the total hours Bursor & Fisher billed on this case, primarily on developing the litigation strategy and negotiating the settlement.

**IV. THE CLASS REPRESENTATIVES' ROLE IN THIS LITIGATION**

38. Pursuant to the Settlement Agreement, Plaintiffs are permitted to request approval of an incentive award up to $2,500 each for their service.

39. The involvement of the Court-appointed Class Representatives was critical to the prosecution of the case. Throughout the litigation, the Class Representatives held regular meetings with Class Counsel by phone and through email to receive updates on the progress of the case and to discuss strategy. They assisted in Class Counsel's pre-suit investigation by discussing their experiences, and they assisted in drafting the complaints that have been filed in this action, and they reviewed the complaints for accuracy before they were filed.

40. The Class Representatives were intimately involved in the settlement process, and have continued to keep abreast of settlement progress to date. Thus, Plaintiffs were actively involved in the litigation and devoted substantial time and effort to the case.

41. The Class Representatives were prepared to litigate this case to a verdict if necessary. Their actions and dedication played a significant role in this case and helped achieve the exceptional settlement that will benefit more than 170,000 class members. In light of their contributions and efforts, an incentive award of $2,500 to each of the Class Representatives is appropriate and should be approved.

I declare under penalty of perjury under the laws of the United States and the States of New York and California that the foregoing is true and correct. Executed on September 6, 2021 at New York, New York.



Yitzchak Kopel